**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

| | |
|---|---|
| JANE ROE<br>c/o ENGEL & MARTIN, LLC<br>4660 DUKE DRIVE<br>SUITE 101<br>MASON, OH 45040,<br><br><br>KAREN SOE<br>c/o ENGEL & MARTIN, LLC<br>4660 DUKE DRIVE<br>SUITE 101<br>MASON, OH 45040<br>Plaintiff,<br><br>v.<br><br>THE UNIVERSITY OF CINCINNATI,<br>2600 CLIFTON AVENUE<br>CINCINNATI, OH 45220,<br><br>Defendant | Case No. 1:22-cv-376<br><br>Judge:<br><br><br>COMPLAINT<br><br>AND<br><br>JURY DEMAND |

**INTRODUCTION**

1. Plaintiffs Jane Roe and Karen Soe bring this action for violation of Title IX. The Title IX claim in this action is based on a deliberate indifference theory.

2. This case arises out of the efforts of administrators at the University of Cincinnati ("UC") and its College-Conservatory of Music ("CCM") to protect a 'star' male ballet dancer at the expense of numerous female ballet dancers. During practices and performances, the male student touched his partners inappropriately. UC was deliberately indifferent to the harassment suffered by these women. When UC learned of this conduct, the school did the bare minimum and failed to take adequate steps to assure that the victims were protected.

1

**PARTIES**

3.  Jane Roe is an undergraduate student at the CCM.

    a.  Roe has a permanent residence in [REDACTED], Michigan.

    b.  Roe has paid a significant amount of money to UC and CCM in the expectation of receiving an education and, if she successfully completes her classwork, a degree.

    c.  The disclosure of Jane Roe's identity will cause the student irreparable harm as this case involves matters of the utmost personal intimacy, including education records protected from disclosure by the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g; 34 CFR Part 99.

4.  Karen Soe is an undergraduate student at the CCM.

    a.  Soe has a permanent residence in [REDACTED], Kentucky

    b.  Soe has paid a significant amount of money to UC and CCM in the expectation of receiving an education and, if she successfully completes her classwork, a degree.

    c.  The disclosure of Karen Soe's identity will cause the student irreparable harm as this case involves matters of the utmost personal intimacy, including education records protected from disclosure by the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g; 34 CFR Part 99.

5.  Defendant UC is a public university created by the Ohio Legislature.

    a.  UC has a principal place of business at 2600 Clifton Avenue, Cincinnati, OH 45220. Under Ohio Revised Code 3361.01, the University of Cincinnati's Board of Trustees is the governing body of the University of Cincinnati.

    b.  UC voluntarily participates in federal spending programs.

    c.  CCM is part of UC. CCM refers to itself as a "preeminent institution for the performing and media arts." CCM offers nearly 120 majors, along with a wide variety of pre-collegiate

and post-graduate programs. CCM offers a ballet program intended for dancers seeking top-level training and a rigorous artistic, academic, and studio curriculum. Ballet students are encouraged to dance with professional companies while pursuing a degree, as well as to study abroad for international performances.

## JURISDICTION AND VENUE

6. This case arises under the laws of the United States, specifically Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. § 1681 *et seq.*, Accordingly, this Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1331 and 1343.

7. This Court is an appropriate venue for this cause of action pursuant to 28 U.S.C. § 1391. The defendant is a resident of the State in which this district is located and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## FACTS

8. This case is one of many amidst a continuing national controversy about the responses of colleges and universities to alleged sexual assaults and sexual misconduct on campuses.

**UC's Response To The Problem Of Sexual Misconduct On Campus**

9. UC has adopted various policies and procedures to respond to allegations of sexual assault on campus in direct response to pressure from the U.S. Education Department's Office of Civil Rights ("OCR") related to the enforcement of Title IX.

10. On April 11, 2011, OCR sent a "Dear Colleague Letter" to colleges and universities. The Dear Colleague Letter indicated that, in order to comply with Title IX, colleges and universities must have transparent, prompt procedures to investigate and resolve complaints of sexual misconduct. After the Dear Colleague Letter was published, many schools changed their sexual assault and sexual harassment policies and procedures in a manner that, while not completely ignoring due process concerns, shifted the focus more on victim advocacy.

