## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| JANE ROE, et al | Case No. 1:22-cv-376 |
| Plaintiffs, | Judge: Matthew W. McFarland |
| v. | |
| UNIVERSITY OF CINCINNATI, | RESPONSE TO MOTION TO DISMISS |
| Defendant | ORAL ARGUMENT REQUESTED |

Plaintiffs respectfully submit this Response to Defendant's Motion to Dismiss the Amended Complaint. (Doc#18.)

Plaintiffs respectfully suggest that the Court would benefit from hearing oral argument in this matter. This case raises an issue of significant concern: deliberate indifference by educational institutions to actionable sexual harassment that occurs after the school's knowledge of the misconduct. Oral argument will assist the Court in its analysis of the disputed issues and will enable counsel to address any questions the Court may have.

**TABLE OF CONTENTS**

FACTS .......................................................................................................................................1

ARGUMENT ...........................................................................................................................7

    A.    Standards ..................................................................................................................7

    B.    The Deliberate Indifference Claim .......................................................................7

          1.    Jane Roe And Karen Soe Suffered Actional Harassment ...........................8

          2.    UC Had Actual Knowledge Of John Doe's Conduct Prior To His Continued Sexual Assaults ..................................................................10

              a.    UC's Title Ix Office Was Informed In March 2020 .........................10

              b.    Appropriate Persons Were Informed In September 2021 ..................11

          3.    UC's Response Was Not Reasonable .........................................................12

    C.    The Title IX Retaliation Claim ............................................................................15

          1.    UC Is Liable For The Retaliatory Actions Of Its Staff Because They Have Supervisory Authority .........................................................15

          2.    Adverse Action ........................................................................................16

          3.    Causation .................................................................................................17

    D.    Damages ................................................................................................................18

CONCLUSION .......................................................................................................................20

Jane Roe and Karen Soe, ballet students at the University of Cincinnati College Conservatory of Music, were sexually assaulted by a fellow student during classes/rehearsals. UC was aware of the risk this would occur but initially did nothing, then conducted a sham investigation and flawed hearing that, predictably, exonerated a star dancer. UC makes a number of arguments that, if accepted, would essentially eviscerate all Title IX protections for students. In UC's view, a male student may assault as many women on campus as he wishes – the school has no obligation to act as long as he only assaults each woman only once. In UC's view, touching a woman's breast and buttocks, and rubbing the back of a woman's body against a man's penis, is not "actionable harassment" because it is not severe enough. And, in UC's view, reporting sexual assaults to a professor, department chair, or other high-ranking official who can take appropriate action to prevent harassment in the classroom doesn't count because the student did not submit the exact right paperwork to the exact right administrator. Because none of this is the law, the Motion should be denied.

## FACTS

This case is one of many cases in which UC has struggled to respond to alleged sexual assaults and sexual misconduct on campuses. [1] Plaintiffs Jane Roe and Karen Soe are undergraduate ballet students at CCM. Jane Roe and Karen Soe were sexually harassed by an undergraduate ballet student (referred to here as John Doe). John Doe was considered to be a star performer at CCM. He had been featured in a number of CCM's productions and a video produced by Cincinnati Ballet. But his career was not unproblematic. John Doe had been credibly accused of sexual misconduct by other female dancers at Cincinnati Ballet prior to his enrollment at UC. The ballet community is small and

---

[1] *See e.g. University of Cincinnati investigated for 'sexually hostile environment'*, WKYC, Dec. 30, 2016 ("Allegations of a "sexually hostile environment" on campus spurred a federal investigation of the University of Cincinnati, recently discovered federal documents state."); *Doe v. Univ. of Cincinnati,* 872 F.3d 393 (6th Cir. 2017); *Goldblum v. Univ. of Cincinnati,* S.D.Ohio No. 1:19-cv-398, 2022 U.S. Dist. LEXIS 54979 (Mar. 28, 2022); *Doe v. Univ. of Cincinnati,* 173 F. Supp. 3d 586 (S.D.Ohio 2016); *Gischel v. Univ. of Cincinnati*, 302 F. Supp. 3d 961 (S.D.Ohio 2018). (*See also* Am. Complaint ¶ 17.)

the accusations against John Doe were common knowledge in the Cincinnati dance community in general and among CCM faculty, in particular. (Am. Complaint ¶¶ 23-24.)

Karen Soe first danced with John Doe when she was approximately 15 years old. During that time, John Doe inappropriately touched Karen Soe's breasts and buttocks during practices. Karen Soe did not report the misconduct because she was young and inexperienced and did not appreciate the severity of John Doe's conduct. (Am. Complaint ¶ 25.) In March 2020, shortly after she enrolled in UC, Karen Soe told her professor about her history with John Doe at Cincinnati ballet and that she felt uncomfortable with him in class. The professor indicated that she would report the issue to the UC Title IX office. She said, "Title IX is supposed to take care of it." Karen Soe never heard from anyone in the Title IX office, however. (Am. Complaint ¶ 26.)

Jane Roe became aware of John Doe's alleged conduct at Cincinnati Ballet in general and the impact on Karen Soe in particular. She observed that women who had to partner with John Doe appeared to be uncomfortable but were afraid to complain because of fear of retaliation. In March 2020, Jane Roe spoke to the same professor about the issues and concerns surrounding John Doe, including his history of harassing Karen Soe. The professor indicated to Jane Roe that she was aware of other incidents happening at CCM. (Am. Complaint ¶¶ 27-28.)

This time, the professor discussed the allegations against John Doe and the concerns of students with the UC Title IX office. The UC Title IX Office told the professor that the office had been in contact with her "bosses." During a subsequent meeting, the professor told Jane Roe that the UC Title IX Office had told her to "just stay out of it" and that it was in her best interest to "leave it alone." (Am. Complaint ¶ 28(b).) On March 24, 2020, Jane Roe received an email from an "Administrative Coordinator" in the UC Title IX Office about John Doe. The email states that the "office received a report today that indicated that classmates of yours may have experienced sexual harassment." The email informed Jane Roe about various resources but did not ask Jane Roe for any

more information or request an interview. The UC Title IX office took little or no additional action.[2] (Am. Complaint ¶ 29.)

