IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| JANE ROE, *et al.*, | : |
| *Plaintiffs*, | : Case No. 1:22-cv-376 |
| vs. | : Judge Jeffery P. Hopkins |
| UNIVERSITY OF CINCINNATI, | : Magistrate Judge Karen L. Litkovitz |
| *Defendant*. | : |

## OPINION AND ORDER

Jane Roe and Karen Soe (collectively, "Plaintiffs") studied ballet at the University of Cincinnati's ("UC") prestigious College-Conservatory of Music ("CCM"). In this suit, they assert two claims against UC under Title IX. Am. Compl., Doc. 15. Jane and Karen allege that another ballet student, John Doe, sexually harassed them during class over the course of several weeks. *Id*. ¶ 2. They also allege that, although they reported the harassment to UC faculty and administrators, UC was deliberately indifferent to their risk of further harm and retaliated against them for making the reports. *Id*. ¶ 1. UC moves to dismiss the Amended Complaint for failure to state a claim on which relief may be granted (the "Motion to Dismiss"). Doc. 18. Because the Amended Complaint alleges sufficient facts to sustain Plaintiffs' claims and allegations, the Court **DENIES** the Motion to Dismiss.

I.  BACKGROUND

When Karen Soe was 15, she danced with the Cincinnati Ballet. John Doe was her partner. Doc. 15, ¶ 25.a. During rehearsal practices, John inappropriately touched Karen's breasts and buttocks. *Id*. Karen did not report the incident "because she was young and

inexperienced and did not appreciate the severity" of John's actions. *Id*. Years later, Karen enrolled in UC CCM's ballet program—John Doe did, too. *Id*. ¶ 25.b. Shortly after she enrolled, Karen informed ballet instructor Professor Dierdre Carberry of "her history with John Doe at Cincinnati Ballet and that she felt uncomfortable with him in class." *Id*. ¶ 26. Carberry told Karen that she would report the issue to UC's Title IX office. *Id*.

Karen's classmate, Jane Roe, also became concerned with John Doe's conduct. *Id*. ¶ 27. In March 2020, Jane spoke to Carberry about the issue, including about John Doe's history of harassing Karen. *Id*. ¶ 28. Carberry reported the concerns to UC's Title IX office but was told to "stay out of it" and let her "bosses" handle the matter. *Id*. ¶ 28.b. The Title IX office emailed Jane a list of resources for those experiencing sexual harassment on March 24, 2020—but the Title IX office appeared not to have emailed Karen. *Id*. ¶ 29.

More than a year later, in the Fall of 2021, Jane was cast in a lead role in UC CCM's production of *Paquita*. *Id*. ¶ 30.b. John Doe was assigned as Jane's partner. *Id*. During a September 2, 2021 class, John placed his hand close to Jane's breast during a lift. *Id*. He proceeded to touch Jane's breasts, "improperly" spreading his fingers and reaching upwards during lifts. *Id*. This placement caused his hand to slide up over Jane's breasts and nipples. *Id*. During this first class, Jane "did not want to cause trouble" and so gave John the benefit of the doubt—in Jane's words, it is "always awkward the first time you're partnered" with someone. *Id*.

But the benefit of the doubt soon gave way to an uncomfortable suspicion. During a September 7 rehearsal, John's inappropriate hand placement became "more noticeable, unnecessary, and intentional[.]" *Id*. ¶ 30.c. Jane told John that his hand should be on her hip,

2

instead of her ribs. *Id*. And while John corrected his placement "temporarily[,]" he soon reverted to the inappropriate placement—"especially when others were not looking." *Id*.

The following week, John continued to grope Jane's breasts during lifts. *Id*. ¶ 30.d. Even Professor Carberry noticed, telling John that his hand was "way too high" and asking Jane if she was "ok." *Id*. John also started lowering Jane out of lifts very slowly, "rubbing the back of [her] body against the front of" his, bringing Jane in contact with John's chest and penis. *Id*. Jane felt like she "wanted to physically jump out of [John's] arms" when he did this. *Id*.

