**THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| JANE ROE, et al. | ) | Case No. 1:22-cv-00376 |
| | ) | |
| Plaintiffs, | ) | Judge Jeffrey P. Hopkins |
| | ) | |
| v. | ) | Magistrate Judge Karen L. Litkovitz |
| | ) | |
| UNIVERSITY OF CINCINNATI, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT UNIVERSITY OF CINCINNATI'S
MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, defendant the University of

Cincinnati ("UC") respectfully moves the Court for summary judgment on all of plaintiffs' claims

for the reasons set forth in the accompanying Memorandum in Support.

Respectfully submitted,

D. ANDREW WILSON
ATTORNEY GENERAL OF OHIO

/s/ Michael H. Carpenter
Michael H. Carpenter (0015733) (Trial Attorney)
Timothy R. Bricker (0061872)
David J. Barthel (0079307)
Michael Rogers (0098948)
Carpenter Lipps LLP
280 Plaza, Suite 1300
280 North High Street
Columbus, Ohio 43215
Telephone: (614) 365-4100
Facsimile: (614) 365-9145
carpenter@carpenterlipps.com
bricker@carpenterlipps.com
barthel@carpenterlipps.com
rogers@carpenterlipps.com

*Special Counsel for Defendant
University of Cincinnati*

## MEMORANDUM IN SUPPORT

### I.     INTRODUCTION.

This matter concerns students in UC's ballet program and plaintiffs' allegations of being inappropriately touched by a classmate while learning partnering moves in dance class and rehearsals. The record shows that, when UC had actual knowledge of plaintiffs' allegations, it acted swiftly and took appropriate measures in response. In Title IX vernacular, UC did not show deliberate indifference.

The *first time* Jane Roe reported her belief that John Doe intentionally touched her inappropriately was to her professor on October 6, 2021. Jane Roe's report quickly made its way to UC's Office of Gender Equity and Inclusion ("OGEI"). By October 21, 2021, Jane Roe had already met with OGEI and filed a formal complaint. By October 25, 2021, OGEI had issued a mutual no contact order. Jane Roe's formal complaint was investigated, sent to a hearing, appealed, and concluded by April 26, 2022. After October 5, 2021, Jane Roe was never required to partner with John Doe again and she does not allege any further harassment.

OGEI interviewed Karen Soe as a witness identified by Jane Roe. During her interview, Karen Soe alleged that John Doe touched her inappropriately *once* while partnering in a dance class the month prior, but she had not reported the incident. Karen Soe did not file a formal complaint with OGEI and just wanted to act as a witness for Jane Roe. Karen Soe never partnered with John Doe again after the single, alleged incident and does not allege any further harassment.

Plaintiffs went on to graduate ███████████, obtained professional jobs as ballet dancers after graduation, and suffered no harm to their reputations.

UC was *not* deliberately indifferent or retaliatory towards plaintiffs. There is no genuine dispute as to any material fact and UC is entitled to summary judgment.

II.     **FACTS**.

Jane Roe, Karen Soe, and John Doe were students together in UC's ballet program within UC's College Conservatory of Music ("CCM") in 2021. (UC's Proposed Undisputed Facts ("UF") ¶¶ 1-3.) Jane Roe and Karen Soe allege that John Doe touched them inappropriately while partnering during dance classes and rehearsals in the fall of 2021. (*Id.* ¶¶ 4-6.) It is undisputed that touching is required while partnering. (*Id.* ¶¶ 4-5.)

A.     **Jane Roe's Claims Were Fully Investigated And The Subject Of A Hearing**.

Jane Roe claims that John Doe touched her inappropriately in September and October of 2021 during rehearsals and a partnering class. (*Id.* ¶¶ 13-29.) Jane Roe admits she did not tell any employee at CCM in September that she believed John Doe was ***intentionally*** touching her inappropriately. (*Id.* ¶ 18.) Instead, she told Deirdre Carberry, the professor in charge of rehearsals, that John Doe was not using proper dance technique. (*Id.* ¶¶ 15-16, 19-21.) She testified that "a lot of the partnering wasn't even working out, like we couldn't complete turns and we couldn't do complete jumps and lifts" and she "didn't really know why." (*Id.* ¶¶ 15-16.) Professor Carberry corrected John Doe's technique. (*Id.* ¶ 22.) On September 28, 2021, Jane Roe told Professor Carberry "that she wanted to talk soon," but did ***not*** report she believed John Doe was intentionally touching her inappropriately. (*Id.* ¶¶ 17-18.)

Jane Roe claims that on October 5, 2021, John Doe touched her inappropriately at a rehearsal. (*Id.* ¶¶ 28-29.) After the rehearsal, she left without reporting anything. (*Id.*) Subsequently, on October 6, 2021, ***for the first time***, she told Professor Carberry she believed the touching was intentional. (*Id.*) Jane Roe admits that October 6, 2021, was the first time she told an employee of CCM she thought John Doe was intentionally touching her inappropriately. (*Id.*)

Professor Carberry immediately escalated the issue to her Department Chair, Professor

2

Shauna Steele, and set up a meeting between Professor Steele and Jane Roe on October 6. (*Id.* ¶ 30.) After that meeting, Professor Steele, in turn, immediately escalated the issue to Denton Yockey, the Head of the Division of Theatre Arts, Production, and Arts Administration, who met with Jane Roe, Karen Soe, and three of their classmates on Friday, October 8, 2021. (*Id.* ¶¶ 33-35.) The same day, Professor Yockey submitted a Title IX report to OGEI. (*Id.* ¶ 35.) ***Significantly, after October 5, 2021, Jane Roe never partnered with John Doe again and does not claim to have been harassed by John Doe again.*** (*Id.* ¶ 42-43.)