11. The Obama administration, through OCR, pressured colleges and universities to aggressively pursue investigations of sexual assaults on campuses.  The "Dear Colleague" letter was a step in the increased enforcement of Title IX on colleges and universities. NPR described the Dear Colleague Letter as the government's "first warning shot."  Source:  *How Campus Sexual Assaults Came to Command New Attention*, NPR, August 12, 2014.  In February 2014, Catherine E. Lhamon, the assistant secretary of education who heads the department's Office for Civil Rights, told college officials attending a conference at the University of Virginia that schools need to make "radical" change.

12. Colleges and universities, including UC, were scared of being investigated or sanctioned by the Department of Education and/or of potential Title IX lawsuits by the Department of Justice. According to the Chronicle of Higher Education, college presidents suggested afterward that there were "crisp marching orders from Washington."  Source:  *Colleges Are Reminded of Federal Eye on Handling of Sexual-Assault Cases*, Chronicle of Higher Education, February 11, 2014.

   a. The Federal government has created a significant amount of pressure on colleges and universities to treat all those accused of sexual misconduct with a presumption of guilt. The Chronicle of Higher Education noted, "Colleges face increasing pressure from survivors and the federal government to improve the campus climate."  Source:  *Presumed Guilty: College men accused of rape say the scales are tipped against them,* Chronicle of Higher Education, September 1, 2014.

   b. The White House issued a report entitled "Not Alone" in April 2014, which included a warning that if the OCR finds that a Title IX violation, the "school risks losing federal funds" and that the DOJ shares authority with OCR for enforcing Title IX, and may initiate an investigation or compliance review of schools, if a voluntary resolution cannot be reached, the DOJ may initiate litigation.  In July 2016, then-Vice President Biden

4

suggested that schools that do not comply with administration guidelines could be stripped of federal funding. Source: *Obama, Biden Won't Visit Universities That Fall Short In Addressing Sexual Assault*, Huffington Post, July 4, 2016 ("The vice president said he'd like to take away federal funding from those universities.")

13. A backlash followed and the Trump Administration changed directions radically in favor of accused students. On September 22, 2017, the Department of Education withdrew the Dear Colleague Letter and indicated its intent to issue new guidance "through a rulemaking process that responds to public comment." Letter from Office for Civil Rights, U.S. Dep't of Educ. (September 22, 2017). (Available at https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf )

    a. In withdrawing the Dear Colleague Letter, OCR observed that prior actions "may have been well-intentioned, but . . . led to the deprivation of rights for many students—both accused students denied fair process and victims denied an adequate resolution of their complaints." *Id.* at 1-2.

    b. OCR further said: "Legal commentators have criticized the 2011 Letter . . . for placing "improper pressure upon universities to adopt procedures that do not afford fundamental fairness." As a result, many schools have established procedures for resolving allegations that "lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation." *Quoting Open Letter From Members Of The Penn Law School Faculty: Sexual Assault Complaints: Protecting Complainants And The Accused Students At Universities*, Feb. 8, 2015; *Rethink Harvard's Sexual Harassment Policy*, Boston Globe (Oct. 15, 2014) (statement of 28 members of the Harvard Law School faculty).

14. On May 6, 2020, the Department of Education released a Final Rule under Title IX of the Education Amendments of 1972.  The Final Rule, *inter alia*, prescribes a transparent grievance process that treats accused students as innocent until proven guilty, requires the school to state a standard of evidence, and requires the school to provide a hearing process where accused students may question adverse witnesses.  The Final Rule carried the force and effect of law as of August 14, 2020.

15. The Biden Administration proposed new rules in an effort to repeal the 2020 rules.  During the presidential campaign, President Biden vowed to scrap the Trump administration's new regulation on campus sexual misconduct; in March 2021, the President signed an executive order directing Education Secretary Miguel Cardona to review and consider rewriting the regulation.  Lhamon has been re-installed in her prior office.

16. Despite recent efforts of the Biden Administration to restore Obama administration enforcement priorities, recent years has continued to see a backlash to the efforts to hold accused students accountable.   In many instances, accused students, not just alleged victims, have filed complaints with OCR.  A student note in the UC Law Review states:

> Despite mechanisms by both the OCR and the courts, enforcement remains erratic, and school liability for Title IX infractions is not guaranteed. Part of the problem lies in the pendulum swing of enforcement as various Presidents' administrations have expanded and contracted Title IX, changing the various harms for which students can recover and the rules governing how the Title IX regulations should be applied.

Keeley B. Gogul, *The Title IX Pendulum: Taking Student Survivors Along for the Ride*, 90 U. Cin. L. Rev. (2022).