In Fall 2021, Jane Roe was cast in one of the lead roles for a performance of *Paquita*. John Doe was assigned to be her partner. On September 2, 2021 John Doe inappropriately placed his hand close to Jane Roe's breast during a lift. John Doe's hands then touched Jane Roe's breasts on a number of occasions. Jane Roe, based on her experience as dancer, did not believe that John Doe had acted accidently. Jane Roe did not pursue a complaint at this time because she did not want to cause trouble and was willing to give John Doe the benefit of the doubt. Five days later, on September 7, 2021 John Doe again touched Jane Roe inappropriately during a practice. A week later, on September 14, 2021 John Doe again inappropriately touched Jane Roe during a practice. He touched Jane Roe's breasts and lowered Jane Roe from lifts very slowly, rubbing the back of Jane Roe's body against the front of his body. (Am. Complaint ¶¶ 30(a) – 30(d).)

During a September 14, 2021 practice, the professor noticed some of the inappropriate touching and addressed it with Jane Roe and John Doe. The professor turned to Jane Roe and asked, "Are you ok?." (Am. Complaint ¶ 30(d).) This did not stop John Doe. He touched Jane Roe inappropriately during two more practices, on September 21, 2021and September 28, 2021. After the September 28, 2021 class, Jane Roe again spoke to the professor about John Doe's conduct. The conversation was brief, but Jane Roe informed the professor that she wanted to talk further about the issue soon. (Am. Complaint ¶ 30(e) – 31.)

John Doe's inappropriate conduct still continued. On October 5, 2021, John Doe again inappropriately touched Jane Roe's breasts and rubbed her body against his penis when lowering her

---

[2] UC attached to its Motion an Email chain from the Title IX Coordinator to Jane Roe. (Email, R.18-2, PageID#208.) Even if this email were properly before the Court on a Motion to Dismiss, this only shows that the Title IX Coordinator emailed Jane Roe – a fact described the Amended Complaint. The email does not show that UC took any action or opened an investigation. Of course, "[a]s a general rule, matters outside the pleadings may not be considered in ruling on a 12(b)(6) motion to dismiss…" *Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir. 1999).

from lifts.  The stress and anxiety from partnering with John Doe caused Jane Roe to have to leave the classroom; she was so upset that she had a nosebleed.  The next day, October 6 2021, Jane Roe met with the professor and the Chair of Dance Department to discuss John Doe's inappropriate conduct and what steps could be taken to protect her in class. (Am. Complaint ¶¶ 32-33.)

Two days later, on October 8, 2021, Jane Roe and Karen Soe met with the Head of the Division of Theatre Arts, Production and Arts Administration to discuss John Doe's inappropriate touching.  Karen Soe asked to also be listed as a victim of John Doe.  Later that day, the UC Office of Gender Equity & Inclusion received a report stating UC Student John Doe had repeatedly touched Jane Roe inappropriately while dancing in partnering class or in the fall dance concert. The report did not mention Karen Soe; the report listed only Jane Roe as a victim.

On October 14, 2021 Jane Roe and Karen Soe again met with the professor and department chair to discuss John Doe's conduct.  The professor shrugged when asked about prior reports of misconduct by John Doe at Cincinnati Ballet.  Jane Roe and Karen Soe asked that John Doe be removed from the partnering class.    The department chair said no because "he is paying for the class."   They did not place any restrictions on John Doe; all of the obligation to avoid inappropriate contact from John Doe was placed on Jane Roe and Karen Soe.  Jane Roe and Karen Soe were told that if they ever felt "uncomfortable" they could "just walk out of class without explaining."  The department chair promised to alert the rest of the faculty about the allegations and said, "if you're uncomfortable, you don't have to partner with him. We will try to find some way to make sure you're both still having some rehearsals, but no partnering."   (Am. Complaint ¶¶ 34-36.)

On October 19, 2021, Jane Roe and her mother met with the department chair and division head.  They discussed ways to keep John Doe way from Jane Roe.  Jane Roe was informed that she could be taken out of her lead role in *Paquita*.  The CCM administrators declined to take any further

actions against John Doe.  The division head said, "We don't know anything about Title IX and we can't do anything. It's up to them."  (Am. Complaint ¶ 37.)

The misconduct continued.  On October 22, 2021 Karen Soe was required to partner with John Doe in class.  During this practices John Doe touched Karen Soe inappropriately.  John Doe lifted Karen Soe over his head and slowly brought her down the front of his body.  (Am. Complaint ¶ 38.)

Finally, on October 25, 2021 – more than a year after the initial general report and more than a month after Jane Roe's specific complaints – the UC Title IX Office issued a "Mutual No Contact Order." This No Contact Order did not prevent John Doe from being in the same dance class as Jane Roe and put the obligation on Jane Roe, as much as John Doe, to avoid contact.  (Am. Complaint ¶ 39.) UC never issued a No Contact Order prohibiting John Doe from having contact with Karen Soe. UC instructors became hostile to Jane Roe when she left class to avoid continued contact with John Doe, even though she was just following instructions.[3]

UC conducted a sham investigation into Jane Roe's claims.  (Am. Complaint ¶ 43, 45.)  UC ignored Karen Soe's claims, even after Karen Soe told the investigator about John Doe's conduct during class and indicated to the UC investigator that she wished to be listed as a victim and to pursue a complaint.  (Am. Complaint ¶ 45.)  This request was refused.  Other students interviewed as part on the investigation corroborated the allegations against John Doe.  One student told the investigator that she was aware of general concerns about John Doe's technique and that John Doe is "constantly holding [Jane Roe] and other females in the wrong positions… causing contact with private areas and causing discomfort." (Am. Complaint ¶ 46.)  Another student confirmed that twice Jane Roe "came out crying" from class and that Jane Roe had described John Doe touching her breasts and "rubbing

---

[3] On November 1, 2021, Jane Roe filed for, and received, an *ex parte* Order of Protection from the Hamilton County Common Pleas Court.  This protection order remained in place through the rest of the 2021-2022 school year. (Am. Complaint ¶¶ 40-41.)