Jane experienced the same groping behavior over the next several weeks during classes on September 21 and 28. *Id*. ¶¶ 30.e., 30.f. After the September 28 class, Jane spoke to Professor Carberry about John's conduct. *Id*. ¶ 31. Though the conversation was brief, Jane "informed Carberry that she wanted to talk further about the issue soon." *Id*. Still, Jane was assigned to partner with John on October 5. *Id*. ¶ 32. He groped her again. *Id*. By this time, Jane was under such "stress and anxiety from partnering with John Doe" that she needed to "leave the classroom." *Id*. Jane became "so upset" that she suffered from "a nosebleed." *Id*.

The next day, Jane met with Professor Carberry and Dance Department Chair Shauna Steele. Jane again described John's harassing conduct and "asked what steps could be taken to protect her in class." *Id*. ¶ 33.

When Karen learned what Jane was experiencing, she offered that Jane "could put [her] down as a fellow victim[.]" *Id*. ¶ 34. On October 8, Jane and Karen both met with Denton Yockey, Head of the Division of Theatre Arts, Production, and Arts Administration. *Id*. ¶ 35. Jane and Karen described John's harassing conduct to him, and Yockey told them he would proceed to file a Title IX report. *Id*. ¶ 35.a. Karen informed Yockey of her past

3

experiences with John and "asked to also be listed as a victim of John Doe[.]" *Id*. ¶ 35.b. Yockey filed a Title IX report that day; he did not list Karen as a victim. *Id*. ¶ 35.c.

On October 14, Jane and Karen met with Carberry and Steele to discuss John's harassing conduct. *Id*. ¶ 36. Jane and Karen asked that John be removed from the class. *Id*. ¶ 36.b. Carberry and Steele refused, but they advised the students that they could walk out of class if they ever felt uncomfortable. *Id*. Steele also told Jane and Karen that neither would have to partner with John again. *Id*. Carberry and Steel did not place any restrictions on John Doe. *Id*. ¶ 36.c.

Jane and her mother met with Steele and Yockey again on October 19. *Id*. ¶ 37. In that meeting, Jane was informed that she could be removed from her lead role in *Paquita*. *Id*. The administrators "declined to take any further actions against John Doe." *Id*.

Just three days later, on October 22, 2021, Karen was assigned to be John's partner in class. *Id*. ¶ 38. She "panicked" but "did not want to make a scene." *Id*. ¶ 38.a. During practice, John lifted Karen above his head without her consent (the class was not practicing lifts at the time) and, when lowering her, dragged the back of her body down the front of his. *Id*. ¶ 38.b. He did the same when the class later practiced lifts. *Id*. Karen did not immediately report the incident, in part because she did not believe that UC would take "sufficient action." *Id*. ¶ 38.c. She did report it to the Title IX office the following month, however. *Id*. ¶ 45.

Jane and Karen participated in the investigation and proceedings stemming from their reports about John Doe's conduct.[1] Jane and Karen allege that they suffered declining

---

[1] While UC did conduct a hearing on April 1, 2022 regarding Jane Roe's claims against John Doe, the hearing panel ultimately found John Doe "not responsible." Doc. 15, ¶¶ 53, 55. Nonetheless, Jane claims that the hearing "contained a number of procedural errors and deficiencies that had the effect of helping John Doe[,]" including that the UC conduct office was "hostile" to Jane Roe, that the panel "failed to consider evidence of

4

performance, trouble concentrating, and fear of attending school after making their reports. *Id.* ¶¶ 59.a., 60.a. They also allege that they were each denied performance and casting opportunities because they reported John Doe's conduct. Jane alleges that, before the complaint, she was cast in significant roles but, after the complaint, was given only supporting roles. *Id.* ¶ 59.d. She further asserts that she was denied a solo performance in April 2022 because she complained about John Doe's harassing conduct. *Id.* Karen alleges that she was either not cast or given "some of the worst casting" after complaining about John's conduct towards her and participating in the investigation into Jane's complaint. *Id.* ¶ 60.b. Jane and Karen allege that because they were denied these types of performance opportunities, they did not have high-level job prospects post-graduation. *Id.* ¶ 62.d.