OGEI is the appropriate entity charged with responding to Title IX reports, including reports of sexual harassment, and conducting investigations of formal complaints. (*Id.* at ¶ 37.) On Monday, October 11, OGEI contacted Jane Roe. (*Id.* ¶ 44) After meeting with OGEI, Jane Roe filed a formal complaint on October 21, 2021. (*Id.* ¶¶ 45-47.) UC's Title IX Coordinator issued a mutual no-contact order between Jane Roe and John Doe on October 25, 2021. (*Id.* ¶¶ 48-52.)

Other accommodations were made for Jane Roe, including separating Jane Roe from John Doe, and developing and implementing a twelve-step plan outlining how to navigate both students' rights to their education.[1] (*Id.* ¶¶ 53-58.) In this regard, CCM temporarily stopped scheduling both Jane Roe and John Doe for rehearsals to keep them separated. (*Id.* ¶ 54.) Jane Roe agrees this was correct and she and John Doe "should have been separated and not rehearsed together." (*Id.* ¶ 55.)

OGEI investigated Jane Roe's allegations. Shannon Schipper, the investigator, interviewed nine witnesses and gathered documentary evidence. (*Id.* ¶ 59.) She compiled the information into a Preliminary Investigation Report (the "PIR"), which she provided to Jane Roe and John Doe on November 29, 2021. (*Id.* ¶ 60.) Jane Roe provided comments to the PIR on November 29, which were incorporated into a January 19, 2022, Final Investigation Report (the "FIR") and provided to

---

[1] On her own, Jane Roe obtained an *ex parte* Civil Protection Order against John Doe prohibiting him from being at CCM while Jane Roe was there. (UF ¶¶ 102-103.)

Jane Roe, John Doe, and the Office of Student Conduct & Community Standards' Administrative Review Committee (the "ARC"). (*Id.* ¶¶ 61-64.) The ARC then scheduled and conducted a hearing to determine whether John Doe violated UC's Sex- and/or Gender-Based Misconduct Policy and Procedure (the "UC Policy"). (*Id.* ¶ 65.)

Before the hearing, Jane Roe was permitted to identify potential witnesses. (*Id.* ¶ 66.) She submitted three students' names. (*Id.*) John Doe also identified three potential witnesses. (*Id.* ¶ 69.)

The hearing occurred on April 1, 2022. (*Id.* ¶ 71.) Jane Roe brought an advisor. (*Id.* ¶ 72.) Jane Roe and John Doe provided opening statements, then responded to questions posed by each of the four members of the ARC. (*Id.* ¶¶ 73-74.) One witness for Jane Roe and one witness for John Doe, who each observed Jane Roe and John Doe dance together, were permitted to testify and answer the hearing panel's questions. (*Id.* ¶ 75.) ***Jane Roe's witness stated she did not personally observe any inappropriate conduct.*** (*Id.* ¶¶ 67-68, 76.) Jane Roe and John Doe also were permitted to submit written questions to the hearing panel to be asked of each other and the witnesses. (*Id.* ¶ 75.) The parties gave closing statements, and the hearing concluded. (*Id.* ¶ 77.)

The ARC unanimously found John Doe did not violate UC's Policy. (*Id.* ¶ 78.) The panel did "not believe that [John Doe's] actions were of a sexual nature" or that he "engaged in physical or verbal conduct based on [Jane Roe's] sex and/or gender identity." (*Id.* ¶ 79.) Jane Roe appealed, and the decision of the panel was affirmed. (*Id.* ¶¶ 80-81.)

### B. Karen Soe Alleges A Single Incident, And She Did Not Make A Report.

For her part, Karen Soe claims one incident in a partnering class in October 2021. (*Id.* ¶¶ 93-96.) She stated John Doe used "incorrect technique" and did not perform "the move that [they] were supposed to be practicing." (*Id.* ¶ 94.) She "stopped" John Doe, "asked him why he performed the lift incorrectly," "told him never to do that again," and "left class." (*Id.* ¶ 95.) Afterwards,

Karen Soe did not partner with John Doe again and does not claim any further harassment. (*Id.* ¶¶ 96, 98-99.) Karen Soe shared this information with UC for the first time during her November 5, 2021, witness interview with Ms. Schipper. (*Id.* ¶ 97.) She did not want to file her own formal Title IX complaint against John Doe and instead preferred to participate in Jane Roe's matter as a witness. (*Id.* ¶¶ 100-01.)

### C.      Jane Roe Accused UC Professors Of Retaliation Without Basis.

On October 25, 2021, Jane Roe received an email from Professor Tricia Sundbeck criticizing her for "abruptly inform[ing] her [she] would not be in class," calling it "incredibly disrespectful." (*Id.* ¶ 134.) Jane Roe believed this email was "inappropriate" and "thought the tone was very condescending and rude." (*Id.* ¶ 135.) She did not believe she was "required to tell the instructors whether or not [she] will be there," but admitted the class was "graded based on mostly [the students'] attendance." (*Id.* ¶ 136-37.) Despite this email, Jane Roe received an A in the class. (*Id.* ¶ 138.)

Jane Roe also contends an A-minus she received in a class from Professor Shauna Steele was retaliation for her report because she "believed [she] was going to get an A." (*Id.* ¶ 133.) Jane Roe additionally believes she was retaliated against by professors because she was cast as a member of the *corps de ballet*[2] for one performance instead of as a soloist or lead. (*Id.* ¶¶ 130-31.) Plaintiffs' purported expert, Karen Jennings, did not find "any evidence to support that Jane Roe['s] … casting while at UC was affected because [she] made accusations against John Doe."[3] (*Id.* ¶ 132.) And Jane Roe admitted that UC provided her supportive measures by switching her classes

---

[2] The *corps de ballet* is the ensemble cast of a ballet. (UF ¶ 131.)