17. UC has a pattern and practices of both not taking allegations of sexual assault against female students seriously, and not respecting the due process rights of both accused students and alleged victims.

6

a. On information and belief, UC has been the subject of a number of investigations by the Department of Education for the manner in which it investigates and adjudicates allegations of sexual assault and harassment.

b. Two students who founded a group at UC called "Students for Survivors" said, the UC "administration was going to pretend to care as much as they had to." *UC Has Failed Sexual Assault Victims*, December 9, 2017 (https://www.hercampus.com/school/cincinnati/uc-has-failed-sexual-assault-victims/).

c. According to the student newspaper, UC has been attempting to minimize coverage of sexual assault on campus. The Student newspaper reviewed records showing that "24 on-campus rapes were reported to UC officials in 2018 and 2019, but the Department of Public Safety issued five crime alerts – just 21% of all reported rapes for both years." *A Troubling Trend: As on-campus rape reports rise, UC continues to issue few alerts*, News Record, April 15, 2021 (https://www.newsrecord.org/news/a-troubling-trend-as-on-campus-rape-reports-rise-uc-continues-to-issue-few-alerts/article_743241da-9e57-11eb-bc39-c7bc652c9b61.html).

18. UC has adopted a "UC Title IX Grievance Procedure for Students and Third Parties." This is referred to as the "Sexual Misconduct Policy." Further proceedings and hearings are held in accordance with the UC Student Code of Conduct, codified at O.A.C. 3361: 40-5-05. (The Code of Conduct was revised in November 2020.) If the respondent chooses to contest responsibility, UC holds an administrative hearing before "a pool of faculty and staff who receive training at least annually on sexual violence, sexual harassment, and the requirements of Title IX." (Sexual Misconduct Policy, §IV(7).) At the hearing, the student is entitled to present evidence and examine adverse witnesses.

19. Both the respondent and the complainants have the right to appeal findings or responsibility and sanctions. (Sexual Misconduct Policy, §VIII.)

20. UC has been sued successfully by a number of students accused of misconduct. Both federal and state courts have issued preliminary injunctions finding that UC has violated its own policies and the procedural due process rights of students accused of misconduct.

**Jane Roe And Karen Soe Are Touched Inappropriately By John Doe During Rehearsals And UC's Deliberate Indifference**

21. Jane Roe is an undergraduate student at UC. She is a student in the CCM ballet program. She has performed in ballets including *Paquita* and *Serenade*. She has also performed with touring companies.

22. Karen Soe is an undergraduate student at CCM. She is a student in the CCM ballet program. She has performed in ballets such as *La Bayadere* and *Death and the Maiden*.

23. John Doe was an undergraduate student at UC. He is a student in the CCM ballet program. John Doe was considered to be a star performer at CCM.

    a. On information and belief, John Doe received a scholarship from CCM. John Doe also received favored and starring roles in many productions.

    b. John Doe was featured in a number of CCM's productions, including *Cinderella, En Tournee, Virosa, Serenade*, and *Paquita*. John Doe had been featured in a video produced by Cincinnati Ballet. The website hosting the video states, "To have the natural talent to pursue your dream is a privilege. But to seize an opportunity and take an active role in shaping your future is truly a gift." CCM's official Twitter account linked to the story, stating, "[John Doe] found his passion for dance at @CincyBallet's CincyDance! program. Now he's pursuing his degree at CCM. Watch his story in the link below."

24. John Doe had been accused of sexual misconduct by other female dancers at Cincinnati Ballet prior to his enrollment at UC. This included, in information and belief, at least one student who

8

sought a protection order in Hamilton County Common Pleas Court. The accusations against John Doe were common knowledge in the Cincinnati dance community and, on information and belief, CCM faculty were aware of the allegations.

25. Karen Soe first danced with John Doe when she was approximately 15 years old. Karen Soe had partnered with John Doe at the Cincinnati Ballet. During that time, John Doe inappropriately touched Karen Soe's breasts and buttocks during practices. Karen Soe did not report the misconduct because she was young and inexperienced and did not appreciate the severity of John Doe's conduct.

26. While enrolled at UC, Karen Soe would see John Doe on campus. His presence made her feel uncomfortable but, at the time, she did not believe she was able to take any further actions because she did not dance with him during her first years on campus.

27. In 2019, John Doe approached Jane Roe and partnered with her during a rehearsal. This was unusual and unnecessary because Jane Roe was an understudy for that role in an upcoming performance. This type of behavior was something John Doe did often with other female dancers; he would just start partnering without speaking to the dancer or asking for consent.