his body down her body." A third student provided videos of some of the practices. A fourth student, who had partnered with John Doe, also reported that John Doe's hand placement was sometimes inappropriate. (Am. Complaint ¶¶ 46-49.) John Doe denied any misconduct and tried to explain his conduct by suggesting that Jane Roe consistently wore "slippery leotards" which made it difficult to maintain appropriate hand placement. (Am. Complaint ¶ 51.) The professor, despite her obvious conflict of interest (as the instructor in the class, Carberry could be liable if inappropriate conduct occurred), was asked by the investigator to "serve as an expert witness for this investigation to provide appropriate knowledge of ballet technique and discernment of hand placement."[4]

On April 1, 2022 UC conducted a hearing on Jane Roe's complaint.[5] (Am. Complaint ¶ 53.) This hearing, like the investigation, was biased in favor of John Doe. Jane Roe was not given the opportunity to cross-examine important witnesses. UC permitted John Doe to present witnesses who had not been disclosed in advance but prohibited Jane Roe from presenting witnesses who had relevant information.[6] The UC hearing officer declined to ask many of the questions submitted by Jane Roe to the witnesses who testified or changed the wording of many questions. Predictably, John Doe was found "not responsible" by the UC hearing panel. (Am. Complaint ¶ 54.)

Jane Roe and Karen Soe suffered as a result of UC's failure to adequate address John Doe's conduct. Both Jane Roe and Karen had declining performance, trouble concentrating, and fear of attending school. She was not cast in the same type of roles as before or was assigned inappropriate partners. Some professors, who were not informed of the need to make accommodations, started to

---

[4] The professor, unsurprisingly, stated her opinion that John Doe's conduct was "not inappropriate" and suggested that the dancers "are awkward." (Am. Complaint ¶ 48.) This is in contrast to an independent ballet instructor who viewed the same materials and said, "I am appalled with what these young ladies have had to endure at the hands of this partner." (Am. Complaint ¶ 54(b)(iii).)

[5] UC never held a hearing on Karen Soe's complaint.

[6] UC prohibited witnesses who could have presented evidence of a pattern of conduct by John Doe that negated his defense that the inappropriate touching was accidental. In particular, Karen Soe and two other students were prohibited from testifying.

believe that Jane Roe and Karen Soe were slacking off or had bad attitudes; they stopped receiving solos and prominent roles in productions. This got so bad that Jane Roe and Karen Soe, when seeking placement for the Fall of 2022, were not considered by large and prestigious ballet companies because of lack of good roles and support from faculty at CCM. Instead, Jane Roe and Karen Soe were forced to leave Ohio and seek an opportunity to dance with a small, new, company located in another state. (Am. Complaint ¶¶ 59-64.)

**ARGUMENT**

**A.     Standards**

In deciding whether to grant a Rule 12(b)(6) motion, this Court is required to accept all well-pleaded factual allegations of the Amended Complaint as true and construe the complaint in the light most favorable to the plaintiffs. *Reilly v. Vadlamudi*, 680 F.3d 617, 622 (6th Cir. 2012), *quoting Dubay v. Wells*, 506 F.3d 422, 426 (6th Cir. 2007). The Amended Complaint will survive a motion to dismiss if it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" that is, "that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). *See also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

**B.     The Deliberate Indifference Claim**

Title IX of the Education Amendments of 1972 is a federal statute designed to prevent sexual discrimination and harassment in educational institutions, like UC, receiving federal funding. Title IX specifically provides: "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). A federal funding recipient may be liable under Title IX for student-on-student sexual harassment. *Davis v. Monroe County Board of Education* that 526 U.S. 629, 643 (1999); *Stiles v. Grainger Cty.*, 819 F.3d 834, 848 (6th Cir. 2016).

7

In *Gebser v. Lago Vista Indep. School Dist.*, the Supreme Court held that Title IX liability attaches only when a school official "who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination" and fails to correct such behavior in a manner that amounts to deliberate indifference. 524 U.S. 274, 290. To proceed on their Title IX claim against UC, Plaintiffs are required to establish that: (1) they were subjected to a sexually hostile environment; (2) they provided actual notice of the situation to an 'appropriate person,' who was, at a minimum, an official of the educational entity with authority to take corrective action and to end discrimination; and (3) the institution's response to the harassment amounted to "deliberate indifference." *Klemencic v. Ohio State Univ.*, 263 F.3d 504 (6th Cir. 2001).

### 1.    Jane Roe and Karen Soe Suffered Actional Harassment

UC argues that John Doe's conduct would not qualify as "actionable harassment" under Title IX.  Def. Memo. at PageID#141.  UC first argues that Karen Soe did not suffer "pervasive" harassment.  Def. Memo. at PageIOD#141-142.  However, as UC acknowledges, the Supreme Court in *Davis* explained that a single incident could be sufficiently severe that it would result in the articulated injury.[7]  526 U.S, at 652-53.  And, as UC acknowledges, an "injury" in the Title IX context is what the Amended Complaint alleges: deprivation of access to educational opportunities.  (Am. Complaint ¶¶ 67, 71)

---

[7] John Doe's conduct would be a criminal sex offense under Ohio law, sexual imposition.  R.C. 2907.06.(A).  UC's Memorandum – which ignores the  pattern of conduct by John Doe and minimizes and diminishes what the two young women went through – demonstrate  better than anything else that it is plausible that UC would not take this seriously.  UC's characterization of what Jane Roe and Karen Soe experienced is disgraceful – if UC is willing to minimizes the severity of John Doe's actions in a public court filing, it is easy to imagine that its response to Jane Roe telling her professor, a department chair, a division head, and the UC Title IX office about John Doe's actions was insufficient and deliberately indifferent.  UC was aware of John Doe's conduct as early as March 2020 (if not before).  In the fall of 2021, John Doe touched Jane Roe's breasts repeatedly and rubbed her body against his penis during lifts at rehearsals.  (Am. Complaint ¶ 30.)  A few weeks later, John Doe, who had touched Karen Soe inappropriately when they danced together prior to enrolling at UC, rubbed Karen Soe's body against his penis during a practice.  But how does UC characterize what John Doe did?  UC writes that Jane Roe merely "experience[d] multiple incidents of John Doe holding her in an improper manner."  UC Memo. at PageID#137.  UC further writes that John Doe only "held [Karen Soe] too close during a lift."  UC Memo. at PageID#139.