Jane and Karen filed this suit in 2022, asserting claims against UC for deliberate indifference and retaliation under Title IX.

## II.     STANDARD OF REVIEW

UC seeks to dismiss the Amended Complaint for failure to state a claim under Rule 12(b)(6). Doc. 18. A party may move to dismiss a complaint for "failure to state a claim upon which relief can be granted" under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, a complaint must include "only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). This, however, requires "more than labels and conclusions [or] a formulaic recitation of the elements of a cause of action," and the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 555. "A claim has facial plausibility

---

prior misconduct by John Doe," and that Jane Roe was not given an opportunity to cross-examine witnesses. *Id.* ¶ 54.

when the plaintiff pleads factual content that allows the court to draw the reasonable interference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). Indeed, under the plausibility standard set forth in *Twombly* and *Iqbal*, courts play an important gatekeeper role, ensuring that claims meet a plausibility threshold before defendants are subjected to the potential rigors (and costs) of the discovery process. "Discovery, after all, is not designed as a method by which a plaintiff discovers whether he has a claim, but rather a process for discovering evidence to substantiate plausibly-stated claims." *Green v. Mason*, 504 F. Supp. 3d 813, 827 (S.D. Ohio 2020).

In deciding a motion to dismiss, the district court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh,* 487 F.3d 471, 476 (6th Cir. 2007). In doing so, the district court "need not accept as true legal conclusions or unwarranted factual inferences." *Gregory v. Shelby County,* 220 F.3d 433, 446 (6th Cir. 2000).

### III.  LAW AND ANALYSIS

Title IX of the Education Amendments of 1972 provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a). Plaintiffs assert two Title IX claims against UC for its response to the students' complaints about John Doe. First, that UC was deliberately indifferent to John Doe's sexual harassment against Plaintiffs. Doc. 15, PageID 23. And second, that UC retaliated against Plaintiffs for reporting John Doe's sexual harassment. *Id.* at PageID 27. UC moves to dismiss both claims under Rule 12(b)(6). Doc. 18. But taking the allegations as true, and drawing reasonable inferences in the light most

favorable to the Plaintiffs, the Amended Complaint alleges sufficient facts to survive the motion. Thus, the Court **DENIES** Defendant's Motion to Dismiss.

### A. Title IX Deliberate Indifference

In Count One, Plaintiffs allege that UC was deliberately indifferent to known sexual harassment and misconduct "during rehearsals and performances[,] the result of which was a campus environment that was hostile to women." Doc. 15, ¶ 67. More than twenty-five years ago, the Supreme Court held that schools that receives federal funds, including UC, may be liable under Title IX for student-on-student sexual harassment when it "acts with deliberate indifference to known acts of harassment in its programs or activities." *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 633 (1999). A plaintiff asserting deliberate indifference "attempts to hold [a school] liable for its *own* decision to remain idle in the face of known student-on-student harassment[.]" *Id*. at 641. To state a claim for Title IX deliberate indifference, a complaint must allege that the defendant-school was "deliberately indifferent to sexual harassment, of which [it had] actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Id*. at 650. The Sixth Circuit interprets *Davis* as requiring a plaintiff to plead five elements:

> [(1)] an incident of actionable sexual harassment, [(2)] the school's actual knowledge of it, [(3)] some further incident of actionable sexual harassment, [(4)] that the further actionable harassment would not have happened but for the objective unreasonableness (deliberate indifference) of the school's response, and [(5)] that the Title IX injury is attributable to the post-actual-knowledge further harassment.

*Kollaritsch v. Michigan State Univ. Bd. of Trustees*, 944 F.3d 613, 623–24 (6th Cir. 2019). UC argues that Plaintiffs fail to adequately allege any of the five elements of Title IX deliberate indifference. The Court disagrees.