[3] UC may separately file a motion addressing the opinions of plaintiffs' purported experts. UC's citations to plaintiffs' experts are not an agreement that their opinions are admissible under Fed. R. Evid. 702 or otherwise. Instead, these citations underscore the ***indisputability of the facts*** to which even plaintiffs' purported experts agree.

to other professors. (*Id.* ¶ 140.)

### D.   Plaintiffs Graduated From UC And Obtained Paid Positions As Ballerinas.

Jane Roe and Karen Soe completed paid co-ops at ████████████████████ during their senior years. (*Id.* ¶ 118.) Both graduated from CCM ████████████████ and obtained jobs as professional dancers immediately after graduation. (*Id.* ¶¶ 115-16, 119.) CCM Professor Qi Jiang helped both Jane Roe and Karen Soe obtain these paid positions. (*Id.* ¶ 120.)

### III.   LAW AND ARGUMENT.

A Court should "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The burden is on the moving party to show that no genuine dispute as to any material fact exists." *Irvin v. Grand Rapids Pub. Sch.*, 366 F. Supp. 3d 908, 917 (W.D. Mich. 2016). The burden is satisfied "by showing that the nonmoving party has failed to establish an essential element of his case, for which he bears the ultimate burden of proof at trial." *DeWalt v. Harrison County Commissioners*, 2015 WL 5679634, at *2 (S.D. Ohio Sept. 28, 2015) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Once this is established, "the burden shift[s] to [the non-moving party] to provide specific evidence, such as affidavits or depositions, showing genuine issues of material fact." *Id.* A "nonmovant must 'do more than simply show that there is some metaphysical doubt as to the material facts.'" *Smith v. Ohio Dept. of Jobs & Family Servs.*, No. 2:13-CV-56, 2014 WL 5529588, at *2 (S.D. Ohio Nov. 3, 2014) (internal citations omitted). Plaintiffs "must present evidence supporting the claims asserted." *Jane Doe v. Jackson Loc. Sch. Dist. Bd. of Educ.*, No. 5:17-CV-1931, 2018 WL 6590615, at *6 (N.D. Ohio Dec. 14, 2018). "The non-moving party, however, cannot defeat summary judgment merely by pointing to any factual dispute." *Fifth Third Bank, N.A. v. Low Voltage Serv., Inc.*, No. 1:24-CV-00236, 2025 WL

2098196, at *2 (S.D. Ohio July 25, 2025). Instead, "the dispute must be 'genuine' (*i.e.*, supported by evidence) and go to a 'material fact' (*i.e.*, a fact that could matter to the outcome)." *Id.*

Despite extensive discovery, plaintiffs have failed to establish genuine disputes of material fact supported by record evidence regarding their respective claims. The undisputed record establishes that UC is entitled to summary judgment.

### A.     UC Is Entitled To Summary Judgment On Jane Roe's "After" Title IX Claim.[4]

Liability under Title IX may ***not*** be premised on principles of agency, negligence, respondeat superior, vicarious liability, or the independent actions of school employees. *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 642 (1999). Rather, in student-on-student sexual misconduct cases, the school can be held responsible only if it "acts with ***deliberate indifference to known acts of harassment*** in its programs or activities." (Opinion and Order, ECF 45, PageID 508 (quoting *Davis*, 526 U.S. at 633) (emphasis added)).

"Deliberate indifference, as the phrase suggests, presents a 'high bar' to imposing Title IX liability on a university." *Foster v. Bd. of Regents of Univ. of Michigan*, 982 F.3d 960, 965 (6th Cir. 2020) (en banc). A university's response to sexual harassment allegations does not violate Title IX unless its response "is clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. The Supreme Court has admonished courts to "refrain from second-guessing the disciplinary decisions made by school administrators." *Davis*, 526 U.S. at 648. Indeed, the alleged harasser has "constitutional and statutory rights too." *Foster*, 982 F.3d at 969.

To prove a Title IX "after" claim, a plaintiff must prove four discrete elements: (1) actual knowledge by the University of conduct that is "severe, pervasive, and objectively offensive [such]

---

[4] Pursuant to its June 17, 2025 decision, the Court narrowed plaintiffs' deliberate indifference claims, holding that "Plaintiffs have only stated a viable claim for an 'after' theory of liability under Title IX (*i.e.*, not [a] Title IX 'before' claim)." (Order, ECF 55at PageID 599-601.)

that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school," (2) an act by the university indicating deliberate indifference, (3) injury, and (4) that the deliberately indifferent action caused further actionable harassment. (Opinion and Order, ECF 45, PageID 508 (citing *Kollaritsch v. Michigan State Univ. Bd. Of Trustees*, 944 F.3d 613, 623-24 (6th Cir. 2019)). Absent any one of these elements, a Title IX "after" claim fails.

Here, it is undisputed that UC complied with the requirements of Title IX. It ensured Jane Roe and John Doe did not dance together after October 5, 2021; issued a mutual no-contact order; made accommodations; and provided Jane Roe with an investigation, hearing, and appeal. As a matter of law, UC was not deliberately indifferent.

### 1. An Appropriate Person At UC Did Not Have Actual Knowledge Of Jane Roe's Claim Of Sexual Harassment Until October 8, 2021.