28. In March 2020, Karen Soe told Professor Dierdre Carberry about her history with John Doe at Cincinnati ballet. Prior to this, Jane Roe had also spoken to Carberry about her concerns about John Doe based on reports of his prior conduct. Carberry indicated to Jane Roe that she was aware of other incidents happening at CCM; Carberry even asked about John Doe's romantic relationship with another student because she was worried about John Doe abusing his girlfriend.

29. On information and belief, Carberry discussed the allegations against John Doe and the concerns of students with the UC Title IX office. The UC Title IX Office told Carberry to "stay out of it" and that it was in her best interest to "leave it alone."

30. Later in Fall 2021, Jane Roe was cast in one of the lead roles for a performance and John Doe was assigned to be her partner.

31. On September 2, 2021 John Doe inappropriately placed his hand close to Jane Roe's breast during a ballet lift. John Doe's hands then touched Jane Roe's breasts on a number of occasions. Jane Roe, based on her experience as dancer, did not believe that John Doe had acted accidently. His fingers were improperly spread out and reaching upwards. John Doe's hands would 'slide up,' push Jane Roe's breasts in, and touch her nipples. Jane Roe did not pursue a complaint at this time because she did not want to cause trouble and was willing to give John Doe the benefit of the doubt – she thought that John Doe didn't know what he was doing. She later indicated to an investigator, it is "always awkward the first time you're partnered" with someone "especially dealing with weight placement."

32. On September 7, 2021 John Doe's inappropriate hand placement started to become more noticeable, unnecessary, and intentional, particularly while Jane Roe and John Doe were doing turns or bigger lifts. Jane Roe told John Doe that his hand "should be lower, not that high, should be on the hip…" When corrected, John Doe would temporarily modify his hand placement. But he soon returned to inappropriate hand placement, especially when others were not looking.

33. On September 14, 2021 John Doe again inappropriately touched Jane Roe during a practice. John Doe touched Jane Roe's breasts and lowered Jane Roe from lifts very slowly, rubbing the back of Jane Roe's body against the front of John Doe's body. Jane Roe's back side would touch John Doe's body at the chest and slide down the front of John Doe's body until Jane Roe's feet were on the floor. Jane Roe could feel John Doe's penis slide along her back as John Doe lowered her. Jane Roe later told an investigator that when John Doe "dragged" her down the front of his body she "wanted to physically jump out of his arms."

10

34. During the September 14, 2021 practice, Carberry noticed some of the inappropriate touching and addressed it with Jane Roe and John Doe, saying ""That hand was way too high." Carberry turned to Jane Roe and asked, "Are you ok?."

35. On September 21, 2021, despite the knowledge of UC instructors, John Doe continued to touch Jane Roe inappropriately during practices.

36. On September 28, 2021, despite the knowledge of UC instructors, John Doe again inappropriately touched Jane Roe while lowering her from a lift. As this time, Jane Roe concluded that John Doe's conduct was definitely intentional. Jane Roe felt like she needed to leave and wanted to talk to someone immediately. After class, Jane Roe again spoke to Carberry about John Doe's conduct. Jane Roe initially blamed herself. She started the conversation by apologizing to Carberry for her "mindset and energy" that day. She later told an investigator that she remembered "feeling defeated" and not "in control" when partnered with John Doe. The conversation with Carberry was brief and Jane Roe informed Carberry that she wanted to talk further about the issue soon.

37. On October 5, 2021, John Doe, despite the knowledge of UC instructors, again inappropriately touched Jane Roe's breasts and rubbed her body against his penis when lowering her from lifts. By this time, the stress and anxiety from partnering with John Doe caused Jane Roe to have to leave the classroom. She was so upset that she had a nosebleed.

38. On October 6 2021. Jane Roe met with Carberry and Shauna Steele, the Chair of Dance Department to discuss John Doe. At this meeting Jane Roe again described John Doe's inappropriate conduct and asked what steps could be taken to protect her in class.

39. Jane Roe and Karen Soe discussed John Doe's conduct and discovered that they had been subjected to similar harassment. At one point, Karen Soe texted to Jane Roe: "You could put me down as a fellow victim if that's an option."