The Sixth Circuit has held that a school can be liable for a single incident of actionable sexual harassment that occurs after the school's knowledge of the misconduct.  *Kollaritsch v. Michigan State Univ. Bd. of Trustees*, 944 F.3d 613, 623 (6th Cir. 2019).  In *Kollaritsch*, the plaintiffs were female students who had been sexually assaulted on campus.  The school, unlike UC in this case, had no knowledge of any threat to female students from their attackers prior to the assaults. 944 F.3d at 618, 624-25. The Amended Complaint states that Jane Roe and Karen Soe were touched inappropriately multiple times after UC officials were aware of John Doe's conduct – that is sufficient under *Kollaritsch*.  UC minimizes this touching – analogizing it to being shoved in a locker or receiving an obscene gesture. Def, Memo. at PageID#145-146.  The decision in *Kollaritsch*, however, does not require the Court to attempt to calculate some equivalency between the plaintiffs' actual experiences and other types of sexual harassment or abuse. One court in this Circuit explains:

> the yardstick against which a Title IX harassment allegation is to be judged is not whether the harassment was objectively 'akin to' some other form or type of sexual mistreatment in an abstract sense, but whether the harassment, in light of the totality of the circumstances, "deprived [the plaintiffs] of access to the educational opportunities or benefits provided by the school."

*T.C. v. Metro. Govt. of Nashville & Davidson Cty.*, M.D.Tenn. No. 3:17-cv-01098, 2019 U.S. Dist. LEXIS 241434, at *18 (June 11, 2019), *quoting Davis*, 526 U.S. at 650.  In this case, the events alleged by Plaintiffs was not merely severe – John Doe's conduct would be a criminal sex offense under Ohio law, sexual imposition, R.C. 2907.06(A) – but the Amended Complaint describes how it was extraordinarily disruptive of the educational process and "deprived" Jane Roe and Karen Soe "of access to educational opportunities at UC."  (Am. Complaint ¶¶ 32, 59-60, 71.)  The disruptions in the plaintiffs' educations, in other words, were real.[8]

---

[8] In *Wamer v. Univ. of Toledo*, 27 F.4th 461 (6th Cir.2022), the Sixth Circuit held that students state a claim where they experienced an objectively reasonable fear of further harassment which caused them to take specific reasonable actions to avoid the harassment and deprived them of the educational opportunities available to other students.  The Amended Complaint also satisfies this standard.  (Am. Complaint ¶¶ 30, 32, 41.)

2.      **UC Had Actual Knowledge Of John Doe's Conduct Prior To His Continued Sexual Assaults**

A plaintiff must demonstrate that the school had actual knowledge of that harassment, meaning an "appropriate person" knew of it. *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 650 (1999). UC argues that the school lacked "actual knowledge" because, in part only a report to the Title IX Office, and not CCM faculty, is sufficient because the faculty lacked "authority to institute corrective measures." Def. Memo. at PageID#89.

a.      **UC's Title IX Office Was Informed In March 2020**

In March 2020 – months before John Doe sexually assaulted Jane Roe and Karen Soe – both students told a Professor about the issues and concerns surrounding John Doe. In March 2020, Karen Soe told her Professor Dierdre Carberry about her history with John Doe. The professor indicated that she would report the issue to the UC Title IX office. She said, "Title IX is supposed to take care of it." (Am. Complaint ¶ 26.) Later, Jane Roe raised this issue with the same professor. The professor admitted to UC's knowledge of the concerns, even stating that she "was aware of other incidents happening at CCM." (Am. Complaint ¶ 28.) The Professor then reported the matter to the UC Title IX Office. The Title IX Office emailed Jane Roe on March 24, 2021 acknowledging the complaint. . (Amended Complaint ¶¶ 28-29.)[9]

The Amended Complaint states, "the UC Title IX office took little or no additional action to investigate the matter or protect student from future harassment and assaults." (Am. Complaint ¶29.) The Amended Complaint explains that the UC Title IX Office told the professor r to "just stay out of it" and that it was in her best interest to "leave it alone." (Am. Complaint ¶ 28.)

---

Meng Huang v. Ohio State Univ., S.D.Ohio No. 2:19-cv-1976, 2022 U.S. Dist. LEXIS 133145, at *7 (July 26, 2022)

[9] The Office emailed Jane Roe on March 24, 2021 acknowledging the complaint. (Am. Complaint 29.) UC attaches some other emails from the Title IX Office. This is improper in a motion to dismiss. Plaintiffs also note that the emails are presented without any context or explanation.

### b. Appropriate Persons Were Informed In September 2021

Even if the Court, like UC, ignores the March 2020 report to the Title IX Office, UC had actual knowledge in September 2021when Plaintiffs reported their allegations to the classroom professor, the Chair of the Dance Department, and the Head of the Division of Theatre Arts, Production and Arts Administration. (Am. Complaint ¶¶ 33, 35.) The Amended Complaint specifically alleges that these individuals "had the authority to institute corrective measures on behalf of the UC, including the removal of John Doe from classes… and other steps designed to protect the safety of female dancers at CCM." (Am. Complaint ¶ 68.)[10]

Under Supreme Court precedents, an "appropriate person" is, at a minimum, an official of the recipient entity with authority to take corrective action…" *Gebser*, 524 U.S. at 290. Courts, in applying this test, have not relied upon titles, but have considered the chain-of-command at a school and the actual ability of the person to take actions. In other words, an "appropriate person" is anyone with authority to address problems and institute corrective measures, and, in particular, the ability to "to intervene at some level to stop harassment" if they are aware it is occurring. *Frederick v. Simpson College*, 149 F.Supp.2d 826, 837 (S.D.Iowa 2001) (department chair and assistant dean were appropriate persons for Title IX notification purposes).[11] UC's argument, that only an employee of the Title IX

---

[10] UC dismisses this allegation as conclusory – but does not explain why this is so. Def. Memo. at PageID#143. In fact, the allegations that the UC faculty and staff members who received the reports from Jane Roe and Karen Soe are not conclusory as the Amended Complaint states that they have "the authority to institute corrective measures on behalf of the UC, including the removal of John Doe from classes, the assignment of appropriate alternative partnering and educational opportunities, and other steps designed to protect the safety of female dancers at CCM." (Am. Complaint ¶ 68.)