7

i. **Jane Roe states a claim for Title IX deliberate indifference.**

Jane Roe alleges that John Doe used his position as Jane's assigned partner as an opportunity to grope her multiple times over the course of several practices. Jane alleges that John groped her on September 2, 7, and 14. She further alleges that Professor Carberry witnessed the incident on September 14 and asked Jane if she was alright. After John groped Jane again on September 28, she reported the incident to Carberry. But the harassment did not stop. John groped Jane *yet another time* during their October 5 class. The next day, Jane kicked off a series of meetings with Professor Carberry and CCM administrators. Jane filed a formal complaint to UC's Title IX office on October 21.

As to element one, UC argues that the alleged groping is not "actionable sexual harassment" because it is not severe, pervasive, and objectively offensive. Doc. 18, PageID 141–42. Taking the allegations as true and construing all reasonable inferences in her favor, the Court finds that Jane has alleged actionable sexual harassment. The harassment was so severe that Jane allegedly suffered from "stress and anxiety from partnering with John Doe[,]" needed to "leave the classroom[,]" and became "so upset" that she suffered from "a nosebleed." Doc. 15, ¶ 32. The groping was pervasive in that Jane claims it took place on several occasions, even after Jane raised the issue with John. And it was so overt that Professor Carberry purportedly stopped the class to ask Jane if she was okay following inappropriate contact by John.

On elements two and three, UC argues that it did not have actual knowledge of the harassment until Jane reported to the Title IX office on October 21—*after* the final incident of alleged harassment. Doc. 18, PageID 143. But Jane argues that her September reports to Professor Carberry gave UC actual notice of John Doe's conduct. Doc. 20, p. 11. A school

8

has "actual knowledge" of sexual harassment when an "appropriate person" knows about it. *Kesterson v. Kent State Univ.*, 967 F.3d 519, 527 (6th Cir. 2020) (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)). An appropriate person is generally a school official with "authority to address the alleged discrimination and to institute corrective measures on [the school's] behalf[.]" *Gebser*, 524 U.S. at 290. The Amended Complaint alleges that Carberry had such authority.[2] Doc. 15, ¶ 68.b. Carberry witnessed John's conduct on September 14. She and Jane discussed it further on September 28. Still, Jane alleges that John groped her during class on October 5. She thus adequately alleges that UC had actual knowledge before the final instance of harassment.

UC's arguments on elements four and five are premised on the assumption that UC did not have actual notice of the harassment until October 21. Doc. 18, PageID 144–47. Because that assumption does not hold at this stage of the litigation, the arguments are unavailing.

Therefore, Jane Roe has adequately alleged a claim for Title IX deliberate indifference.

### ii. Karen Soe also states a claim for Title IX deliberate indifference.

Although Karen Soe's allegations differ from Jane Roe's, they nonetheless state a claim for relief and survive Defendant's Motion to Dismiss. Karen alleges that John Doe groped her while the two were dancing with Cincinnati Ballet's program for high school students. Years later, Karen and John both enrolled at UC CCM. Karen told Professor Carberry about her history with John in March 2020. Carberry allegedly relayed the report to UC's Title IX office later that month (though, the details of her report are unclear). Eighteen

---

[2] Discovery will bear out whether or not Professor Carberry was in fact an "appropriate person." *See Chapman v. Seuffert*, 713 F. Supp. 3d 425, 436 (N.D. Ohio 2024) (explaining whether someone is an "'appropriate person' under Title IX is 'necessarily a fact-based inquiry' . . .") (further citation omitted).

months later, when Jane was experiencing harassment, Karen offered to corroborate Jane's story as a "fellow victim." She asked to be included as a complainant, but was allegedly denied that opportunity. Karen met with Professor Carberry, Chair Steele, and Division Head Yockey to discuss her and Jane's experiences with John Doe. Despite having made those individuals aware of her past experiences, Karen was required to partner with John Doe in an October 22 class—during which he groped her again. Karen made a formal complaint to UC's Title IX office in November 2021.

Karen alleges that she was sexually harassed by John Doe before enrolling at UC; that she reported the conduct to an appropriate person at UC after enrolling; that UC did not act on the report, and instead subjected Karen to further harassment; and that John further harassed Karen while they were on campus and during class-time. She therefore states a viable claim for Title IX deliberate indifference.