A school must have "actual knowledge of an incident of actionable sexual harassment that prompted or should have prompted a response." *Kollaritsch*, 944 F.3d at 621 (quoting *Davis*, 526 U.S. at 650). "Only when an 'appropriate person' at a school knows about sexual discrimination does the school have 'actual knowledge.'" *Kesterson v. Kent State Univ.*, 967 F.3d 519, 527 (6th Cir. 2020). An "appropriate person" is an administrator "high enough up the chain-of-command" with "the authority to take corrective action" on the school's behalf. *Id.* at 527-529.

The Court's Opinion and Order related to UC's motion to dismiss referenced Jane Roe's allegation "that her September reports to Professor Carberry gave UC actual notice of John Doe's conduct." (Opinion and Order, ECF 45, PageID 509-10.) At the pleading stage, the Court found plaintiffs' Amended Complaint adequately pled that Professor Carberry was "[a]n appropriate person" who had "authority to address the alleged discrimination and to institute corrective measures," but noted that "[d]iscovery will bear out whether or not Professor Carberry was in fact an 'appropriate person.'" *Id.* (citing *Gebser v. Lago Vista Ind. Sch. Dist.*, 524 U.S. 274, 290

(1998)). The Court also relied on the allegations in the Amended Complaint that "Carberry witnessed John [Doe's] conduct on September 14," and "discussed it further on September 28." *Id.* The undisputed facts do not support the allegations.

As an initial matter, Professor Carberry did ***not*** have "authority to address the alleged discrimination and to institute corrective measures." *Gebser*, 524 U.S. at 290; *Kesterson*, 967 F.3d at 528. Professors Carberry, Steele, and Yockey testified that instructors such as Professor Carberry are not permitted to unilaterally suspend students from their classes or discipline them in response to an allegation of sexual harassment. (UF ¶ 38.) To do that, they must work with OGEI. (*Id.* ¶ 39.) Plaintiffs' purported expert, Zev Steinrock, agreed that Professor Carberry did not have the authority to take such action. (*Id.* ¶¶ 38-41.) Steinrock agreed that all students accused of misconduct—***including John Doe***—are entitled to a presumption of non-responsibility and full access to all educational benefits unless and until they are found responsible. (*Id.* ¶ 40.); *see also Foster*, 982 F.3d at 969. Mr. Steinrock additionally testified that it is the responsibility of "[t]he staff of the Title IX Office" to investigate claims of harassment, and that "[i]t is not appropriate" for a professor to investigate a sexual harassment claim. (UF ¶ 41.) In short, per the admission of plaintiffs' own purported expert, Professor Carberry was not an appropriate person at UC for purposes of Title IX. *Kesterson*, 967 F.3d at 529.

In *Kesterson*, for example, the Sixth Circuit found that only the Title IX coordinator counted as an "appropriate person" because "[s]he had the authority to take corrective actions on Kent State's behalf to remedy the sexual discrimination Kesterson faced." *Id.* at 528. The plaintiff's head coach, two assistant coaches, her team's academic counselor, and the executive director of Kent State's Women's Center were not "appropriate persons." *Id.* at 523-524, 528. Similarly, here, the appropriate group at UC to take action was OGEI, but it did not have "actual

9

knowledge" of Jane Roe's allegations of sexual harassment until October 8, 2021, ***when it first received a Title IX report from Professor Yockey***. (UF ¶ 35.)

Notwithstanding the fact that Professor Carberry is not an appropriate person under Title IX, the record evidence also is undisputed that she did not have knowledge of claimed ***sexual harassment*** until October 6, 2021. (*Id.* ¶ 29.) Under Sixth Circuit law, "to be actionable," the conduct "must be (a) severe, (b) pervasive, and (c) objectively offensive." *Kollaritsch*, 944 F.3d at 620. "'Objectively offensive' means behavior that would be offensive to a reasonable person under the circumstances, not merely offensive to the victim, personally or subjectively." *Id.* at 621.

Here, the alleged harassment occurred while Jane Roe and John Doe were students learning to partner in ballet. (UF ¶¶ 1-5, 8.) When two dancers partner, they are required to touch each other. (*Id.* ¶¶ 4-5.) Another of plaintiffs' purported experts, Karen Jennings, a ballet instructor, acknowledged that "it's not uncommon when partnering for a male dancer to touch the private area of a female dancer" and that "[a]ccidents happen," and such conduct is not harassment. (*Id.* ¶ 8.)

During the rehearsals in September 2021, Jane Roe admits she did ***not*** report intentional sexual harassment. (*Id.* ¶¶ 15-21.) Instead, she expressed her frustration that "a lot of the partnering wasn't even working out, like we couldn't complete turns and we couldn't do complete jumps and lifts," and she "didn't really know why." (*Id.* ¶¶ 15-16.) Operating with the information Jane Roe provided her, Professor Carberry watched Jane Roe and John Doe dance together and provided feedback and corrections to John Doe so he would perform the lifts correctly. (*Id.* ¶ 22-24.) Jane Roe admits that after Professor Carberry gave John Doe this feedback, he "fixed it and it was fine" for the rest of the rehearsal. (*Id.* ¶ 23.) Jane Roe also admits that when she claims John Doe began misplacing his hands again in the following weeks, he did so when Professor Carberry "was

working with the other couple that was rehearsing." (*Id.* ¶ 26.) Jane Roe did not speak to anyone at UC about John Doe's hand placements for the rest of September. (*Id.* ¶ 27.) All she reported on September 28, 2021, was "that she wanted to talk soon," but did ***not*** report she believed John Doe was intentionally touching her inappropriately. (*Id.* ¶¶ 17-18.)