40. On October 8, 2021, Jane Roe and Karen Soe met with Denton Yockey, the Head of the Division of Theatre Arts, Production and Arts Administration.

    a. During this meeting, Jane Roe and Karen Soe described John Doe's inappropriate touching. Yockey said would he file a Title IX report. He said, "I've never had to do that before…"

    b. During this meeting, Karen Soe informed Yockey that John Doe had previously touched her inappropriately. Karen Soe asked to also be listed as a victim of John Doe when she met with Yockey.

    c. Later that day, the UC Office of Gender Equity & Inclusion received a report from Yockey stating UC Student John Doe had repeatedly touched UC Student Jane Roe inappropriately while dancing in partnering class or in the fall dance concert. The report from Yockey did not mention Karen Soe; the report filed by Yockey listed only Jane Roe as a victim.

41. On October 14, 2021 Jane Roe again met with Carberry and Steele to discuss John Doe's conduct. This time, she was accompanied by Karen Soe. The two women described John Doe's inappropriate conduct in more detail.

    a. The prior allegations against John Doe were discussed. Carberry shrugged when asked about prior reports of misconduct by John Doe at Cincinnati Ballet.

    b. Jane Roe and Karen Soe asked that John Doe be removed from the partnering class. Steele said no because "he is paying for the class." Instead, Jane Roe and Karen Soe were told that if they ever felt "uncomfortable" they could "just walk out of class without explaining." Steele also promised to alert the rest of the faculty about the allegations. Steel said, "if you're uncomfortable, you don't have to partner with him. We will try to find some way to make sure you're both still having some rehearsals, but no partnering."

12

     c.   Carberry and Steel did not place any restrictions on John Doe; all of the obligation to avoid inappropriate contact from John Doe was placed on Jane Roe and Karen Soe.

42. On October 19, 2021, Jane Roe and her mother met with Steel and Yockey.  They discussed ways to keep John Doe way from Jane Roe.  Steel and Yockey declined to take any further actions against John Doe.  Yockey said, "We don't know anything about Title IX and we can't do anything.  It's up to them."

43. On October 22, 2021 – after the meeting with Yockey and with the full knowledge of UC instructors – Karen Soe was required to partner with John Doe in class.

     a.   Karen Soe panicked.  She did not want to make a scene and believed that the instructors had been informed by Steele about her concerns.

     b.   During this practices John Doe touched Karen Soe inappropriately.  John Doe inappropriately touched Karen Soe's breasts and buttocks.  John Doe lifted Karen Soe over his head and slowly brought her down the front of his body.  This move was particularly inappropriate because the class was not practicing lifts at the time.  On one occasion during partnering class, John Doe and Karen Soe did a step called a "fish," during which John Doe brought up the front of his body and then slowly back down so that and their bodies made contact.  John Doe did the lift the wrong way, resulting in Karen Soe being dragged slowly down John Doe's body and penis.  When she questioned John Doe, John Doe said it was an accident and blamed it on Karen Soe's height.

     c.   Karen Soe did not report the matter because Jane Roe had told her that she was seeking a protective order that could lead to John Doe's exclusion from the class.  Karen Soe had also observed UC's inappropriate responses and did not believe that the school would take sufficient action.

44. On October 25, 2021, a Mutual No Contact Order was issued by UC for Jane Roe.  This No Contact Order prohibited social media and direct conflicts but did not prevent John Doe from being in the same dance class as Jane Roe.  Worse, the No Contact order put the obligation on Jane Roe, as much as John Doe, to avoid contact in class.  The No Contact Order states:

> Neither party is barred from accessing any part of the university's programs or activities, however reasonable action is required to adhere to this order. For example, if there is occasion for both parties to access the same room or other physical space of the university, it is the responsibility of both parties to select the least intrusive means of sharing the space. Both parties must make every effort in preventing their direct partnerships within shared university programs and activities.

45. The No Contact Order was insufficient and impracticable; it failed to adequately ensure that Jane Roe could fully participate in classes.  On information and belief, UC used a "standard form" no contact order that failed to account for the peculiar relationship between dancers in a classes.

46. UC never issued a No Contact Order prohibiting John Doe from having contact with Karen Soe. As a result, Karen Soe continued to have classes with John Doe.  On several occasions, Karen Soe felt so uncomfortable she had to leave the class and, as a result, did not receive instruction.

47. Investigator Shannon Schipper met with Jane Roe on three occasions.  Following those meetings, Jane Roe filed a Formal Complaint on October 21, 2021 alleging that on September 2, 7, 14, 21, 24, 28, and 30, 2021 and October 5, 2021, during pas de deux rehearsals and partnering classes on UC campus, John Doe inappropriately touched Jane Roe's breasts and rubbed Jane Roe's body against John Doe's body without Jane Roe's consent.