[11] *Kesterson v. Kent State Univ.*, 967 F.3d 519 (6th Cir. 2020), is not to the contrary. UC cites this case for the proposition that "faculty members do not constitute an 'appropriate person." UC Memo. at PageID#143. But that isn't the facts of *Kesterson* and the Sixth Circuit said no such thing. In *Kesterson*, a softball coach was not considered to be an "appropriate person" because the plaintiff "offered no evidence that these individuals could act on [the school's] behalf." 967 F.3d at 529. The Amended Complaint alleges – as must be assumed true for purposes of this Motion that a professor, department chair, or division head could take necessary actions. (Am. Complaint ¶ 68.) This is consistent with case law requiring an inquiry beyond titles. *See Hawkins v. Sarasota Cty. Sch. Bd.*, 322 F.3d 1279, 1286-87 (11th Cir. 2003) (explaining that actual knowledge in student-on-student harassment cases is a fact-intensive inquiry); *Plamp v. Mitchell Sch. Dist.*, 565 F.3d 450, 457 (8th Cir. 2009) (warning against fashioning "a bright-line rule as to what job titles and positions automatically mark an individual as having sufficient authority or control for the purposes of Title IX liability"); *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1247 (10th Cir. 1999) (deciding who exercises substantial control "is necessarily a fact-based inquiry").

Office – and not a professor, department chair, or division head – can qualify as an "appropriate person" is inconsistent with the Sixth Circuit's recent decision in *Dahmer v. W. Kentucky Univ.*, 6th Cir. No. 21-5318, 2022 U.S. App. LEXIS 28533, at *9 (Oct. 13, 2022). In *Dahmer,* the Sixth Circuit rejected the idea that only a Title IX Office can receive complaints, reasoning instead that a complaint to an administrator was sufficient where the administrator had some ability to address and remedy sexual harassment. 2022 U.S. App. LEXIS 28533, at *9.[12]     UC's argument was also explicitly rejected by another court in this Circuit in *Lipian v. Univ. of Michigan*, 453 F. Supp. 3d 937, 957-958 (E.D.Mich. 2020). In *Lipian*, a report to a department chair – not the Title IX office – was sufficient to create liability for the school because the individual who received the report had the authority to monitor student interactions and instruct on proper behavior and boundaries. The *Lipin* court cautioned, "there can be no bright-line rule on who is or isn't an appropriate person to receive a Title IX report." 453 F. Supp. 3d at 957-958 (collecting cases).[13]

### 3.    UC's Response Was Not Reasonable

UC's response John Doe's inappropriate touching in class subjected both Jane Roe and Karen Soe to further actionable sexual harassment.[14]  UC took no actions when the allegations against John

---

[12] In *Dahmer*, the District Court seemed to agree with UC in dismissing a claim, in part, on the grounds that a report to an administrator – and not the school's Title IX Office – was insufficient and that a school did not have notice of harassment until a school employee "reported [the] complaint to the Title IX office." *Dahmer v. W. Kentucky Univ.*, W.D.Ky. Civil Action No. 1:18-cv-124, 2021 U.S. Dist. LEXIS 39209, at *16 (Mar. 2, 2021).. The Sixth Circuit reversed.

[13] UC's formalistic focus on *who* receives a complaint than on whether the person is actually able to help the student improperly elevates the form of a Title IX complaint over substance and ignores the goal of Congress in eliminating sexual harassment in higher education. The definition of an "appropriate person" should be liberally construed in favor of the victims of harassment – many of whom are not experts on the intricacies of higher education administration. The alternative is a system that resembles the Central Bureaucracy in *Futurama*. By only taking action if the exact right person is informed using the exact right form, UC is not far from a place where someone yells, "Guards! Bring me the forms I need to fill out to have her taken away!" or where someone could be demoted because they stamped some papers only four times instead of the standard five. *How Hermes Requisitioned His Groove Back*, Futurama, Season 2, Ep. 14 (2000).

[14] Twice in a little over a year prior to this Memorandum the Sixth Circuit reversed a decision of a district court that a plaintiff failed to present sufficient evidence or plausible claims that UC used pretextual reasons to cover up unlawful discrimination. *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 515 (6th Cir. 2021) ("record contains evidence from which a reasonable jury could conclude that [UC's action] was retaliatory rather than innocent"); *Charlton-Perkins v. Univ. of Cincinnati*, 35 F.4th 1053, 1061 (6th Cir. 2022) (UC's failure to hire a person because of gender, then cancelling a search, plausible evidence of pretext).

Doe were reported to the Title IX Office in March 2020. The Amended Complaint in ¶¶ 33-39 describes at least seven different meetings involving at least four different UC faculty and staff members discussing John Doe's actions. UC's response was clearly unreasonable and that it caused the further harassment and denied Jane Roe and Karen Soe access to educational opportunities. All the school did initially was issue a no contact order for Jane Roe; but the Amended Complaint specifically alleges that this No Contact Order was "insufficient and impracticable." (Am. Complaint ¶40.) The school took no action *at all* to protect Karen Soe. (Am. Complaint ¶41.)[15] UC essentially took no steps proactive steps to reduce opportunities for further harassment even when John Doe repeated the conduct on multiple occasions and the Amended Complaint alleges that both Jane Roe and Karen Soe continued to be deprived of educational opportunities. (Am Complaint ¶¶ 41, 42, 44.) See *Stiles ex rel. D.S. v. Grainger Cty.*, 819 F.3d 834, 849 (6th Cir. 2016). UC's subsequent sham investigation and flawed hearing process suggests the school's efforts "amounted to 'an official decision… not to remedy the violation.'" *Foster v. Bd. of Regents of Univ. of Mich.*, 982 F.3d 960, 967 (6th Cir. 2020) (*en banc*), *quoting Davis*.