UC makes several arguments for the opposite conclusion. In particular, UC argues that Karen's allegations fall short because the groping was not severe; only one instance of harassment occurred on campus; and none of the people Karen spoke to before the October 22 incident had authority to act on UC's behalf, and thus, none were "appropriate persons." These are arguments, however, that turn on facts, not allegations. They are therefore better addressed on a motion for summary judgment and not a motion to dismiss, especially where this Court is obliged to construe all allegations in a light most favorable to Plaintiffs.[3]

---

[3] UC also challenges the availability of certain types of damages. Doc. 18, PageID 152–55. First, UC argues that money damages for emotional distress are not available under Title IX. *Id.* (citing *Cummings v. Premier Rehab Keller, P.L.L.C*, 596 U.S. 212 (2022)). Plaintiffs respond that they do not seek money damages for emotional distress. Doc. 20., p. 18. Next, UC argues that damages for Plaintiffs' lost earnings opportunities are too speculative. This argument relies on facts not yet in the record. It is thus also better addressed on a motion for summary judgment. *Accord Fisk v. Bd. of Trs. of Cal. State Univ.*, No. 22-cv-173 TWR (MSB), 2023 WL 2919317, at *20 (S.D. Cal. April 12, 2023) (deferring analysis of available damages because dismissing or striking damages allegations on a Rule 12(b)(6) motion would be a "piecemeal approach" to litigation).

Furthermore, what Defendant asserts appears, at this stage, to be belied by the record and Plaintiffs' statement of facts. For example, UC argues that there was no actionable harassment by John Doe because "John Doe and Karen Soe were required to touch each other as part of the *partnering* class." Doc. 18, PageID 142. But Karen's claim is premised on an incident in which "John Doe lifted Karen Soe over his head and slowly brought her down the front of his body"—a move that was "particularly inappropriate because the class was *not* practicing lifts at the time." Doc. 15, ¶ 38.b. (emphasis added). Further, even though UC claims that it was "informed of . . . Karen Soe's allegations in November, 2021," (Doc. 18, PageID 142), Karen alleges that she provided UC with actual knowledge of John Doe's history of "inappropriate touching" well before—at the latest on October 8, 2021. Doc. 15, ¶ 35.a. Though there are factual inconsistencies in the record, UC does not convince the Court that these inconsistencies render Karen's claims implausible *per se*. And the Court is further of the mindset that these inconsistencies would best be threshed out during discovery and disposed of on a motion for summary judgment—not on the instant Motion to Dismiss.

### B. Title IX Retaliation

In Claim Two, Plaintiffs allege that they were retaliated against for making complaints about John Doe's harassing conduct. To state a claim for Title IX retaliation, a plaintiff must show "that (1) she engaged in protected activity, (2) the [school] knew of the protected activity, (3) she suffered an adverse school-related action, and (4) a causal connection exists between the protected activity and the adverse action." *Bose v. Bea*, 947 F.3d 983, 988 (6th Cir. 2020) (internal quotation and citation omitted) (cleaned up). Plaintiffs allege that they engaged in protected activity—namely, that they reported sexual harassment to UC and participated in the investigations and proceedings stemming from their reports. Plaintiffs

further allege that they suffered adverse school-related actions when their casting prospects and performance opportunities deteriorated. They assert that the deterioration was caused by the protected activity and allege that the timing of their fallen prospects closely aligned to the timing of the protected activity. UC argues that these casting decisions (i) were not made by UC, (ii) were not adverse, and (iii) were not causally connected to Plaintiffs' protected activity. Doc. 18, PageID 148–52. While discovery may bear that out, the allegations in Plaintiffs' Amended Complaint are nonetheless sufficient to state a viable claim for relief.

## IV. CONCLUSION

For the reasons stated, the Court **DENIES** UC's Motion to Dismiss. Doc. 18.

**IT IS SO ORDERED.**

March 31, 2025

Jeffery P. Hopkins
United States District Judge