Thus, even if CCM professors could be appropriate persons under Title IX (they cannot), the undisputed record evidence establishes that no person at UC had "actual knowledge" of alleged sexual harassment by John Doe against Jane Roe until October 6, 2021. It also is undisputed that Professor Carberry—who plaintiffs point to as an "appropriate person" (but who was not)—did not have knowledge of alleged sexual harassment before that date. Instead, Professor Carberry only knew, based on what Jane Roe told her and her own observations, that John Doe needed further instruction on how to technically perform a lift correctly. (*Id.* ¶¶ 15-21.) Such instruction is known as a "correction," and it is what ballet professors do. (*Id.* ¶ 22.)

For all the above reasons, it is undisputed that an appropriate person at UC did not have ***actual knowledge*** of alleged ***sexual harassment*** against Jane Roe until October 8, 2021. It is further undisputed that ***no person*** at UC had knowledge of sexual harassment against Jane Roe until October 6, 2021. (*Id.* ¶ 29.) As such, UC is entitled to summary judgment.

### 2. *UC Was Not Deliberately Indifferent To Jane Roe, And Jane Roe Did Not Suffer Further Actionable Harassment.*

The undisputed record evidence also establishes that once UC had actual knowledge of alleged sexual harassment by John Doe against Jane Roe for the first time on October 8, 2021, it did not "act" with deliberate indifference, and Jane Roe did not suffer further actionable harassment by John Doe. *Foster*, 982 F.3d at 962, 966-971; *Kollaritsch*, 944 F.3d at 621.

"Ordinarily, 'deliberate indifference' means that the defendant both knew and consciously disregarded the known risk to the victim." *Kollaritsch*, 944 F.3d at 621. "An 'Act' means a

response by the school that was 'clearly unreasonable in light of the known circumstances,' ... thus demonstrating the school's deliberate indifference to the foreseeable possibility of *further* actionable harassment of the victim." *Id*. (emphasis *sic*). "It's not a university's job to do the impossible—to 'purg[e] [its] school[] of actionable peer harassment." *Foster*, 982 F.3d at 965 (quoting *Davis*, 526 U.S. at 648). Title IX imposes liability only when schools "refuse[ ] to take action…not when they take action that ultimately fails to purge their schools of actionable peer harassment. We ask not whether the school's efforts were ineffective but whether they amounted to an official decision ... not to remedy the violation." *Id.* at 968 (cleaned up). The Sixth Circuit has held that a university's investigation of misconduct can satisfy Title IX *even if the investigation does not result in the termination or expulsion of the alleged harasser*. *Doe v. Univ. of Kentucky*, 959 F.3d 246, 252 (6th Cir. 2020).

In *Doe*, plaintiff told her friends a fellow student was sexually harassing her, and her friends filed a Title IX report with the university. *Id.* at 248. From there, the university "met with" plaintiff, "issued a no-contact order," and "began its investigation." *Id.* It then provided plaintiff a hearing and appeal on her claims. *Id.* at 249. The Sixth Circuit found that the university did not act with deliberate indifference as a matter of law. In affirming summary judgment, it held that the university "took 'proactive steps to reduce opportunities for further harassment' by issuing no-contact orders." *Id.* at 252 (quoting *Stiles ex rel. D.S. v. Grainger Cty.*, 819 F.3d 834, 849 (6th Cir. 2016)). The Court concluded that "[t]he record simply fails to establish that [the university] took 'insufficient action,' which made Jane Doe 'vulnerable to, meaning unprotected from, further harassment.'" *Id.* (quoting *Kollaritsch*, 944 F.3d at 623.)

On October 6, 2021, Jane Roe reported for the first time that she believed John Doe was *intentionally* touching her inappropriately. (UF ¶ 29.) Although she is not an "appropriate person"

12

under Title IX, Professor Carberry's response to Jane Roe's report was not clearly unreasonable nor deliberately indifferent. *Kesterson* 967 F.3d at 527. It was just the opposite. After receiving the report, she made sure the two did not partner again. (UF ¶¶ 42-43.) She also immediately escalated the matter to the department chair, Shauna Steele, who in turn escalated the matter to the head of the division, Denton Yockey, who filed a Title IX report with OGEI on October 8, 2021, at which point UC received actual knowledge of the report. (*Id.* ¶¶ 30-36.) OGEI contacted Jane Roe and met with her to "explain[] everything" about the process, answer her questions, and allow Jane Roe "to express what [she] wanted to express." (*Id.* ¶ 46.) After speaking with OGEI, Jane Roe then filed a formal Title IX complaint on October 21, 2021. (*Id.* ¶ 47.)

After receiving Professor Yockey's Title IX report, OGEI was not deliberately indifferent. Once Jane Roe filed a formal Title IX Complaint on October 21, 2021, OGEI began a full-scale investigation. (*Id.* ¶¶ 59-64.) Ms. Schipper interviewed nine witnesses and collected documentary evidence. (*Id.* ¶ 59.) She authored the PIR, emailed it to Jane Roe for a response, and incorporated that response into the FIR. (*Id.* ¶¶ 60-62.) The matter was then referred to the ARC for a hearing. (*Id.* ¶ 64.)

The hearing took place on April 1, 2022. (*Id.* ¶ 71.) Jane Roe was permitted to bring an advisor (whom she procured through Ms. Schipper), give an opening statement, submit written questions to John Doe and witnesses, and provide a closing statement. (*Id.* ¶¶ 72-77.) When ARC determined John Doe was not responsible, Jane Roe was permitted to appeal that decision. (*Id.* ¶¶ 78-81.) All these actions were reasonable responses to Jane Roe's report, and did not make Jane Roe "vulnerable to, meaning unprotected from, further harassment." *Doe*, 959 F.3d at 252.