48. Jane Roe did not believe that the No Contact Order provided sufficient protection because John Doe would still be in her classes.    On November 1, 2021, Jane Roe filed for, and received, an *ex parte* Order of Protection from the Hamilton County Common Pleas Court.  This protection order remained in place through the rest of the 2021-2022 school year.

49. The UC investigator met with Karen Soe.  During this meeting Karen Soe described her experiences with John Doe.

14

a. Karen Soe told the investigator about John Doe's conduct during class on October 22, 2021. Karen Soe indicated to the UC investigator that she wished to be listed as a victim and to pursue a complaint.  This request was refused.

b. In November 2021, Karen Soe provided a written statement to the investigator.  In the statement, she again described the October 22, 2021 incident.  She wrote,

> "I told [Jane Roe] that she could list me as a fellow victim on her report, because I am one, and have been for years, and I felt that it was important to note for the Title IX investigation that what [John Doe] did to [Jane Roe] was a pattern of behavior, and not a one time incident or "accident."

50. Another student, ▮, was interviewed by the investigator. ▮ told the investigator that she was aware of general concerns about John Doe's technique and that John Doe is "constantly holding [Jane Roe] and other females in the wrong positions… causing contact with private areas and causing discomfort." ▮ told the investigator that John Doe's hands "slide to the inner pelvis area" in some positions or "under the breasts" in other positions. ▮ stated that while watching Jane Roe and Respondent practicing, ▮ believed John Doe was not using correct hand placement. ▮ submitted a screenshot of a text message in which ▮ stated to Jane Roe "I briefly said to [John Doe] like hey you have to hold her lower cause it looks bad, and he was like yeah I know.'

51. A student, ▮, was interviewed by the Title IX investigator. ▮ told the investigator that while she never actually witnessed inappropriate touching by John Doe, she could tell that Jane Roe was upset by what had been happening in class. ▮ stated that twice Jane Roe "came out crying" and once "gave herself a nosebleed."  She confirmed that Jane Roe had described John Doe touching her breasts and "rubbing his body down her body."

52. Carberry was interviewed by the Title IX investigator.  Carberry was not asked to confirm that she had observed inappropriate touching by John Doe in class.  Carberry, despite her obvious conflict of interest (as the instructor in the class, Carberry could be liable if inappropriate conduct

occurred), instead was asked by the investigator to "serve as an expert witness for this investigation to provide appropriate knowledge of ballet technique and discernment of hand placement." Carberry was shown 6 images of dancers provided by Jane Roe or witnesses.  Carberry stated her opinion to the investigator that in the images, the hand placement by John Doe was "not inappropriate" and suggested that the dancers "are awkward."

53. A student, ███, was interviewed by the investigator. ███ stated that she had taken videos of some rehearsals.  When she showed one of the videos to Jane Roe, Jane Roe said, "this is the picture that you took – it captured the moment where" John Doe touched her inappropriately.

54. A student, ███, was interviewed by the investigator at the request of John Doe. ███ stated that he never saw inappropriate touching, but suggested that Jane Roe and other women wore "silky" leotards that made his hands slide around when partnering.

55. John Doe was interviewed by the investigator.  He said that any inappropriate touching was an accident or mistake.

   a. John Doe tried to explain his conduct by suggesting that Jane Roe consistently wore "slippery leotards" and tutus, which made it difficult to maintain appropriate hand placement.  He said, "men's hands sweat a lot" and some materials can "act like glue" when they come in contact with sweaty hands, while other materials can become slick.

   b. John Doe claimed that when he first introduced himself to Jane Roe at a rehearsal, John Doe asked "may I partner you" and "may I touch you for rehearsal," and told Jane Roe "if you feel uncomfortable" or "if anything hurts in lifts" to tell John Doe so that he can put Jane Roe down "safely" and "comfortably."

   c. John Doe generally denied Jane Roe's allegations.  He stated that he did not recall touching Jane Roe's breasts and could not recall any specific incidents in which his hands touched Jane Roes breasts or were near Jane Roe's breasts.

16

      d. John Doe acknowledged that Jane Roe had complained to the Carberry.  He said that Carberry told John Doe his hand was too high.

      e. John Doe acknowledged that Jane Roe left the room crying during one class after a lift.