The Sixth Circuit's recent decision in *Doe v. Metro. Govt. & Davidson Cty.*, 35 F.4th 459, (6th Cir. 2022), is instructive.[16] In *Metro. Govt. & Davidson Cty* the plaintiffs alleged that they suffered sexual harassment as a result of a school's failure to address "the problem of pervasive sexual misconduct in the schools." The Sixth Circuit distinguished between two theories of liability under Title IX: liability

---

[15] While UC is correct that John Doe did not assault Jane Roe or Karen Soe after the no contact order was issued, UC gets no credit because Jane Roe only was protected because she obtained a protection order from the Common Pleas Court. *See Williams Bd. of Regents*, 477 F.3d 1282, 1295-96 (11th Cir. 2007) (school could not claim that it was not deliberately indifferent when actions of the victim, as opposed to the school, prevented further harassment); *Kelly v. Yale Univ.*, D.Conn. No. 3:01-CV-1591, 2003 U.S. Dist. LEXIS 4543, at *12 (Mar. 26, 2003) ("Although [plaintiff] was not subjected to further harassment…, it was her departure from her classes and her dormitory, not any immediate action taken by [the school], that assured that outcome").

[16] *Metro. Govt. & Davidson Cty* is not distinguishable on the basis that the students in that case were in high school. The operative test is whether the school has "some control over the alleged harassment." Davis, 526 U.S. at 644. In this case, where the inappropriate touching occurred in a classroom, UC had significant control over the environment.

for the school's conduct before the students were harassed and liability for the schools conduct after the students were harassed (i.e. "before" and "after" claims.). UC's response was unreasonable under *Metro. Govt. & Davidson Cty* under both a "before" and "after" theory.

      <u>Before</u>. UC was informed in March 2020 about John Doe's alleged misconduct – yet took no action.[17] The school, thus, maintained a policy of deliberate indifference to reports of sexual misconduct by ballet students which created a heightened risk of sexual harassment that was known or obvious in a context subject to the school's control, and as a result, Plaintiffs suffered harassment that was "so severe, pervasive, and objectively offensive that it can be said to [have] deprive[d] the [plaintiff] of access to the educational opportunities or benefits provided by the school." UC claims that the "neither Plaintiff suffered any further actionable sexual harassment by John Doe after her report of harassment." Def. Memo. a PageID#142. But UC was aware of John Doe's conduct regardless of who made the report, and, as the Sixth Circuit warned about in *Metro. Govt. & Davidson Cty*, UC's argument would "allow schools to remain deliberately indifferent to widespread discrimination as long as the same student was not harassed twice." 35 F.4th at 468.

      <u>After</u>. In September 2021, on multiple occasions, Jane Roe informed her professor, the department chair, and the division head that she had been touched inappropriately in class. Yet the inappropriate touching continued for both Jane Roe and Karen Soe. The Amended Complaint plausibly alleges that rather than take steps to remedy the violation, UC opted to avoid cover up and avoid the problem through ineffective orders and a sham investigation, resulting in Jane Roe and

---

[17] UC's argument that the school "had no duty" to respond to the allegations against John Doe prior to his enrollment misses the point of *Metro. Govt. & Davidson Cty*. Def. Memo at PageID#148 *citing Doe v. Univ. of Kentucky*, 971 F.3d 553 (6th Cir. 2020). *Univ. of Kentucky* is a completely different fact pattern, as it concerned a victim, not a perpetrator, who was not enrolled at the school. While UC may have no obligation to discipline John Doe for conduct that occurred prior to his enrollment, the school is also not free to ignore information suggesting that he could cause a threat to students in the classroom once he enrolls. A school may be deliberately indifferent to a culture of sexual misconduct. For example, a school may be deliberately indifferent by admitting a student who had a prior finding of responsibility for sexual misconduct at a previous institution where the school was on notice of that determination because admitting the student created a hostile environment and a risk to other students.

Karen Soe being excluded from educational opportunities. In *Doe v. Hamilton Cty. Bd. of Edn.*, 329 F. Supp. 3d 543, 563-564 (E.D.Tenn.2018), for example, a court found that a student who suffered continued harassment that "made it difficult for him to continue attending" the school had stated a valid deliberate indifference claim under Title IX. The *Hamilton Cty. Bd. of Edn* court relied on a second circuit opinion in *Doe v. East Haven Bd. of Educ.*, 200 F. App'x 46, 48 (2d Cir. 2006). In that case, similarly to the Plaintiffs here, the claim survived because, in part, "the plaintiff would skip classes" due to the presence of the perpetrator and was otherwise deprived of educational opportunities. *Compare Foster* 982 F.3d at 962 ( (noting how the school "ratcheted up protections" as more reports of harassment came to the institution's attention). (*See e.g.* Am. Complaint ¶¶ 49, 57, 60.)

## C.     The Title IX Retaliation Claim

The Supreme Court has held that "[r]etaliation against individuals because they complain of sex discrimination is 'intentional conduct that violates the clear terms of [Title IX].'" *Jackson v. Birmingham Board of Education*, 544 U.S. 167, 183 (2005), *quoting Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 642 (1999). In order to successfully establish a Title IX retaliation claim, a plaintiff must show "that (1) [s]he engaged in protected activity, (2) [the funding recipient] knew of the protected activity, (3) [s]he suffered an adverse school-related action, and (4) a causal connection exists between the protected activity and the adverse action." *Bose v. Bea*, 947 F.3d 983, 988 (6th Cir. 2020), *quoting Gordon v. Traverse City Area Pub. Sch.*, 686 F. App'x 315, 320 (6th Cir. 2017).