What is more, once Jane Roe reported that she believed John Doe's misplaced hands were intentional sexual harassment for the first time on October 6, *it is undisputed that UC employees*

13

***took action such that she never danced with John Doe again and did not suffer any further instances of alleged sexual harassment by John Doe***. (UF ¶¶ 42-43.) As a matter of law, a university cannot be liable for deliberate indifference under Title IX unless it ***causes*** the plaintiff to suffer further actionable harassment.[5] *Kollaritsch*, 944 F.3d at 620. Here, UC actually took steps that ***prevented*** further harassment, even prior to the formal complaint being filed and the investigation. This requires the dismissal of Jane Roe's claim.

Thus, as a matter of undisputed fact and law, UC was not deliberately indifferent and Jane Roe did not suffer further actionable harassment by John Doe after UC learned of the report on October 8, 2021. UC is entitled to summary judgment.[6]

### B. UC Was Not Deliberately Indifferent to Karen Soe.

Karen Soe's claim relates to one incident of alleged sexual harassment in October 2021,

---

[5] Jane Roe and Karen Soe alleged the mutual no-contact order UC issued was deliberately indifferent because it was "insufficient and impracticable" and failed to prevent "continued contact" with John Doe. (Amend. Compl. ¶¶ 40-42, ECF 15 PageID 114.) To the extent plaintiffs intend to pursue this particular allegation of deliberate indifference, it has no basis. Plaintiffs admit they falsely accused John Doe of being at CCM on two separate occasions. (UF ¶¶ 102-14.) On the day of the ARC hearing, Jane Roe emailed multiple UC faculty stating she "was told that [John Doe] was seen in the dance hallways today after the hearing." (*Id.* ¶¶ 105.) It turned out that John Doe "was not in the building [that day]." (*Id.* ¶ 106.) Instead, the person Jane Roe was emailing about was a different man, █████████████ who happened to be in the dance hallway that day. (*Id.* ¶ 107.) Three days later, Jane Roe and Karen Soe falsely reported to police that John Doe was on campus. (*Id.* ¶ 108.) Jane Roe reported she saw "████████████" she believed was John Doe. (*Id.* 109.) Similarly, Karen Soe reported seeing a █████████████████████." (*Id.* ¶ 110.) The person they saw was not John Doe, but rather ████████████████. (*Id.* ¶ 111.)

[6] Plaintiffs also alleged in their Amended Complaint that, in March 2020, Professor Carberry knew John Doe had allegedly harassed Karen Soe ███████ while at a ballet company not associated with UC ████████████████, and UC took no action. (Amend. Compl. ¶¶ 26, 28, ECF 15 PageID 108-09.) As noted above, however, the March 2020 allegations relate to plaintiffs' "before" Title IX claim, which the Court determined failed to state a claim. *See* supra, fn. 4. The remaining "after" Title IX claims in this matter relate exclusively to allegations about interactions between plaintiffs and John Doe in the fall of 2021. (Order, ECF 55 at PageID 604.) In addition, documents show that in 2020 Jane Roe spoke with Professor Carberry about John Doe's rumored history at the other ballet company when he was in ███████. (UF ¶ 82.) Professor Carberry reported the allegations to OGEI ***that same day*** and OGEI contacted Jane Roe ***that same day***. (*Id.* ¶¶ 83-85.) OGEI sent multiple follow-up emails to Jane Roe seeking a meeting with her or any other person who had knowledge. (*Id.* ¶¶ 86-87, 90.) Jane Roe replied, "I passed the information along when I received it. We all have been very busy with our full schedules and rehearsals. Thank you." (*Id.* ¶ 88.) Neither plaintiff responded to OGEI's invitation to meet. (*Id.* ¶ 90.) Per standard practice, OGEI followed up with the reporting party, Professor Carberry, but she did not have additional information. (*Id.* ¶ 91.) Despite this, CCM still addressed the concerns directly with John Doe. (*Id.* ¶ 92.) Hereto, UC's response was reasonable in light of the known circumstances and does not constitute deliberate indifference.

14

for which she did not want to pursue a formal resolution and did not file a formal complaint. (UF ¶¶ 93-101.) After the alleged single incident of harassment, she never partnered with John Doe again and does not claim to have suffered further harassment. (*Id.* ¶¶ 96, 98.) Standing alone, the fact she alleges only a single incident entitles UC to summary judgment on her claim. *Kollaritsch*, 944 F.3d at 620 ("'Pervasive' means 'systemic' or 'widespread,' … but for our purposes, it also means *multiple* incidents of harassment; one incident of harassment is not enough.") Based on these undisputed facts, UC was not deliberately indifferent as a matter of law and is entitled to summary judgment. *Id.* at 621.

### C. UC Is Entitled To Summary Judgment On Plaintiffs' Retaliation Claims.

When discussing a Title IX retaliation claim, the Sixth Circuit has "analogized to Title VII retaliation," and stated "a Title IX plaintiff must show 'that (1) [s]he engaged in protected activity, (2) [the funding recipient] knew of the protected activity, (3) [s]he suffered an adverse school-related action, and (4) a causal connection exists between the protected activity and the adverse action.'" *Bose v. Bea*, 947 F.3d 983, 988 (6th Cir. 2020).[7] *Gebser*, *Davis*, and *Jackson* establish that a Title IX retaliation claim lies only for a funding recipient's own retaliation—***not*** for the actions of employees. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 184 (2005). The Sixth Circuit has held the same. *See M.D. by & through Deweese v. Bowling Green Indep. Sch. Dist.*, 709 F. App'x 775, 779 (6th Cir. 2017).