56. A student, █, was interviewed by the investigator.  HP had previously partnered with John Doe and complained that his hands were too high.  When asked if John Doe's hands could have slipped by accident, █ said that slipping often happens when partners are taller or smaller than one another, however John Doe's "hands felt… more forceful."  HP said that John Doe  "apologized and said he would grab lower" and that an instructor corrected John Doe.

57. On April 1, 2021 UC conducted a hearing on Jane Roe's claims against John Doe.

58. The April 1, 2021 hearing contained a number of procedural errors and deficiencies that had the effect of helping John Doe.

      a. The UC conduct office was biased in favor of John Doe.  The UC administrator responsible for conducting the hearing was hostile to Jane Roe and her advisor, family, and witnesses.  In contrast, the UC administrator was observed conduct officer being friendly with John Doe, including shaking his hand.

      b. The hearing panel relied on the expert opinion of Carberry contained in the investigative report.  The UC investigator selected some photos and videos for Carberry to review.

        i. On information and belief, Carberry viewed the photographs and videos out of context and failed to consider evidence of prior misconduct by John Doe that would make a conclusion of mistake or accident far less likely.

        ii. Jane Roe was not given the opportunity to cross-examine Carberry about the basis for her opinions or potential bias.  Had Jane Roe been given the chance to question Carberry, she would have asked questions that called her credibility into question.  For example, Jane Roe would have been able to ask Carberry why she deviated

from the standard of care required of choreographers or ballet masters by failing to adequately protect the safety of personal space for young dancers.

    iii. Other experienced ballet instructors who examined the material have reached different conclusions. One experienced ballet instructor who viewed a video of a ballet performance with Jane Roe and John Doe said, "This ballet is one grab fest after another. If I had been in the audience, I would have been very uncomfortable…" After viewing the same materials reviewed y Carberry, she said, "I am appalled with what these young ladies have had to endure at the hands of this partner."

c. UC permitted John Doe to present witnesses who had not been disclosed in advance in accordance with the requirements of the UC Title IX Policy. As a result, Jane Roe was unable to

d. UC prohibited Jane Roe from presenting witnesses who had relevant information. In particular, UC prohibited witnesses who could have presented evidence of a pattern of conduct by John Doe that negated his defense that the inappropriate touching was accidental. In particular, Karen Soe and ▮ were prohibited from testifying, as well as another student, ▮.

e. The UC hearing officer declined to ask many of the questions submitted by Jane Roe to the witnesses who testified. The UC hearing officer also changed the wording of many questions.

59. John Doe was found "not responsible" by the UC hearing panel. Jane Roe appealed; the appeal was denied. As a result, John Doe faced no disciplinary action.

60. After UC officials learned of the misconduct by John Doe, Jane Roe and Karen Soe continued to suffer denial or abridgement of the educational opportunities or programs provided by the school.

In particular, UC officials were aware that the No Contact Order issued to Jane Roe was ineffective in preventing further negative impacts on Jane Roe and Karen Soe.

    a. Jane Roe's ability to participate in educational activities was negatively impacted by the presence of John Doe. Jane Roe had declining performance, trouble concentrating, and fear of attending school. Jane Roe had a "bad feeling from seeing" John Doe and generally did not go around him." When interviewed by the investigator, she described John Doe as walking around in an intimidating manner and making "weird gestures" such as clenching his fists or banging on items. She said he always looks angry. She was not cast in the same type of roles as before.

    b. Karen Soe's ability to participate in educational activities was negatively impacted by the presence of John Doe. Karen Soe was unable to be cast in a in a classical ballet piece each semester because of presence of John Doe. In Spring 2022, Karen Soe received some of the worst casting in a production of *Gizelle*. When she asked a professor how she was doing, the professor said, "you are dancing really well, but it seems like there is something on." Karen Soe explained the situation; the professor indicated that he had no idea what was going on despite the promises of Carberry and Steele to inform the faculty.

61. The failure of UC to adequately respond to the harassment from John Doe has caused Jane Roe and Karen Soe to be denied the benefits of education at their chosen school. The conduct of UC has damaged Jane Roe and Karen Soe's academic and professional reputations and will affect their ability to find professional employment as ballet dancers. Jane Roe's and Karen Soe's damages include economic damages such as diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, and loss of reputation. Jane Roe and Karen Soe also suffered humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other non-economic damages.