### 1.     UC Is Liable For The Retaliatory Actions Of Its Staff Because They Have Supervisory Authority

UC argues that Plaintiffs, in order to state a retaliation claim, must allege that appropriate persons at UC knew of the retaliation. Def. Memo. at PageID#151, *citing Bose* 947 F.3d at 988-89 (analogizing Title IX retaliation claims to Title VII retaliation claims and requiring plaintiffs demonstrate the educational institution's knowledge of the protected activity). True, Title IX bars the Plaintiffs from holding UC liable for any retaliatory acts of staff under a "*respondeat superior*" theory.

*Gebser*, 524 U.S. at 285; *Davis*, 526 U.S. at 640-42). But the Amended Complaint alleges that UC was deliberately indifferent to known retaliation *by the appropriate persons*. In other words, the UC officials and administrators who engaged in the retaliatory conduct also had the authority to institute corrective measures. The Amended Complaint states, "After UC officials learned of the misconduct by John Doe, Jane Roe and Karen Soe continued to suffer denial or abridgement of the educational opportunities or programs provided by the school." (Am. Complaint ¶56.)

### 2. Adverse Action

UC focuses on the lack of severity of the retaliatory adverse actions. Def. Memo. at PageID#151-152. UC applies the wrong analysis. In the Title VII context, applicable to Title IX retaliation claims, the controlling standard is described in *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). The *Burlington N.,* Court held that to establish an adverse action in the retaliation context, a plaintiff must show that "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." 548 U.S. at 68.

UC argues the criticism from professors and removal from performances are not sufficient "adverse actions" to constitute retaliation under Title IX. None of this is relevant. The relevant question under *Burlington N.* is whether, under these facts, the risk of discipline, suspension, or expulsion is sufficient to dissuade students from engaging in protected activity. *Burlington N.*, 548 U.S. at 69, 126 S. Ct. at 2415. ("[T] he significance of any given act of retaliation will often depend upon the particular circumstances. Context matters.") The Amended Complaint explains that as part of the retaliation, Jane Roe and Karen Soe were denied solo roles in performances because of their complaints against John Doe. (Am. Complaint ¶60(b).) The Amended Complaint alleges that "These adverse actions were designed to dissuade Jane Roe, Karen Soe, and other students from participating in a Title IX process, filing complaints, or criticizing the UC Title IX process." (Am. Complaint ¶ 81.)

16

This is reasonable because, as the Amended Complaint explains, "This had the result of denying Jane Roe and Karen Soe the opportunities necessary in order to obtain good placements" with other ballet companies. (*Id.*) Elsewhere, the Amended Complaint explains that "reputation damage and loss of opportunity to perform is particularly harmful…" (Am. Complaint ¶62(a)-(c).) As a result, the adverse actions described in the Amended Complaint are sufficient to create a non-trivial chilling effect that would be likely to deter other UC students from making Title IX complaints. *See Pettit v. Steppingstone, Center for the Potentially Gifted,* 429 Fed. Appx. 524, 532 n.3 (6th Cir., July 7, 2011) (adverse actions " encompass a broader range of actions… that harm" plaintiff); *Swenson v. Bd. of Edn. of the City of Chicago,* N.D.Ill. No. 20-cv-06558, 2021 U.S. Dist. LEXIS 196115, at *7 (Oct. 12, 2021) ("damage to… s personal and professional reputation" and "career prospects" constituted adverse action).

### 3.   Causation

UC argues that the Plaintiffs failed to allege retaliation "because they reported John Doe." Def. Memo. at 152 (emphasis omitted). Plaintiffs need only clear a low hurdle to allege a causal link at the motion to dismiss stage. *Pennington v. City of Huntsville,* 261 F.3d 1262, 1266 (11th Cir. 2001) ("The causal link element is construed broadly so that a plaintiff merely has to prove that the protected activity and the negative… action are not completely unrelated."). UC's characterization of the Amended Complaint in this respect is incorrect. The Amended Complaint alleges that Jane Roe and Karen Soe had good reputations and received good roles "[p]rior to complaining about harassment from John Doe" but not after making complaints  (Am. Complaint ¶¶ 59-60, 62(b).) Under Sixth Circuit precedent, the close proximity between these adverse actions and the complaints is sufficient evidence of causation to survive a motion to dismiss. "The Sixth Circuit has held, for purposes of a Rule 12(b)(6) motion that '[a]lthough temporal proximity may not be enough to ultimately sustain Plaintiffs' allegations, it is sufficient at [the motion to dismiss] stage to render Plaintiffs' claims plausible.'" *Coles v. Scion Steel, Inc.*, E.D.Mich. No. 20-12606, 2021 U.S. Dist. LEXIS 189222, at *14

17

(Sep. 30, 2021), *quoting Top Flight Ent., Ltd. v. Schuette*, 729 F.3d 623, 632 (6th Cir. 2013). *See also Meadows v. Coppick,* S.D.Ohio No. 1:21-cv-322, 2022 U.S. Dist. LEXIS 194685, at *26 (Oct. 25, 2022) ("the Court concludes that temporal proximity may, in some circumstances, give rise to a plausible inference of retaliatory intent sufficient to survive a motion to dismiss."

## D.    Damages

The U.S. Supreme Court recently barred recovery of emotional distress damages under anti-discriminatory legislation passed pursuant to Spending Clause authority. *Cummings v. Premier Rehab Keller PLLC*, ___ U.S. ___, 142 S.Ct. 1562 (2022). Under *Cummings* a particular remedy is available only if the recipient of the funds is 'on notice' that, by accepting federal funding, it exposes itself to liability of that nature. Following a contract analogy, the Court reasoned that a funding recipient is on notice of damages explicitly provided in the legislation and also those remedies traditionally available in suits for breach of contract. *Id.* at 1571.

Assuming *Cummings* applies to Title IX claims,[18] the damages sought in the Amended Complaint (which DO NOT include emotional distress) remain permissible because they are directly related to UC's failure to assure that Plaintiffs could receive the full benefits of education at the school, including the opportunity to meaningfully access and fully participate career opportunities.[19] (Am. Complaint ¶ 5.)  In this case, Jane Roe and Karen Soe sought degrees from UC.  If through UC's deliberate indifference they are unable to complete their degrees (or gain the experience they

---

[18] At least one federal court has declined to extend *Cummings* to Title IX claims. *Doe v. Purdue Univ.*, N.D.Ind. No. 4-18-CV-89, 2022 U.S. Dist. LEXIS 128601, at *10-11 (July 20, 2022).