Additionally, to prove Title IX retaliation, a plaintiff must show that the retaliatory conduct was "materially adverse" such that it "dissuade[s] a reasonable [person] from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006). Mere criticism or failure to obtain a desired position does not constitute retaliation as a matter of law.

---

[7] These prima facie elements are part of the burden-shifting framework governing Title IX retaliation claims. *See Goldblum v. Univ. of Cincinnati*, 62 F.4th 244, 251 (6th Cir. 2023).

*See Primes v. Reno*, 190 F.3d 765, 767 (6th Cir. 1999) ("If every low evaluation or other action by an employer that makes an employee unhappy or resentful were considered an adverse action, Title VII would be triggered by supervisor criticism or even facial expressions indicating displeasure.").

To survive summary judgment, a plaintiff "must put forth some fact creating an inference that the adverse action would not have occurred without the [student] first engaging in protected activity." *Sizemore v. Edgewood Bd. of Educ.*, No. 1:19-CV-555, 2020 WL 1904726, at *8 (S.D. Ohio Apr. 17, 2020) (Title VII); *see also Mitchell v. Ohio State Univ.*, No. 2:19-CV-4162, 2020 WL 5250459, at *5 (S.D. Ohio Sept. 3, 2020) (Title IX). Jane Roe has no such evidence.

### 1. Jane Roe Has No Evidence That UC Retaliated Against Her.

All purported retaliatory conduct identified by Jane Roe was allegedly committed by CCM faculty members, not UC. (UF ¶¶ 129-38.) As discussed above, however, faculty members are not high enough up the chain-of-command such that their decisions constitute the decision of UC. *See supra* at 8-11 (citing *Kesterson*, 967 F.3d at 529). UC is entitled to summary judgment for this reason. Relatedly, Jane Roe's Title IX retaliation claim against UC cannot be based on a theory that UC was deliberately indifferent to its employees' retaliatory conduct. *See Bose*, 947 F.3d at 989 (questioning whether "deliberate indifference to retaliation [is] even actionable under Title IX"); *M.D. ex rel. Deweese*, 709 F. App'x at 779 ("M.D. has failed to cite any authority applying the ... deliberate indifference framework to a Title IX retaliation claim"). And, even if a Title IX retaliation claim based on deliberate indifference were actionable (which it is not), UC is still entitled to summary judgment because there is no record evidence that Jane Roe notified an appropriate UC official that she was subjected to retaliation. In other words, UC could not have been deliberately indifferent to retaliation it did not know about. *Bose*, 947 F.3d at 993 (6th Cir. 2020); *M.D. ex rel. Deweese*, 709 F. App'x at 779. Jane Roe's Title IX retaliation claim fails.

The undisputed facts also defeat Jane Roe's retaliation claim:

### a. The October 25, 2021 Email From Professor Sundbeck Was Not Retaliation.

Regarding the October 25, 2021 email, it made no mention of Jane Roe's allegations related to John Doe and, instead, criticized Jane Roe for speaking to her professor in a disrespectful manner. (UF ¶ 134.) At her deposition, Jane Roe did *not* testify that she believed Professor Sundbeck sent this email to punish her for reporting alleged sexual harassment. Rather, she stated the email was "inappropriate" because she "thought the tone was very condescending and rude." (*Id.* ¶ 135.) Being rude is not proof of retaliation nor is it an adverse action. Criticism alone cannot be retaliation as a matter of law. *Primes*, 190 F.3d at 767. And Jane Roe still received an A in the class. (UF ¶ 138.) She further testified that she did not believe it was appropriate for her professor to criticize her for missing class because "coming to class is completely up to [her], [she's] not required to tell the instructors whether or not [she] will be there or not." (*Id.* ¶ 136.) Yet, she acknowledged that the class was "graded based on mostly [the students'] attendance." (*Id.* ¶ 137.)

### b. UC Did Not Retaliate Against Jane Roe By Finding Her A New Partner.

The allegation that UC retaliated against Jane Roe by telling her she could be removed from an end of year performance unless CCM could find a male partner to replace John Doe fails to demonstrate retaliation. ***It is undisputed that CCM took extensive steps to, and did, find Jane Roe another male partner.*** (UF ¶¶ 56-57.) In this regard, Professor Steele contacted third-party professional dancers in an effort to employ them at UC's cost to replace John Doe, ***including one recommended by Jane Roe*** (he declined). (*Id.* ¶ 56) UC was ultimately able to find a replacement partner and successfully replaced John Doe. (*Id.* ¶ 57.) As a result, Jane Roe was able to perform her role as the lead in the performance. (*Id.*)

### c. The Modified Rehearsals Were Accommodations, Not Retaliation.

Jane Roe also admits that she understood rehearsals were properly modified because she and John Doe "should have been separated and not rehearsed together." (*Id.* ¶ 55.) This temporary pause applied evenly to both her and John Doe, and so cannot constitute retaliation. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000) (a key component of causation is "evidence that defendant treated the plaintiff differently from similarly situated" individuals).

### d. Jane Roe's Unpled Retaliation Claims Also Fail.

Beyond her pled allegations, Jane Roe testified that she "felt" like her professors retaliated against her because she was cast as a member of the *corps de ballet* in one performance and she believed she was not receiving detailed enough feedback, resulting in an A-minus in one class where she believed she should have received an A. (UF ¶¶ 130-33.) Regarding casting, plaintiffs' purported ballet expert, Karen Jennings, admitted that she did not find "any evidence to support that Jane Roe['s] … casting while still at UC was affected because [she] made accusations against John Doe." (*Id.* ¶ 132.) Without evidence, Jane Roe's retaliation claim as to casting should be dismissed.