## COUNT I
## (VIOLATION OF TITLE IX – DELIBERATE INDIFFERENCE)

62. Plaintiffs repeat and incorporate all the allegations of this Complaint, as if fully set forth herein.

63. Title IX of the Education Amendments of 1972 is a federal statute designed to prevent sexual discrimination and harassment in educational institutions, like UC, receiving federal funding.  Title IX specifically provides: "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

   a. A federal funding recipient may be liable under Title IX for student-on-student sexual harassment.  *Davis v. Monroe County Board of Education*, 526 U.S. 629, 643 (1999).

   b. Title IX is enforceable through an implied private cause of action.

64. UC and CCM maintained a policy of deliberate indifference to sexual misconduct during rehearsals and performances the result of which was a campus environment that was hostile to women and an elevated risk that they would be subject to sexual harassment.  As a result, Jane Roe and Karen Soe suffered harassment that was so severe, pervasive, and objectively offensive that it can be said to have deprived them of access to the educational opportunities or benefits provided by the school.

65. UC and CCM Officials were, on information and belief, aware of John Doe's history of inappropriately touching female partners.

66. Jane Roe and Karen Soe informed UC and CCM officials on a number of occasions that they were the subject of discriminatory harassment and retaliation from John Doe.

67. UC is liable to Jane Roe and Karen Soe because school officials who had the authority to address the alleged discrimination and to institute corrective measures had actual knowledge of John Doe's conduct and failed to correct such behavior in a manner that amounts to deliberate indifference.

20

a. UC failed to investigate the allegations by Karen Soe that she had been a victim of sexual misconduct by John Doe.  UC failed to take any corrective action to aid Jane Roe, such as the issuance of a no contact order.

b. UC and CCM instructors failed to provide adequate supervision in class, thereby placing female dancers in general, and Jane Roe and Karen Soe in particular, at risk for inappropriate conduct.  UC and CCM instructors were aware, on information and belief, of John Doe's prior inappropriate conduct yet failed to provide sufficient supervision and oversight of classes.

c. Jane Roe and Karen Soe were subjected to a sexually hostile environment; they provided actual notice of the situation to an 'appropriate person,' who was, at a minimum, an official of the educational entity with authority to take corrective action and to end discrimination; and UC's response to the harassment amounted to "deliberate indifference."

d. UC and CCM officials were aware that the standard No Contact Order provided to Jane Roe was insufficient and impracticable.  The No contact Order failed to adequately ensure that Jane Roe could fully participate in classes and permitted John Doe to touch Karen Soe inappropriately.  When faced with an allegation that one dancer assaulted another, UC was required to take more precautions than usual in order to engage in efforts that were reasonably calculated to end the harassment.

e. UC employed a hearing process that had a number of procedural errors and deficiencies. In particular, the hearing panel relied on biased and unreliable expert testimony, failed to permit Jane Roe to cross-examine key witnesses, and prevented Jane Roe from submitting relevant testimony to rebut John Doe's claim of mistake or accident.

68. UC officials and administrators who had the authority to institute corrective measures had actual notice of and failed to correct the misconduct. On information and belief, throughout the

disciplinary proceedings, UC and its agents demonstrated and acted on pervasive gender bias and/or a desire to protect a star performer.

69. Jane Roe and Karen Soe have been deprived of access to educational opportunities at UC.

70. As a direct and proximate result of defendants' violations of Jane Roe's and Karen Soe's rights under Title IX, Jane Roe and Karen Soe have suffered severe and substantial damages. These damages include diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages, in an amount to be determined by a jury and the Court.

71. UC is liable under Title IX to Jane Roe and Karen Soe for their damages.

72. Pursuant to 42 U.S.C. §1988, Jane Roe and Karen Soe are entitled to attorney's fees incurred in bringing this action.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 58, Plaintiff demands a jury trial on any issue triable of right by a jury.

*Wherefore*, Plaintiff seeks the following relief from the Court:

- Judgment in favor of Jane Roe and Karen Soe on all counts.
- Judgment in favor of Jane Roe and Karen Soe awarding damages in an amount to be determined at trial; and
- Court costs and other reasonable expenses incurred in maintaining this action, including reasonable attorney's fees as authorized by 42 U.S.C. §1988.

Respectfully submitted,

_____/s/ Joshua A. Engel_____
Joshua Adam Engel (OH 0075769)
Scott O'Reilly (OH 0075717)
ENGEL AND MARTIN, LLC
4660 Duke Dr., Suite 101
Mason, OH 45040
(513) 445-9600
engel@engelandmartin.com

22