[19] UC is certainly on notice that students attend CCM precisely because of the career opportunities available after graduation.  CCM even maintains an entire office for this purpose:  "CCM's Office of Career Services helps current students and alumni find jobs in both academic and performance arenas…"  (https://ccm.uc.edu/resources/career-services.html).  The failure to complete education causes significant reputational damage to students as they pursue the careers, as noted in Sixth Circuit opinions involving UC.  *Doe v. Cummins*, 662 Fed. Appx. 437, 445 (6th Cir. 2016) (dismissal from UC would cause damage to a students' academic and professional reputations and may affect their ability to pursue a career); *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 407 (6th Cir. 2017) (student would "suffer reputational harm both on and off campus based on a finding rendered after an unfair hearing" at UC).  *See also Goss v. Lopez*, 419 U.S. 565, 574-75 (1975) (dismissal from a school could damage the students' academic reputation and "interfere with later opportunities for higher education and employment").

18

anticipated), their expectation damages include the loss of income they would have received plus the value to them of the resulting enhancement of their reputations. (Am. Complaint ¶ 60 ("damages in this regard includes more than pure reputational harm — they include the direct financial losses resulting from their impaired professional reputations").) In *Doe v. Bd. of Regents of the Univ. of Nebraska,* D.Neb. No. 4:20CV3036, 2022 U.S. Dist. LEXIS 148284, at *11 (Aug. 18, 2022), for example, following *Cummings,* a court permitted a Title IX plaintiff to present evidence about "actual financial damages she suffered as a result of leaving" the school.

These damages are not, as UC suggests, too speculative, because they identify specific career opportunities that were lost. The Amended Complaint states that Plaintiffs "when seeking placement for the Fall of 2022, [were] not considered by large and prestigious ballet companies because of lack of good roles and support from faculty at CCM" and that they were "forced to leave Ohio and seek an opportunity to dance with a small, new, company located in another state." (Am. Complaint ¶62(d).) Compare Def. Memo. at PageID#154. *Compare Broan Mfg. Co. v. Associated Distributors, Inc.,* 923 F.2d 1232, 1235-36 (6th Cir. 1991) (explaining that that damages are too speculative "only where the fact of damage is uncertain . . . not where the amount of damage alone is uncertain"). Loss of opportunity is the type of injury that would normally be recoverable as compensatory damages in a breach of contract case. *See e.g. Ask Chems., LP v. Computer Packages, Inc.,* 593 F.App'x 506, 511 (6th Cir.2014) "consequential damages, including damages for lost profits, are available in suits for breach of contract"). Compensatory damages available for breach of contract include "expectation" damages, which are meant to provide the plaintiff "the benefit of the bargain that he or she made by awarding a sum of money that will place [him or her] in as good a position as he or she would have been in had the contract been performed." 24 *Williston on Contracts* § 64.3 (4th ed. 2022). In *Redgrave v. Boston Symphony Orchestra, Inc.,* 855 F.2d 888 (1st Cir. 1983), the Court held that a "plaintiff may receive

19

consequential damages if the plaintiff proves with sufficient evidence that a breach of contract proximately caused the loss of identifiable professional opportunities." *See*

Two recent cases hold that loss of opportunity damages are available for violations of Spending Clause statutes post-*Cummings*: *Montgomery v. D.C*, No. 18-1928, 2022 U.S. Dist. LEXIS 92281 (D.D.C. May 23, 2022); *Chaitram v. Penn Medicine-Princeton Med. Ctr.*, D.N.J. Civil Action No. 21-17583, 2022 U.S. Dist. LEXIS 203676 (Nov. 8, 2022). In *Montgomery,* the court held that *Cummings* does not foreclose compensatory damages under an expectation-interest theory for claims under Spending Clause statutes. *Montgomery* concerned a local government's alleged failure to offer an accommodation to a disabled individual. The *Montgomery* court reasoned that while the plaintiff could not recover either emotional distress damages in light of *Cummings*, he may be able to recover damages to compensate him for the opportunity as a result of the agency's failures to comply with the statute. 2022 U.S. Dist. LEXIS 92281, at \*25. In *Chaitram* the court considered a similar claim that a Hospital failed to provide proper accommodations to a disabled person. The court rejected an argument that *Cummins* precluded all possible damages holding, instead, that the plaintiff had "an expectation interest in the ability to fully participate in her own medical care through effective communication." 2022 U.S. Dist. LEXIS 203676, at \*7. The court concluded that after *Cummins* a plaintiff asserting a claim under a Spending Clause statute could "state a claim for recovery for compensatory damages under a loss of opportunity theory." *Id.*[20]

**CONCLUSION**

The Motion should be Denied.

---

[20] UC fails to articulate exactly *what* damages a student asserting a deliberate indifference claim under Title IX would be permitted to claim. Certainly, *Cummings* did not make *every* Title IX claim subject to automatic dismissal because no damages are available. At a minimum, even under the most aggressive reading of *Cummings,* Plaintiffs would still be entitled to damages "for the benefits of education at their chosen school, such as the cost of attendance at UC, which includes tuition, room and board, and incidentals." (Am. Complaint ¶ 61.) As long as, at a minimum, costs of attendance damages are available, the Amended Complaint would not be subject to dismissal.

Respectfully submitted,

_____/s/ Joshua A. Engel_____
Joshua Adam Engel (OH 0075769)
Scott O'Reilly (OH 0075717)
ENGEL AND MARTIN, LLC
4660 Duke Dr., Suite 101
Mason, OH 45040
(513) 445-9600
engel@engelandmartin.com

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been electronically served via the Courts ECF
system this November 30, 2022 upon all counsel of record.

/s/ Joshua Engel
Joshua Engel

21