Jane Roe's claim that receiving an A-minus instead of an A constitutes retaliation also fails. A single evaluation, particularly a high evaluation such as an A-minus, is not a materially adverse action as a matter of law. *Primes*, 190 F.3d at 767. "[C]onclusory allegations of retaliatory motive unsupported by material facts" are not sufficient. *Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005) (§ 1983 retaliation claim); *see also Theidon v. Harvard Univ.*, 948 F.3d 477, 502 (1st Cir. 2020) (conclusory allegations insufficient).

The undisputed evidence establishes Jane Roe was not retaliated against. As such, UC is entitled to summary judgment.

18

**2.** ***Karen Soe Admits She Has No Evidence of Retaliation.***

Karen Soe candidly admits she "wouldn't say [she] was threatened with retaliation," and "can't prove that [she] was retaliated against." (UF ¶¶ 141-42.) Karen Soe's admissions remove all genuine factual issues as to her retaliation claim, and UC must be granted summary judgment.

**D.** **Plaintiffs Cannot Recover The Damages They Seek Pursuant To Title IX.**

Plaintiffs seek relief only under Title IX. As a result, they are limited to only those remedies "traditionally available" or "usual" for breach of contract. *See Cummings v. Premier Rehab Keller, P.L.L.C,* 596 U.S. 212, 220-221 (2022); *S.C. v. Metro. Gov't of Nashville*, 86 F.4th 707, 718 (6th Cir. 2023); *Doe 162 v. The Ohio State University*, 796 F.Supp.3d. 476, 488 (S.D. Ohio 2025). Thus, damages for emotional distress, lost wages or earning capacity, reputational harm or other tort-like damages are not available. *Id.*

Despite the significance of the *Cummings* decision, plaintiffs seek claimed loss-of-income and loss-of-reputation damages. (UF ¶ 7.) Post-*Cummings*, a "myriad [of] cases ultimately prohibit[ed] damages for lost earnings or earning capacity due to the plaintiff's inability to prove the same." *Snyder-Hill v. Ohio State Univ*, No. 2:23-cv-3051, 2026 WL 1846975, at *3 n.6 (S.D. Ohio Apr. 28, 2026) (collecting cases). Lost earnings must be "reasonably foreseeable and certain," and plaintiffs "are limited to recovering their 'actual loss, which loss must be established with reasonable certainty.'" *Id.* at *4 (quoting *Eggert v. Meritain Health, Inc.*, 428 F. App'x 558, 563 (6th Cir. 2011)). Similarly, reputational damages are not available post-*Cummings*. *See*, *e.g.*, *Unknown Party v. Ariz. Bd. of Regents*, No. CV-1801623, 2022 WL 17459745, * 4 (D. Ariz. Dec. 6, 2022) ("*Cummings* applies with full force" in Title IX actions and "reputational harm damages are both unavailable"). Here, plaintiffs have no proof, let alone proof with reasonable certainty, that they suffered lost earnings. Instead, the undisputed facts defeat plaintiffs' claim for damages.

19

Plaintiffs both obtained paid positions as professional ballerinas. (UF ¶ 118-19.) Plaintiffs' purported expert, Karen Jennings, admits that ballet is a highly competitive field, and that there are many dancers for very few positions, particularly for women. (*Id.* ¶ 117.) Despite the high competition, UC Professor Qi Jiang helped both plaintiffs obtain paid co-op positions ███ ███████████████████ during their senior year, and both were then hired after graduation. (*Id.* ¶¶ 118-20.) In short, plaintiffs suffered no lost earnings.

Finally, plaintiffs can point to no evidence that their reputations have been harmed, or that they lost income. Plaintiffs' purported expert admitted that she has not seen any evidence that plaintiffs' respective reputations were harmed in the dance community. (UF ¶ 121.) Jane Roe admitted that her own subjective belief is her only basis for claiming her reputation was harmed. (*Id.* ¶ 122.) She also admitted that no one told her that they thought less of her because of her allegations against John Doe. (*Id.* ¶ 123.) She additionally admitted that she does not know what her reputation is. (*Id.* ¶ 124.)

For her part, Karen Soe candidly admitted that she has no evidence that her alleged loss-of-reputation "was a direct result of what happened at CCM." (*Id.* ¶ 125.) She also did not attempt to apply to any other ballet companies after leaving ███████████. (*Id.* ¶ 126.)

Plaintiffs are not entitled to damages for loss of income or harm to their reputations. UC is entitled to summary judgment.

## IV. CONCLUSION.

For the foregoing reasons, UC is entitled to summary judgment on all claims asserted in plaintiffs' Amended Complaint (ECF 15).

Respectfully submitted,

D. ANDREW WILSON
ATTORNEY GENERAL OF OHIO

/s/ Michael H. Carpenter
Michael H. Carpenter (0015733) (Trial Attorney)
Timothy R. Bricker (0061872)
David J. Barthel (0079307)
Michael Rogers (0098948)
Carpenter Lipps LLP
280 Plaza, Suite 1300
280 North High Street
Columbus, Ohio 43215
Telephone: (614) 365-4100
Facsimile: (614) 365-9145
carpenter@carpenterlipps.com
bricker@carpenterlipps.com
barthel@carpenterlipps.com
rogers@carpenterlipps.com

*Special Counsel for Defendant University of Cincinnati*

21

## <u>CERTIFICATE OF SERVICE</u>

I certify that a copy of the foregoing was filed electronically on August 13, 2026. Notice was sent by operation of the Court's electronic filing system to all other counsel who have entered an appearance and any parties who have entered an appearance through counsel. The parties may access this filing through the Court's ECF system.

/s/ Michael H. Carpenter
Michael H. Carpenter

*Trial Attorney for Defendant University of Cincinnati*