**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

| | |
|---|---|
| JANE ROE, et al | Case No. 1:22-cv-376 |
| Plaintiffs, | Judge: Jeffrey P. Hopkins |
| v. | RESPONSE TO MOTION FOR SUMMARY JUDGMENT |
| UNIVERSITY OF CINCINNATI, | ORAL ARGUMENT REQUESTED |
| Defendant | |

Plaintiffs respectfully submit this Response to Defendant's Motion to for Summary Judgment. (Doc#64.)

Defendant's Motion reminds one of the famous line spoken by Gene Wilder's Willy Wonka in the 1971 version of Willy Wonka & the Chocolate Factory. When a child (Augustus Gloop) falls into the chocolate river, Wilder delivers the line, "Help. Police. Murder." In a comically flat and unenthusiastic manner, with zero emotion or urgency, while doing nothing to help the child. (https://youtu.be/Y2gH2b2WcGI.)

This is how UC believes professors should act when confronted by sexual assault in their classrooms. A Department chair at CCM testified:

> Q … do faculty members have the ability to protect students from sexual harassment at CCM?
> A No.

(Yockey Depo., Doc.61-6, PageID#1718.) He later testified that the only responsibility of faculty to make sure that there is no sexual harassment in the classroom is to report the issue to the school's Title IX Office. (Yockey Depo., Doc.61-6, PageID#1718.)

Jane Roe and Karen Soe were sexually assaulted in the classroom because CCM faculty who had the ability to take actions to prevent the continued assaults, were deliberately indifferent. They, like Wilder's Willy Wonka, just stood there, professed concern, and half-heartedly called for help from someone else – someone who was unable to provide effective assistance.

## TABLE OF CONTENTS AND SUMMARY OF ARGUMENT

FACTS.......................................................................................................................................1

Jane Roe and Karen Soe, ballet students at the University of Cincinnati College Conservatory of Music, were sexually assaulted by a fellow student during classes/rehearsals. UC was aware of the risk this would occur but initially did nothing, then conducted a sham investigation and flawed hearing

ARGUMENT ...............................................................................................................................4

A. Standards ...........................................................................................................................4

Federal Rule of Civil Procedure 56(a) provides that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party has the burden of showing an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). A federal funding recipient may be liable under Title IX for student-on-student sexual harassment. *Davis v. Monroe County Board of Education*, 526 U.S. 629, 643 (1999). Title IX liability attaches only when a school official "who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination" and fails to correct such behavior in a manner that amounts to deliberate indifference. Gebser v. Lago Vista Independent School District, 524 U.S. 274, 290 (1998). Title IX also protects individuals who "complain of sex discrimination" from retaliation. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 184 (2005).

1. Summary Judgment ..........................................................................................4

2. The Deliberate Indifference And Retaliation Claims ...................................................5

B. UC Had Actual Knowledge Of John Doe's Conduct Prior To His Continued Sexual Assaults ..........................................................................................................6

Months, even years, before John Doe sexually assaulted Jane Roe and Karen Soe both faculty at CCM and the UC Title IX Office were informed that John Doe would inappropriately touch women during ballet rehearsals. In February 2020, Jane Roe's and Karen's Soe dance instructor was informed of the risk posed by John Doe. Professor Carberry reported the allegations to the Title IX Office, but no formal investigation was started and no remedial actions were taken. A faculty member is an an appropriate person because they have the authority to take corrective action in the classroom to prevent and remedy sexual harassment. UC's argument, that only an employee of the Title IX Office – and not a professor, department chair, or division head – can qualify as an "appropriate person" is inconsistent with the Sixth Circuit's decision in

*Dahmer v. W. Kentucky Univ.*, 6th Cir. No. 21-5318, 2022 U.S. App. LEXIS 28533, at *9 (Oct. 13, 2022), and this Court's decision in *Doe v. Ohio Univ.*, S.D.Ohio No. 2:21-cv-00858, 2023 U.S. Dist. LEXIS 52435, at *21 (Mar. 27, 2023). At a minimum, Plaintiffs have created an issue of fact about whether professors may be appropriate persons under Title IX because whether someone is an 'appropriate person' under Title IX is necessarily a fact-based inquiry.

C. Jane Roe And Karen Soe Suffered Actional Harassment After Providing Notice To UC ....... 12

UC aware that John Doe would touch students inappropriately in 2020. In Fall 2021, John Doe sexually harassed (really, sexually assaulted) Jane Roe and Karen Soe during rehearsals. Rather than take steps to remedy the violation, UC opted to avoid cover up and avoid the problem through ineffective orders and a sham investigation, resulting in Jane Roe and Karen Soe being excluded from educational opportunities. UC took no actions when the allegations against John Doe were reported to Professor Carberry and the Title IX Office in March 2020. The UC Title IX Office got involved in 2021 but, it, too, was ineffective by, for example, issuing a no contact order for both Jane Roe and John Doe (but not Karen Soe) that did not prevent John Doe from being in the same dance class as Jane Roe and put the obligation on Jane Roe, as much as John Doe, to avoid contact. UC's subsequent sham investigation and flawed hearing process suggests the school's efforts "amounted to 'an official decision… not to remedy the violation.'" *Foster v. Bd. of Regents of Univ. of Mich.*, 982 F.3d 960, 967 (6th Cir. 2020) (*en banc*). To wit: the investigation was incomplete and the rules were not applied evenly; the investigative report did not include statements from other dancers about John Doe's prior conduct and hearing panel denied Jane Roe's request to have other dancers, including Karen Soe, testify about similar experiences with John Doe (but allowed John Doe to present such witnesses); and the hearing panel relied on "expert" evidence provided by Professor Carberry that was inaccurate and highly misleading.

1. Jane Roe ....... 13
2. Karen Soe ....... 14
3. UC's Response To The Harassment Of Jane Roe Was Not Reasonable ....... 14
   a. UC Failed To Take Adequate Actions To Prevent Sexual Harassment ....... 15
   b. UC Conducted A Sham Investigation And Hearing ....... 17

D. The Title IX Retaliation Claim ....... 22

Plaintiff presented evidence that retaliation is an especially high risk in the performing arts. Both Jane Roe and Karen Soe received poor roles and had difficulty obtaining employment because they were portrayed as

"troublemakers," "being difficult" or having a "bad attitude."

E. Damages ........ 23

Under *Cummings v. Premier Rehab Keller PLLC*, 596 U.S. 212 (2022), UC is 'on notice' that, by accepting federal funding, it exposes itself to liability directly related to UC's failure to assure that Plaintiffs could receive the full benefits of education at the school, including the opportunity to meaningfully access and fully participate career opportunities. To the extent a Title IX violation caused quantifiable losses in educational opportunities or benefits, or in earnings or earning capacity, such losses are akin to lost profits and are, therefore, recoverable as expectation damages.

CONCLUSION ........ 26

**TABLE OF AUTHORITIES**

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .......... 5

*Chaitram v. Penn Medicine-Princeton Med. Ctr.*, D.N.J. Civil Action No. 21-17583, 2022 U.S. Dist. LEXIS 203676 (Nov. 8, 2022) .......... 26

*Chapman v. Seuffert*, 713 F. Supp. 3d 425 (N.D. Ohio 2024) .......... 12

*Cummings v. Premier Rehab Keller PLLC*, 596 U.S. 212 (2022) .......... 23

*Dahmer v. W. Kentucky Univ.*, 6th Cir. No. 21-5318, 2022 U.S. App. LEXIS 28533 (Oct. 13, 2022) .......... 11

*Davis v. Monroe County Board of Education* that 526 U.S. 629 (1999) .......... 5

*Doe v. Cummins*, 662 Fed. Appx. 437 (6th Cir. 2016) .......... 24

*Doe v. East Haven Bd. of Educ.*, 200 F. App'x 46 (2d Cir. 2006) .......... 15

*Doe v. Hamilton Cty. Bd. of Edn.*, 329 F. Supp. 3d 543 (E.D.Tenn.2018) .......... 14

*Doe v. Oberlin College*, 963 F.3d 580 (6th Cir.2020) .......... 17

*Doe v. Ohio State Univ.*, 796 F. Supp. 3d 476 (S.D.Ohio 2025) .......... 23

*Doe v. Univ. of Cincinnati*, 872 F.3d 393 (6th Cir. 2017) .......... 24

*Doe v. Univ. of Ky.*, 111 F.4th 705 (6th Cir. 2024). .......... 6

*Doe v. Vanderbilt Univ.*, M.D.Tenn. No. 3:23-cv-00426, 2025 U.S. Dist. LEXIS 158632 (Aug. 15, 2025) .......... 11

*Foster v. Bd. of Regents of Univ. of Mich.*, 982 F.3d 960 (6th Cir. 2020) .......... 15, 17

*Frederick v. Simpson College*, 149 F.Supp.2d 826 (S.D.Iowa 2001) .......... 8

*Gebser v. Lago Vista Indep. School Dist.*, 524 U.S. 274 (1998) .......... 5, 7

*Goss v. Lopez*, 419 U.S. 565 (1975) .......... 24

*Hawkins v. Sarasota Cty. Sch. Bd.*, 322 F.3d 1279 (11th Cir. 2003) .......... 9

*Herndon v. College of the Mainland*, S.D.Tex. No. G-06-0286, 2009 U.S. Dist. LEXIS 12425 (Feb. 13, 2009) .......... 8

*Jackson v. Birmingham Bd. of Edu*c., 544 U.S. 167 (2005) .......... 6

*Kesterson v. Kent State Univ.*, 967 F.3d 519 (6th Cir. 2020) .......... 9

*Klemencic v. Ohio State Univ.*, 263 F.3d 504 (6th Cir. 2001) .......... 6

*Kollaritsch v. Michigan State Univ. Bd. of Trustees*, 944 F.3d 613 (6th Cir. 2019) .......... 13

*Montgomery v. D.C*, No. 18-1928, 2022 U.S. Dist. LEXIS 92281 (D.D.C. May 23, 2022) .......... 26

*Montgomery v. Indep. School Dist. No. 709*, 109 F.Supp.2d 1081 (D.Minn. 2000). .......... 8

*Murrell v. School Dist. No. 1*, 186 F.3d 1238 (10th Cir. 1999) .......... 7, 9

*Ohio Environmental Dev. Ltd. Partnership v. Envirotest Sys. Corp.*, 478 F.Supp.2d 963 (N.D.Ohio 2007) .......... 25

*Plamp v. Mitchell Sch. Dist.*, 565 F.3d 450 (8th Cir. 2009) .......... 9

*Rullo v. Univ. of Pittsburgh*, W.D.Pa. Civil Action No. 17-1380, 2021 U.S. Dist. LEXIS 29882 (Feb. 18, 2021) ....... 26

*Snyder-Hill v. Ohio State Univ.*, S.D.Ohio No. 2:23-cv-2993, 2026 U.S. Dist. LEXIS 143803 (Apr. 28, 2026), ....... 25

*Stiles v. Grainger Cty.*, 819 F.3d 834 (6th Cir. 2016) ....... 5

*Weis v. Bd. of Trustees of the Florida Gulf Coast Univ.,* M.D.Fla. No. 2:19-cv-503, 2020 U.S. Dist. LEXIS 80701 (May 7, 2020) ....... 9

Wright, Miller & Kane, *Federal Practice and Procedure Civil 3d* § 2726 (1998) ....... 5

Jane Roe and Karen Soe, ballet students at the University of Cincinnati College Conservatory of Music, were sexually assaulted by a fellow student during classes/rehearsals. UC was aware of the risk this would occur but initially did nothing, then conducted a sham investigation and flawed hearing. that, predictably, exonerated the harasser.

**FACTS**

This case is one of many cases in which UC has struggled to respond to alleged sexual assaults and sexual misconduct on campuses.[1] Plaintiffs Jane Roe and Karen Soe were undergraduate ballet students at CCM when they were sexually harassed (really, sexually assaulted) by a fellow ballet student (referred to here as John Doe) in the classroom.

Prior to his enrollment at the UC College Conservatory of Music, John Doe had been credibly accused of sexual misconduct by other female dancers at another local instutution. A letter in UC's possession noted that John Doe had been accused by young women of touching them inappropriately while dancing at at this ballet academy. (Letter, Doc.66-1, PageID#___, Exhibit p.121.) The author of the letter said to someone at UC, "I hope this will serve as documentation of what she stated/experienced as well as be on file if ever there is a need to refer back to what transpired." (Letter, Doc.66-1, PageID#___, Exhibit p.121.) The ballet community is small and the accusations against John Doe were "plausibly" common knowledge in the Cincinnati dance community in general and among CCM faculty, in particular. (Soe Depo., Doc.61-2, PageID# 167 "I think… there's a lot of crossover that goes on with them.").)

---

[1] *See e.g. University of Cincinnati investigated for 'sexually hostile environment'*, WKYC, Dec. 30, 2016 ("Allegations of a "sexually hostile environment" on campus spurred a federal investigation of the University of Cincinnati, recently discovered federal documents state."); *Doe v. Univ. of Cincinnati,* 872 F.3d 393 (6th Cir. 2017); *Goldblum v. Univ. of Cincinnati,* S.D.Ohio No. 1:19-cv-398, 2022 U.S. Dist. LEXIS 54979 (Mar. 28, 2022); *Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d 586 (S.D.Ohio 2016); *Gischel v. Univ. of Cincinnati*, 302 F. Supp. 3d 961 (S.D.Ohio 2018). (*See also* Am. Complaint ¶ 17.)

Karen Soe first danced with John Doe when she was approximately 15 years old at a local ballet academy. During that time, John Doe inappropriately touched Karen Soe's breasts and buttocks during practices. Karen Soe did not report the misconduct because she was young and inexperienced and did not appreciate the severity of John Doe's conduct. (Soe Depo., Doc.61-2, PageID#909-909.)

In February 2020 Jane Roe told Carberry about the prior incidents involving John Doe. She also mentioned conduct occurring at CCM. (Roe Depo., Doc61-1, PageID#681.) An email to Carberry states that she "witnessed him touching [a different student's] breast" during a rehearsal; Roe added that "[a] lot of the girls agreed that he makes everyone uncomfortable. We are all scared he will stalk us like he has before with other girls." (Email, Doc.61-1, PageID#844.) Professor Carberry submitted a Title IX report to the Office of Gender Equity and Inclusion ("OGEI") the same week.[2] (Carberry Depo., Doc.61-5, PageID#1541.) Jane Roe received an email from an "Administrative Coordinator" in the UC Title IX Office about John Doe. The email states that the "office received a report today that indicated that classmates of yours may have experienced sexual harassment." The email informed Jane Roe about various resources but did not ask Jane Roe for any more information or request an interview. (Email, Doc.61-1, PageID#846.)

In March 2020, Karen Soe told her professor about her history with John Doe and that she felt uncomfortable with him in class. (Soe Depo., Doc.61-2, PageID# 76-77.) Karen Soe never heard from anyone in the Title IX office, however.

In Fall 2021, Jane Roe was cast in one of the lead roles for a performance of *Paquita*. John Doe was assigned to be her partner. On September 2, 2021, John Doe inappropriately placed his hand close to Jane Roe's breast during a lift. John Doe's hands then touched Jane Roe's breasts on a

[2] OGEI's investigator testified that when she investigated Roe's October 2021 report eighteen months later, she was not made aware of and did not review this February 2020 report or email. (Schipper Depo., Doc.61-9, PgeID#2116-2118.)

number of occasions. Jane Roe, based on her experience as dancer, did not believe that John Doe had acted accidently. Jane Roe did not pursue a complaint at this time because she did not want to cause trouble and was willing to give John Doe the benefit of the doubt. Five days later, John Doe again touched Jane Roe inappropriately during a practice. A week later John Doe again inappropriately touched Jane Roe during a practice. He touched Jane Roe's breasts and lowered Jane Roe from lifts very slowly, rubbing the back of Jane Roe's body against the front of his body. (Report, Doc.66-1, PageID#___, Exhibit p. 59-61; Title IX Complaint Doc.61-1, PageID#857.)

During one practice, Professor Carberry noticed some of the inappropriate touching and addressed it with Jane Roe and John Doe. The professor turned to Jane Roe and asked, "Are you ok?." (Roe Depo, Doc.61-1, PageID#716; Complaint Doc.61-1, PageID#857.) This did not stop John Doe. He touched Jane Roe inappropriately during two more practices. John Doe again touched Jane Roe's breasts and rubbed her body against his penis when lowering her from lifts. The stress and anxiety from partnering with John Doe caused Jane Roe to have to leave the classroom; she was so upset that she had a nosebleed. (Report, Doc.61-1, PageID#857.)

On October 6, 2021, Jane Roe and Professor Carberry met with Shauna Steele, Chair of CCM's Dance Division; Karen Soe was also present. Jane Roe told Professor Steele "that I had been touched inappropriately multiple times throughout our rehearsals the past couple of weeks and I don't feel comfortable or safe with him as a partner." (Roe Dep., Doc.61-1, PageID#723.) Steele escalated the matter the same day to Denton Yockey, Head of UC's Division of Theatre Arts, Production, and Arts Administration. On October 8, 2021, Jane Roe met with Yockey, accompanied by Karen Soe and classmates. (Roe Depo., Doc.61-1, PageID#726-287). Yockey filed a report the same day with OGEI. A few days later, Roe filed a formal written complaint with OGEI. UC's Title IX Coordinator issued a Mutual No-Contact Order between Jane Roe and John Doe.

A few days later, Karen Soe was paired with John Doe in class. John Doe assaulted Karen

Soe in a similar fashion. (Soe Depo., Doc.61-2, PageID#957). She reported the incident to their partnering instructors. (Soe Depo., Doc.61-2, PageID#959-960.) Soe also told the Title IX investigator that she should be "put down" as a victim. (Soe Depo., Doc.61-2, PageID#998.) The Title IX Office never took any action on her complaint.

The OGEI conducted an investigation and the matter eventually led to a hearing. At the hearing, John Doe, responding to a question from a hearing panel member, admitted that he had touched Jane Roe's breasts but claimed that it was accidental. (Wade Depo, Doc.61-7, PageID#1883.) Jane Roe's appeals were denied. Separately, Roe obtained a civil protection order against John Doe from the Hamilton County Court of Common Pleas.[3] (Roe Depo., Doc.61-3, PageID#1296; Order, Doc.66-1, PageID#____, Exhibit p.148.) Jane Roe and Karen Soe were subsequently labeled as "difficult" by faculty and ignored in class. (Roe Depo., Doc.61-3, PageID#1260). They both received lesser roles and had trouble finding employment after school. (Roe Depo., Doc.61-3, PageID#1259-1261; Soe Depo., Doc.61-2, PageID#1019.)

## ARGUMENT

### A. Standards

#### 1. Summary Judgment

Federal Rule of Civil Procedure 56(a) provides that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

---

[3] On one occasion Roe, believing that John Doe was in Professor Steele's office on campus in violation of the protection order, contacted the police. (Roe Depo., Doc.61-3, PageID#1310.) UC characterizes this as "falsely accusing" John Doe. UC Meo at PageID#2947, fn.5. This is not a fair characterization. Jane Roe and Karen Soe testified that when police informed them of the misidentification, they "apologized to the police and… felt terrible," and that they had been following a standing instruction from police "to call if [they] ever thought that he was there." (Roe Depo., Doc.61-3, PageID#11135; Soe Depo., Doc.61-2, PageID#992-993.) Professor Steele was upset with the police, but not Jane Roe. (Steele Depo., Doc.61-8, PageID#2026-2027 ("That doesn't mean that [Jane Roe] hearing this shouldn't have reported it, feeling that she was unsafe…").)

judgment as a matter of law." The moving party has the burden of showing an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether a genuine dispute of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Anderson*, 477 U.S. at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe. Credibility determinations must be left to the factfinder. 10A Wright, Miller & Kane, *Federal Practice and Procedure Civil 3d* § 2726 (1998).

**2. The Deliberate Indifference And Retaliation Claims**

Title IX of the Education Amendments of 1972 is a federal statute designed to prevent sexual discrimination and harassment in educational institutions, like UC, receiving federal funding. Title IX specifically provides: "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). A federal funding recipient may be liable under Title IX for student-on-student sexual harassment. *Davis v. Monroe County Board of Education* that 526 U.S. 629, 643 (1999); *Stiles v. Grainger Cty.*, 819 F.3d 834, 848 (6th Cir. 2016). In *Gebser v. Lago Vista Indep. School Dist.*, Gebser v. Lago Vista Independent School District 524 U.S. 274, 290 (1998), the Supreme Court held that Title IX liability attaches only when a school official "who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination" and fails to correct such behavior in a manner that amounts to deliberate indifference. To proceed on their Title IX claim against UC, Plaintiffs are required to establish that: (1) they were subjected to a sexually hostile environment; (2) they provided actual notice of the situation to an 'appropriate person,' who was, at

a minimum, an official of the educational entity with authority to take corrective action and to end discrimination; and (3) the institution's response to the harassment amounted to "deliberate indifference." *Klemencic v. Ohio State Univ.*, 263 F.3d 504 (6th Cir. 2001).

Title IX also protects individuals who "complain of sex discrimination" from retaliation. *Jackson v. Birmingham Bd. of Edu*c., 544 U.S. 167, 184 (2005). The elements of a Title IX retaliation claim, typically, are that (1) the plaintiff engages in activity protected by Title IX; (2) the educational institution knew about the protected activity; and (3) the plaintiff suffers an adverse action that is causally related to the protected activity. *See Doe v. Univ. of Ky.*, 111 F.4th 705, 716 (6th Cir. 2024).

**B. UC Had Actual Knowledge Of John Doe's Conduct Prior To His Continued Sexual Assaults**

A plaintiff must demonstrate that the school had actual knowledge of harassment, meaning an "appropriate person" knew of it. *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 650 (1999). UC argues that the school lacked "actual knowledge" because, essentially, only a report to the Title IX Office, and not CCM faculty, is sufficient because faculty lack "authority to institute corrective measures." Def. Memo. at PageID#2941.

UC initially argues that the school did not have actual knowledge of John Doe's conduct until October 2021. Def. Memo. at PageID#2942. Even if true, this is not fatal to Plaintiffs' claims – Plaintiffs claim that the response by UC was not reasonable even after this moment. However, the record supports a conclusion that, months, even years, before John Doe sexually assaulted Jane Roe and Karen Soe both faculty at CCM and the UC Title IX Office were informed that John Doe would inappropriately touch women during ballet rehearsals. The first report is a 2015 letter in UC's possession nothing at John Doe had been accused by two students of touching them inappropriately while dancing at a local ballet academy; this letter describes conduct that is eerily similar to the conduct by John Doe with Jane Roe and Karen Soe. (Letter, Doc.66-1, PageID#___, Exhibit p.121.) The author of the letter said to an unidentified person at UC, "I hope this will serve as documentation of

what she stated/experienced as well as be on file if ever there is a need to refer back to what transpired." (Letter, Doc.66-1, PageID#___, Exhibit p.121.)

In February 2020, Jane Roe's and Karen's Soe dance instructor was informed of the risk posed by John Doe. Jane Roe met with Professor Carberry in her office and expressed concerns about John Doe. (Roe Depo., Doc.61-1, PageID#684-686). She had emailed Professor Carberry to report that someone had "witnessed him touching [another student's] breast in… rehearsal." She added, "He is always aggressive in class and rehearsals. A lot of the girls agreed that he makes everyone uncomfortable." (Email, Doc.61-1, PageID#844.) During the meeting Jane Roe reiterated Carberry she had witnessed inappropriate conduct in class by John Doe with other women. (Roe Depo., Doc61-1, PageID#690.) Around this time, Karen Soe also met with Professor Carberry. Carberry brought up her meeting with Jane Roe and asked Karen Soe about the situation; Karen Soe confirmed all of Jane Roe's concerns. She testified about her concerns with John Doe as a partner:

> In 2020, when I spoke to Professor Carberry in her office, she asked me about what [Jane Roe] had told her, and I told her everything. I told her that being in class with him made me uncomfortable, and I told her that I was worried about ever having potentially having to partner with him at CCM

(Soe Depo., Doc.61-2, PageID#1043.) Professor Carberry reported the allegations to the Title IX Office, but no formal investigation was started and no remedial actions were taken.[4]

Under Supreme Court precedents, an "appropriate person" is, at a minimum, an official of the recipient entity with authority to take corrective action…" *Gebser*, 524 U.S. at 290. *Davis* makes clear, that "a school official who has the authority to halt known abuse… would meet this definition." *Murrell v. School Dist. No. 1*, 186 F.3d 1238, 1247 (10th Cir. 1999). Defendant argues that knowledge

---

[4] In September 2020, OGEI Program Coordinator emailed Carberry seeking an update. Carberry responded that there had been "no new or additional experiences in reference to John Doe [John Doe]" (5. Deirdre Carberry Transcript and Errata.pdf, Page 73; Exhibit 24 [Bates UC000084]). This is not surprising since most student had been sent home due to Covid.

by a professor is insufficient; according to UC, only a "report" to the OGEI suffices to provide actual knowledge. Def. Memo. at PageID#2941-2942. This argument fails for two reasons.

First, Carberry actually informed the Title IX Office in the spring of 2020 about the allegations.

Second, professors may be appropriate persons. "Because teachers ordinarily maintain at least some level of disciplinary control over their students, it is reasonable to infer that they had authority to take disciplinary action and to institute other corrective measures to end the harassment…" *Montgomery v. Indep. School Dist. No. 709*, 109 F.Supp.2d 1081, 1099 (D.Minn. 2000). Indeed, the Supreme Court, in recognizing a private right of action under Title IX, would not have intended to insulate school districts from liability where the first line of responsibility for ensuring that the students in a school are safe have actual knowledge of sexual harassment. Courts, in applying this test, have not relied upon titles, but have considered the actual ability of the person to take actions. In other words, an "appropriate person" is anyone with authority to address problems and institute corrective measures, and, in particular, the ability to "to intervene at some level to stop harassment" if they are aware it is occurring. *Frederick v. Simpson College*, 149 F.Supp.2d 826, 837 (S.D.Iowa 2001). *See e.g. Herndon v. College of the Mainland*, S.D.Tex. No. G-06-0286, 2009 U.S. Dist. LEXIS 12425, at *67 (Feb. 13, 2009) (noting that "instructors had the ability to issue warnings, give writing assignments as punishment for infractions, and recommend students' dismissal from the" school).

Consistent with this view, UC's investigator testified that faculty can take corrective actions:

> I think that everybody on a university campus has a responsibility to help prevent or address harassment when they see it. I think that faculty are responsible for classroom management, and so if there is a situation that they are observing in their classroom, then I think that there are obviously in many instances measures that the faculty members could take to safeguard, prevent harassment, or, you know, address the situation. It doesn't always rise to the level of having to come to, you know, the Title IX office or student conduct or, you know, whatever administrator level.

(Schipper Depo., Doc#61-9, PageID#2140-2141.) In an email specifically about the faculty response in this matter, UC Title IX Investigator emphasized that "It is the responsibility of the faculty to

manage the classroom effectively…" (Email, Doc.66-1, PageID#___, Exhibit p. 147.) In this case, even if one faculty member is not sufficient, the head of the division of theatre arts was involved in 2020 in addition to Carberry. (Yockey Depo., Doc.61-6, PageID#1725.) Courts have found that department chairs who had knowledge would suffice under this standard. *Frederick v. Simpson College*, 149 F.Supp.2d 826, 837 (S.D.Iowa 2001) (department chair and assistant dean were appropriate persons for Title IX notification purposes). *Cf. Weis v. Bd. of Trustees of the Florida Gulf Coast Univ.,* M.D.Fla. No. 2:19-cv-503, 2020 U.S. Dist. LEXIS 80701, at *14-15 (May 7, 2020) ("it is certainly a reasonable inference that a department chair at a university has the authority to take corrective action to end discrimination").[5]

Plaintiffs have also obtained expert testimony of this issue, with an expert in arts teaching and intimacy issues in theatre stating:

> Professors and other faculty, such as Department Chairs, have the authority to institute corrective measures on behalf of the schools, including the adjusting of the makeup of classes and other steps designed to protect the safety and support the learning experience of all students in their classrooms at CCM. Faculty, for example, have the authority to assign appropriate alternative partnering and educational opportunities, monitor student interactions and, instruct on proper behavior and boundaries.

(Steinrock Expert Report, Doc.66-2, PageID#3244.) He further noted that merely reporting an incident to the Title IX Office "does not absolve the obligation of faculty to identify when harmful

[5] *Kesterson v. Kent State Univ.*, 967 F.3d 519 (6th Cir. 2020), is not to the contrary. UC cites this case for the proposition that "only the Title IX coordinator counted as an 'appropriate person.'" UC Memo. at PageID#2942. But that isn't the facts of *Kesterson* and the Sixth Circuit said no such thing. In *Kesterson*, a softball coach was not considered to be an "appropriate person" because the plaintiff "offered no evidence that these individuals could act on [the school's] behalf." 967 F.3d at 529. This is consistent with case law requiring an inquiry beyond titles, which makes this an issue for trial, not summary judgment. *See Hawkins v. Sarasota Cty. Sch. Bd.*, 322 F.3d 1279, 1286-87 (11th Cir. 2003) (explaining that actual knowledge in student-on-student harassment cases is a fact-intensive inquiry); *Plamp v. Mitchell Sch. Dist.*, 565 F.3d 450, 457 (8th Cir. 2009) (warning against fashioning "a bright-line rule as to what job titles and positions automatically mark an individual as having sufficient authority or control for the purposes of Title IX liability"); *Murrell*, 186 F.3d at 1247 (deciding who exercises substantial control "is necessarily a fact-based inquiry").

behavior is occurring in the classroom and taking appropriate actions." (Steinrock Expert Report, Doc.66-2, PageID#3244.) Professor Steinrock testified at his deposition:

> Faculty have the ability to manage their classrooms as they… wish as long as it does not contradict department university policy or law, and that is one of the tenets of academic freedom is that, to put it simply, you can't tell a professor how to teach their class. And so that swings both ways in the sense that they have the power to – they have the power to run the class how they see fit. And if they see fit to taking steps to mitigate possible harm, that is within their rights to do. It is something they regularly do.

(Steinrock Depo., Doc.61-10, PageID#2378.) He explained that UC's position – that faculty can only report allegations of sexual harassment to the Title IX Office and could not take other action, is "a very absolute statement that ignores all the things that faculty members can do to make a space safer…" and "ignores the freedom that professors have to shape their classrooms in ways that will best support their students." (Steinrock Depo., Doc.61-10, PageID#2380.) The expert noted that the class syllabus instructed students to report conduct that made them uncomfortable to faculty members, which is inconsistent with UC's position:

> The fact that the syllabus states that students should feel comfortable and that if there's something that -- the language here is if you feel you've been placed in an untenable situation, please feel free to speak with the instructor, choreographer, [or] department chair… if their position as the instructor is my job when something is brought to me is to pass it up the chain and there's nothing else I can do about it, then -- and if the professor does not have ability to impact the situation at all, then it seems odd that the instruction to the student is to bring it to the instructor who we're saying, beyond passing it up, is powerless.

(Steinrock Depo., Doc.61-10, PageID#2383-2384.) The expert further explained that even though students are presumed to be 'not responsible' through the Title IX process, that still does not prevent faculty from taking steps to prevent and alleviate sexual harassment in the classroom:

> once a Title IX case is started,… the instructor cannot take steps to investigate, must treat both parties equally, so that is a policy. But there's no policy -- *there's no policy that I know of that says a teacher can do nothing if they observe sexual harassment other than tell someone about it.*

(Steinrock Depo., Doc.61-10, PageID#2381 (emphasis supplied).)[6]

UC's argument, that only an employee of the Title IX Office – and not a professor, department chair, or division head – can qualify as an "appropriate person" is inconsistent with the Sixth Circuit's decision in *Dahmer v. W. Kentucky Univ.*, 6th Cir. No. 21-5318, 2022 U.S. App. LEXIS 28533, at *9 (Oct. 13, 2022). In *Dahmer*, the Sixth Circuit vacated a district court's grant of summary judgment based on the conclusion that the "Director of Student Activities, Organizations, and Leaderships" did not constitute an appropriate person in the context of a student-on-student Title IX harassment claim. In doing so, the Sixth Circuit rejected the idea that only a Title IX Office can receive complaints, reasoning instead that a complaint to an administrator was sufficient where the administrator had some ability to address and remedy peer sexual harassment.[7] 2022 U.S. App. LEXIS 28533, at *9.[8] This Court, relying on *Dahmer*, denied a motion for summary judgment by a school on almost identical facts. *Doe v. Ohio Univ.*, S.D.Ohio No. 2:21-cv-00858, 2023 U.S. Dist. LEXIS 52435, at *21 (Mar. 27, 2023). In *Ohio Univ.,* the student had complained about ongoing harassment from another student to the professor who "oversaw the class where the harassment took place." The Complaint was then passed on to the school's Title IX Office. This was sufficient, this Court held, to create "a genuine issue of fact as to whether the University had actual knowledge that she experienced sexual

[6] UC claims that Plaintiffs' expert, Zev Steinrock, agreed that Professor Carberry did not have the authority to investigate or take final action. This is irrelevant; just because professors don't conduct investigations does not mean that they lack the ability to act to alleviate sexual harassment in their classrooms.

[7] The definition of an 'appropriate person' is likely different when the sexual harassment is "by an employee of the institution (as opposed to a fellow student)." *Doe v. Vanderbilt Univ.*, M.D.Tenn. No. 3:23-cv-00426, 2025 U.S. Dist. LEXIS 158632, at *18 fn. 7 (Aug. 15, 2025). This makes sense, as faculty have a supervisory role over students, but not other faculty members.

[8] In *Dahmer*, the District Court seemed to agree with UC in dismissing a claim, in part, on the grounds that a report to an administrator – and not the school's Title IX Office – was insufficient and that a school did not have notice of harassment until a school employee "reported [the] complaint to the Title IX office." *Dahmer v. W. Kentucky Univ.*, W.D.Ky. Civil Action No. 1:18-cv-124, 2021 U.S. Dist. LEXIS 39209, at *16 (Mar. 2, 2021). This Sixth Circuit's reversal is a repudiation of UC's position.

harassment." 2023 U.S. Dist. LEXIS 52435, at *21. UC's argument was also rejected by another court in this Circuit in *Lipian v. Univ. of Michigan*, 453 F. Supp. 3d 937, 957-958 (E.D.Mich. 2020). In *Lipian*, a report to a department chair – not the Title IX office – was sufficient to create liability for the school because the individual who received the report had the authority to monitor student interactions and instruct on proper behavior and boundaries. The *Lipin* court cautioned, "there can be no bright-line rule on who is or isn't an appropriate person to receive a Title IX report." 453 F. Supp. 3d at 957-958 (collecting cases).[9]

At a minimum, Plaintiffs have created an issue of fact about whether professors may be appropriate persons under Title IX. In denying the Motion to Dismiss, this Court cited to *Chapman v. Seuffert*, 713 F. Supp. 3d 425, 436 (N.D. Ohio 2024), for the proposition that "whether someone is an 'appropriate person' under Title IX is 'necessarily a fact-based inquiry.'" 2025 U.S. Dist. LEXIS 60575, at *13 fn 2. *See also Doe v. Norwalk Community College*, D.Conn. No. 3:04-cv-1976 (JCH), 2007 U.S. Dist. LEXIS 51062, at *16-17 (July 16, 2007) (finding issue of fact to deny summary judgment on question of whether report to professor was to appropriate person); *Herndon,* 2009 U.S. Dist. LEXIS 12425, at *68 (issue of fact about whether professor had "authority to address behavior in the classroom and to institute corrective measures").

**C. Jane Roe and Karen Soe Suffered Actional Harassment After Providing Notice To UC**

The Sixth Circuit has held that a school can be liable for a single incident of actionable sexual harassment that occurs after the school's knowledge of the misconduct. *Kollaritsch v. Michigan State*

---

[9] UC's formalistic focus on *who* receives a complaint than on whether the person is actually able to help the student improperly elevates the form of a Title IX complaint over substance and ignores the goal of Congress in eliminating sexual harassment in higher education. The definition of an "appropriate person" should be liberally construed in favor of the victims of harassment – many of whom are not experts on the intricacies of higher education administration. This avoids absurd results, like seen in this case, where a student literally telling a Title IX investigator that she is a "victim" is not considered to be a "complaint."

*Univ. Bd. of Trustees*, 944 F.3d 613, 623 (6th Cir. 2019). In *Kollaritsch*, the plaintiffs were female students who had been sexually assaulted on campus. The school, unlike UC in this case, had no knowledge of any threat to female students from their attackers prior to the assaults. 944 F.3d at 618, 624-25. Jane Roe and Karen Soe, in contrast, were touched inappropriately multiple times after UC officials were aware of John Doe's conduct – that is sufficient under *Kollaritsch*.

**1. Jane Roe**

As noted, *supra,* Carberry and the Title IX Office were aware that John Doe would touch students inappropriately in 2020. In Fall 2021, Professor Deirdre Carberry cast Jane Roe and John Doe as leads in the ballet *Paquita*. During this time, John Doe "continually put his hands on [her] breasts and vagina." (Roe Depo., Doc.61-1, PageID#714.) By Mid-September, Jane Roe had repeated her concerns about partnering with John Doe with her professor. (Roe Depo., Doc.61-1, PageID#713.) She mentioned to Carberry that "it was either painful or just physically impossible to complete turns and lifts" with John Doe with his "hands in the incorrect spot on [her] breasts and [her] private area." (Roe Depo., Doc.61-1, PageID#714-715.)

Roe testified that Carberry "could see it happening…" (Roe Depo., Doc.61-1, PageID#716.) For example, on September 14, 2021, during a lift in an ensemble rehearsal, John Doe placed his hand extremely close to her private area. Professor Carberry noticed the misplaced hand and corrected him, stating, "That hand was way too high, are you ok? Put your hand lower on her leg." (Roe Depo., Doc.61-1, PageID#716.) Carberry responded that it was "very evident that something was going on." (Roe Depo., Doc.61-1, PageID#715.) Despite Carberry's knowledge of John Doe's inappropriate conduct, the harassment continued in her classroom. The stress and frustration became so overwhelming that Jane Roe ran out of the studio crying. A few days later the severe anxiety and stress cause Jane Roe to suffer a nosebleed and run out of the studio. (Roe Depo., Doc61-3, OageID#1149-1150.)

**2. Karen Soe**

In October 2021, after the meetings with faculty and the report to Title IX, Karen Soe was touched inappropriately by John Doe. She testified:

> It was one of the first combinations that we were doing, and we were supposed to be doing a dip, so it's kind of hard to explain, but he was supposed to grab me around -- under my ribcage and then under my lower leg and then dip me down towards the floor. Instead, he grabbed around my breast and around my leg, lifted me up and then slowly dragged me down the front of his body, which was incorrect technique and not at all the move that we were supposed to be practicing.

(Soe Depo., Doc.61-2, PageID#959.) She reported the incident to multiple people. (Soe Depo., Doc.61-2, PageID#960.) She testified that she asked to be listed as a victim:

> Q … Did you tell [the investigator] she could put you down as a fellow victim?
> A. Yes.

(Soe Depo., Doc.61-2, PageID#998.) UC never investigated Karen Soe's allegations.

Defendants suggest that this is a "single incident," and therefore precluded under *Kollaritsch.* The *Kollaritsch* court said that "at least one more (further) incident of harassment, after the school has actual knowledge and implements a response, is necessary to state a claim." 944 F.3d 621. The focus was on knowledge of misconduct *by the assailant*, not a single assault on the victim. Otherwise, a school could allow a serial rapist, for example, to remain on campus and escape liability so long as he only raped each female student once.

**3. UC's Response To The Harassment Of Jane Roe Was Not Reasonable**

UC's formal response John Doe's inappropriate touching in class subjected both Jane Roe and Karen Soe to further actionable sexual harassment. Rather than take steps to remedy the violation, UC opted to avoid cover up and avoid the problem through ineffective orders and a sham investigation, resulting in Jane Roe and Karen Soe being excluded from educational opportunities. In *Doe v. Hamilton Cty. Bd. of Edn.*, 329 F. Supp. 3d 543, 563-564 (E.D.Tenn.2018), for example, a court found that a student who suffered continued harassment that "made it difficult for him to continue

attending" the school had stated a valid deliberate indifference claim under Title IX. The *Hamilton Cty. Bd. of Edn* court relied on a Second Circuit opinion in *Doe v. East Haven Bd. of Educ.*, 200 F. App'x 46, 48 (2d Cir. 2006). In that case, similarly to the Plaintiffs here, the claim survived because, in part, "the plaintiff would skip classes" due to the presence of the perpetrator and was otherwise deprived of educational opportunities. *Compare Foster v. Bd. of Regents of Univ. of Mich.*, 982 F.3d 960, 962 (6th Cir. 2020) (noting how the school "ratcheted up protections" as more reports of harassment came to the institution's attention).

**a. UC Failed To Take Adequate Actions To Prevent Sexual Harassment**

UC took no actions when the allegations against John Doe were reported to Professor Carberry and the Title IX Office in March 2020. Jane Roe testified:

> I would say [Carberry] wouldn't -- didn't do anything leading up into 2021. Yes, she reported it to Title IX, but nothing else happened when we first went into rehearsals in 2021. There was no precautions taken and no concern shown…

(Roe Depo., Doc.61-1, PageIOD#689.) The Title IX investigator admitted UC took no steps to prevent further harassment by John Doe after the 2020 Report to OGEI:

> Q. So as we sit here today, are you aware of any steps that the University of Cincinnati took in response to this February of 2020 report to protect students from further harassment by John Doe?
> A. No.

(Schipper Depo., Doc.61-9, PageID#2119-2120.)

In 2020, faculty at CCM responded only by setting up a meeting with John Doe to address not his conduct, but "perceptions." An email from one Professor told John Doe, said "You have not done anything wrong but due to the nature of the concerns brought to me I need to have a meeting so that we can discuss and help assess the perception issues…" (Email, Doc.66-1, PageID#___ Exhibit p.135.) Carberry, in particular, had the ability to take actions to prevent the harassment in the classroom, yet did not. Plaintiff's expert, an experienced dance instructor, gives the opinion that she had the authority and ability to do more:

> I don't believe that Carberry took appropriate steps in class to correct the hand placement. I believe that as a teacher and instructor, Carberry had the authority and responsibility to institute corrective measures designed to protect the safety of female dancers at CCM.

(Jennings Report, Doc#: 61-11, PageID#2707.). She stated further, "I do not understand why action was not taken to protect the safety of personal space for these young dancers… I would not tolerate continued painful groping in rehearsal and performance, and would fire the dancer in a professional setting or replace them in an educational one." (Jennings Report, Doc#: 61-11, PageID#2721.)

The UC Title IX Office got involved in 2021. Defendants assert that the school was not deliberately indifferent because the school conducted an investigation and held a hearing. Def. Memo. at PageID#2945. Jane Roe, however, testified that during her first meeting with the investigator she "felt pressured to not go all the way to the Title IX hearing and go through that full process." (Roe Depo., Doc.61-1, PageID#744.) OGEI initially issued a no contact order for both Jane Roe and John Doe. This No Contact Order did not prevent John Doe from being in the same dance class as Jane Roe and put the obligation on Jane Roe, as much as John Doe, to avoid contact. Jane Roe explained this was insufficient

> because there was not a strict outline of what we were going to be doing in order to separate… I didn't know if it was going to be sufficient enough to actually keep myself safe and also other female dancers that were partnering with him at the time'

(Roe Depo., Doc.61-1, PageID#762.) Jane Roe, instead, obtained a protection order from Hamilton County Common Pleas Court "in order to feel safe and also to protect other female dancers on campus." (Roe Depo., Doc.61-1, PageID#777.)

UC asserts that the school took action so that Jane Roe would never dance with John Doe again. Def. Memo. at PageID#2947. True. Yet… even at the time, everyone felt that the response was not sufficient. The UC Title IX investigator noted that Jane Roe was not receiving sufficient support from the faculty:

> I was very frustrated because Jane Roe at the time had continually expressed to me

> that she felt that the dance department was not doing anything to support her, that she was still being forced to partner with John Doe, and that she didn't feel safe in the classroom and that faculty weren't, you know, taking her concerns seriously.

(Schipper Depo., Doc.61-9, PageID#2150.) For their part, faculty members noted that the response of the Title IX Office was likewise inadequate. In an email, one faculty member noted that historically "there has been a lack of clarity, assistance, support, and then blame casting when faculty do reach out." (Email, Doc.66-1, PageID#___, Exhibit p. 144.) She then noted that the response to Jane Roe's complaint was wholly inadequate:

> In the time between that moment and today we reached out to OGEI for guidance, support, assistant, clarity, and on one occasion I called on [Jane Roe's] behalf...and except for being able to assist [Jane Rpoe] setting up the appt, the overarching response was, "wait." Wait until we talk to [Jane Roe], wait until she files officially, wait until [John Doe] is notified...wait. and while waiting, in essence, 'don't ask, don't tell' which meant how were we to carry on in the department, if we couldn't acknowledge there was an issue?

(Email, Doc.66-1, PageID#___, Exhibit p. 144.) Steele further noted that faculty "had no assistance from OGEI on how to make things work…" and that they were "flying blind with no OGEI assistance or support." (*Id.*) Steele testified in her deposition that "the process felt slow to me." (Steele Depo., Doc.61-8, PageID#2022.)

**b. UC Conducted a Sham Investigation And Hearing**

UC's subsequent sham investigation and flawed hearing process suggests the school's efforts "amounted to 'an official decision… not to remedy the violation.'" *Foster,* 982 F.3d at 967 , *quoting Davis, supra.* The response of UC was clearly unreasonable due to several flaws in the process which suggest a pre-determined outcome.[10] *Cf. Doe v. Oberlin College*, 963 F.3d 580, 587 (6th Cir.2020) (noting that "procedural irregularities" may "provide strong support for… [a] claim of bias" in a Title IX

[10] UC witnesses acknowledged that the school failed to comply with Title IX regulations requiring decision-makers, including hearing panelists and appeals officers, to list their trainings on the school's websites. (*See e.g.* Training Records, Doc.66-1, PageID#___, Exhibit p.1; Smith Depo., Doc.61-4, PageID#1406-1407.)'

proceeding).

First, the investigation was incomplete and the rules were not applied evenly. The investigator never attempted to interview key faculty members, such as Steele and Yockey. (Schipper Depo., Doc.61-9, PgeID#2144-2145.) Carberry was not required to provide a statement about what she observed in class. (Schipper Depo., Doc.61-9, PgeID#2170-2171.)

Worse: John Doe was not required to follow the rules. John Doe, for example, was permitted to submit witness lists and forms after deadlines despite clear rules otherwise. The hearing officer explained that under UC's rules, if a student does not submit a witness list in time, "Then the witness is not allowed." She added that there is no exception to this rule. (Wade Depo., Doc.61-7, PageID#1853.) Jane Roe complied with this rule; John Doe did not but was *still* permitted to present witnesses. (Wade Depo., Doc.61-7, PageID#1868-1870.) The Appeals Officer admitted in her deposition that this was a violation of the rules, yet still affirmed the decisions. (Smith Depo., Doc.61-4, PageID#1432.) The Appeals Officer claimed that there were documents that she reviewed that supported the decision, but no documents were ever produced.[11] (Smith Depo., Doc.61-4, PageID#1435-1436.)

Second, the investigative report did not include statements from other dancers about John Doe's prior conduct. (Schipper Depo. Doc.61-9, PageID#2182.) The hearing panel, then, denied Jane Roe's request to have other dancers, including Karen Soe, testify about similar experiences with John Doe. These witnesses would have presented evidence that he had engaged in similar

[11] The excuse was that Jane Roe agreed to allow John Doe to present undisclosed witnesses. (Wade Depo., Doc.61-7, PageID#1871.) Jane Roe testified otherwise: "I don't think I would have said that was okay, and I don't feel I was given an option otherwise." (Roe Depo., Doc.61-3, PageID#1305.) The Hearing Officer claimed that she documented the conversation in the file – but then later acknowledged "in this case it doesn't appear that I did" upload a document to the file. (Wade Depo., Doc.61-7, PageID#1872.) Which leads to the question: what document could the Appeals Officer have reviewed?

inappropriate conduct. This testimony would have been from dancers who, based on their training and experience, had the ability to differentiate between accidental touching and the type of sexual misconduct described by Jane Roe. One member of the hearing panel said, "the only witnesses that I would be interested in are any who had firsthand visual knowledge of or specific interaction with the respondent and the complainant." (Audio, Doc.66-2 (UC00806) at approx. 2:59.) In making this statement, the hearing panel member failed to recognize that the evidence that Jane Roe proposed to provide to the panel is the type of evidence that someone would rely upon in determining whether a dancer was touching other dancers inappropriately intentionally or by accident. This evidence would have shown that John Doe engaged in, as lawyers say, a particular *modus operandi* when dancing and that his inappropriate contact was not accidental. Plaintiff's expert noted that the statements from other dancers, going back multiple years, would be reasonably relied upon by a ballet instructor to attempt to draw an inference about whether he touched Jane Roe by accident. (Jennings Depo, Doc.61-11, PageID#2627-2628; Jennings Report, Doc.61-11, PageID#2718.)

What moves this past a simple evidentiary error into evidence of a sham is that the Hearing Panel seems to recognize this when it benefitted John Doe. The Hearing Panel allowed John Doe's witness to offer evidence about his prior experiences with Jane Roe. John Doe's witness did not have "first hand visual knowledge" of the specific allegedly inappropriate but was asked "when you were a dance partner to [Jane Roe], did you also have issues with, like, hand placement…?" and "Did you also have issues with touching her breasts?" (Audio, Doc.66-2 (UC00807) at approx. 38:33.) When asked multiple times at her deposition why the "firsthand knowledge" rule was applied only to Jane Roe's witnesses, or why Jane Roe's witnesses who would testify that the same thing happened to them was not be relevant to rebut John Doe's claim that he touched her breasts by accident? the Hearing Officer could only repeatedly say, "I don't know." (Wade Depo., Doc.61-7, PageID#1881-1886.) If the Hearing Officer did not know *why* rules were unevenly applied, who would?

Third, the hearing panel relied on "Expert" evidence provided by Professor Carberry that was inaccurate and highly misleading. Professor Carberry was asked by the investigator to serve as an expert witness for this investigation to provide appropriate knowledge of ballet technique and discernment of hand placement. Professor Carberry was shown 6 images of dancers – but not all of the images and videos in this matter. The investigator said, "What I did was take, I believe, maybe one or two photos of complainant and respondent dancing in the classroom and then I found, you know, four or five photos, just general photos, taken off of the Internet…" (Schipper Depo. Doc.61-9, PageID#2173.) The investigator decided not to show Carberry images that allegedly showed John Doe touching Jane Roe inappropriately. (Schipper Depo. Doc.61-9, PageID#2176.) However, Carberry was not told by the Title IX investigator that some of the images she was asked to review were not actually images of John Doe and Jane Roe! Instead, Carberry provided an opinion on images provided by Jane Roe to demonstrate proper hand placement. (Carberry Depo., Doc.61-5, PageID#1628-1632.) Carberry was also not asked about videos of John Doe's inappropriate touching. (Carberry Depo., Doc.61-5, PageID#1629; Schipper Depo., Doc61-9, PageID#2178.)

Predictably, Carberry did not find that any of the hand placements were sexually inappropriate; this was the information provided to the hearing panel. Jane Roe, in an email to the investigator, noted the incomplete nature of Carberry's opinion, but the investigator did not correct the mistakes or ask Carberry to review additional images. (Schipper Depo. Doc.61-9, PageID#2179-2180.) Plaintiffs' expert notes also that Carberry did not take the entire history into account when providing an opinion to the hearing panel. Plaintiff's expert highlights the problems with this approach:

> Carberry also fails to acknowledge that experienced and talented ballet dancers would be able to distinguish between accidental and intentional conduct. During dancing with a partner, it is not uncommon for dancers to accidentally touch a female partner's private areas… In this case, experienced and talented ballet dancers like Jane Roe, Karen Soe, and the other women who complained about John Doe's conduct would be able to distinguish between common accidental touches and the malicious conduct of John Doe.

(Jennings Report; Doc.61-11, PageID#2720.)

What moves this past a simple evidentiary error into evidence of a sham is the hearing panel was deceived and then misrepresented the evidence at the hearing. As an initial matter, because Carberry did not appear at the hearing, the Hearing Panel was prohibited by UC's rules from considering her evidence. (Code of Conduct, Doc66-1, PageID#___, Exhibit p.48 ("Only statements from witnesses who participate in the hearing in-person or via video conference will be considered by the A.R.C.").) Then, even though this evidence should not have been considered in the first place, the hearing officer testified that the panel was not told important information that impacted the importance of the expert opinion:

> Q …Was the hearing panel told that some of the images do not depict Jane Roe or John Doe?
> A No.
> Q Was the hearing panel aware that some of the images had been provided by Jane Roe in order to educate the investigator on proper techniques and not as images of wrongdoing by John Doe?
> A No.
> Q Was the hearing panel told that Professor Carberry was not asked to look at all the images provided by Jane Roe?
> A … No

(Wade Depo., Doc.61-7, PageID#1894-1895 (objection omitted).) These errors were doubly compounded by the fact that Carberry did not appear at the hearing where Jane Roe could have highlighted these flaws through cross-examination. (Wade Depo. Doc.61-7, PageID#1894.) The hearing panel also did not consider that Professor Carberry has a significant conflict of interest that was not discussed in the investigative report or considered by the hearing panel. As noted *supra,* Carberry – who would have been the key eyewitness – declined to answer any questions from the Title IX investigator about the specific interactions between John Doe and Jane Roe. (Schipper Depo., Doc.61-9, PageID#217. *See also* Carberry Depo., Doc.61-5, PageID#1612-1613 (declining to explain why she did not serve as a witness).) As the classroom instructor, Professor Carberry was responsible

for misconduct that occurred in her classroom and may have faced potential liability or discipline for failing to prevent or adequately respond to John Doe's misconduct.[12]

**D. The Title IX Retaliation Claim**

Plaintiff's expert explains that retaliation is an especially high risk in the performing arts:

> If the student/performer believes that it will impact their future opportunities then the power dynamic is present, and that dynamic can impact their willingness to report problematic behavior. Students and performers are encouraged to "not be the problem." To be seen as a "troublemaker" or a "being difficult" or having a "bad attitude" poses direct risk to their future education, future opportunities, and livelihood.

(Steinrock Report, Doc.66-2, PageID#3243.) Consistent with this risk, Jane Roe testified that she was treated differently by professors after she made a report. She said: "I used to always get corrections and I would get feedback… and after this issue occurred [Carberry] and other professors wouldn't give me corrections or even look at me or talk to me in the hallway like they used to." (Roe Depo., Doc61-3, PageID#1214.) She testified:

> [C]onsidering that I was dancing principal and soloist roles for my first three years and all of a sudden was demoted down to one [corps] spot in that spring of 2022, I saw that as a form of retaliation just because I had that track history of always being in the guest artist works and being in a principal or soloist role, and so I felt that that was retaliation, especially after I heard [Carberry] mention that they said I was being difficult and didn't want me to be in that role. And then on top of not having any feedback, like I was -- I was on my own in class. Like I gave myself corrections and was trying to work on myself for my audition season. I had nobody giving me any feedback in class from that spring on.

(Roe Depo., Doc. 61-3, PageID#1260.)

---

[12] The hearing Panel then triply compounded the mistake by misrepresenting the evidence. The "Rationale" from the Hearing Panel stated "The witnesses explained that the behavior the Respondent engaged in is reasonable in ballet dance." (ARC Summary Form, Doc.66-1, PageID#___, Exhibit p.114.) The Appeals Officer parroted this language in her decision. (Appeal Decision, Doc.66-1, PageID#___, Exhibit p.117.) One witness said, "It didn't look like normal partnering to me." (Audio UC00807, Doc.66-2, at approx.. 1:03:27.) She added, "I think that is incorrect hand placement. And he was touching… her breast." The Appeal Officer, upon hearing the audio of the hearing, was unable to state that testimony that John Doe was touching Jane Roe's breast is consistent with the claim by the ARC that Jane Roe's witness explained that the behavior the Respondent engaged in was reasonable in ballet dance?" (Smith Depo., Doc.61-4, PageID#1450.)

Defendants claim that Karen Soe admitted there was no proof of retaliation. Def. Memo. at PageID#2952. This takes her testimony out of context. Karen Soe explained that "there's no paper trail of any of this, and a lot of it may have happened over the phone or in person and there's just no way to prove for sure…" (Soe Depo., Doc.61-2, PageID#1048.) She then explained that this retaliation impacted her career.

> I truly believe that I would have gotten a better job if not for this whole situation. I danced with [a] professional company when I was 16 and 17 years old, and if I was good enough to dance with a professional company then, the assumption is, after four years of college and training with these professors, that I would be even better and even more qualified to dance with a professional company, and I didn't receive any job offers. So whether it was because I was blackballed or because my technique had dropped because these professors were no longer paying attention to me in class or trying to help me for my last year on campus, I can't say for sure, but I would think that it has something to do with that.

(Soe Depo., Doc.61-2, PageID#1049.)

**E. Damages**

Defendants argue that "Plaintiffs are not entitled to damages for loss of income or harm to their reputations." Plaintiffs initially note that this would not eliminate Plaintiffs' claims entirely, as they would still be entitled, at a minimum, to recovery for the loss of the value of their education.

The U.S. Supreme Court barred recovery of emotional distress damages under anti-discriminatory legislation passed pursuant to Spending Clause authority. *Cummings v. Premier Rehab Keller PLLC*, 596 U.S. 212 (2022). Under *Cummings*, a particular remedy is available only if the recipient of the funds is 'on notice' that, by accepting federal funding, it exposes itself to liability of that nature. Following a contract analogy, the Court reasoned that a funding recipient is on notice of damages explicitly provided in the legislation and also those remedies traditionally available in suits for breach of contract. *Id.* at 1571.

This Court has applied *Cummings* to Title IX claims. *Doe v. Ohio State Univ.*, 796 F. Supp. 3d 476 (S.D.Ohio 2025). Accordingly, the damages sought in the Amended Complaint do not include

emotional distress damages. Instead, Plaintiffs seek damages directly related to UC's failure to assure that Plaintiffs could receive the full benefits of education at the school, including the opportunity to meaningfully access and fully participate career opportunities.[13] Jane Roe and Karen Soe sought degrees from UC and identified specific employment opportunities that were foreclosed by Defendant's deliberate indifference. Jane Roe testified that she lost jobs because of the experience with John Doe. She explained:

> Q. As you sit here today, do you believe you've lost any jobs because of what occurred with John Doe?
> A. Yes, I do.
> Q. Which jobs?
> A. Any of the ballet openings that I've applied for. I also feel like I've lost jobs because you can -- you can sense it when I start partnering with people, and I've had my directors say that I look tense when I'm partnering with people and I look anxious, and it's something that has stuck with me now the past few years trying to get jobs. I feel like I have and I haven't received letters of recommendation that people normally receive to go apply for these jobs.

(Roe Depo., Doc.61-1, PageID#781-782.) She explained that "I believe that I was seen as a complainer and not a team player, and I feel like that's directly affected" her ability to obtain a job as a ballet dancer." (Roe Depo., Doc.61-1, PageID#7856.) Karen Soe similarly testified that "when I was applying for jobs… I got denied every application that I submitted." She also said that "I applied for probably close to a hundred jobs and I got none of them." (Soe Depo., Doc.61-2, PageID#1048.)

---

[13] UC is certainly on notice that students attend CCM precisely because of the career opportunities available after graduation. CCM even maintains an entire office for this purpose: "CCM's Office of Career Services helps current students and alumni find jobs in both academic and performance arenas…" (https://ccm.uc.edu/resources/career-services.html). The failure to complete education causes significant reputational damage to students as they pursue the careers, as noted in Sixth Circuit opinions involving UC. *Doe v. Cummins*, 662 Fed. Appx. 437, 445 (6th Cir. 2016) (dismissal from UC would cause damage to a students' academic and professional reputations and may affect their ability to pursue a career); *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 407 (6th Cir. 2017) (student would "suffer reputational harm both on and off campus based on a finding rendered after an unfair hearing" at UC). *See also Goss v. Lopez*, 419 U.S. 565, 574-75 (1975) (dismissal from a school could damage the students' academic reputation and "interfere with later opportunities for higher education and employment").

She explained that

> The ballet community is very small, and it's -- if I ever do apply for a professional ballet performance job again, they would reach back out to all the professors that I had at CCM, and I'm not confident that any of them, other than maybe [One Professor], would assist me in getting a job if they would speak at all. So that's what I mean by my reputation has been damaged.

(Soe Depo., Doc.61-2, PageID#1026.) Soe elaborated that her "education suffered when I was there. I had to leave several classes, including partnering class. I didn't get the experience that everybody else got that I think would have helped me to land a better job." (Soe Depo., Doc.61-2, PageID#1028.)

In *Snyder-Hill v. Ohio State Univ.*, S.D.Ohio No. 2:23-cv-2993, 2026 U.S. Dist. LEXIS 143803, at *10-11 (Apr. 28, 2026), this Court explained:

> [T]o the extent a Title IX violation caused quantifiable losses in educational opportunities or benefits, or in earnings or earning capacity, such losses are akin to lost profits and are, therefore, theoretically recoverable as expectation damages. So, the Court refuses to preclude recovery for either form of loss at this juncture. *See A.T. v. Oley Valley Sch. Dist.*, E.D. Pa. No. 17-4983, 2023 U.S. Dist. LEXIS 16619, at *4 (Feb. 1, 2023) (finding that the plaintiff in a Title IX suit could recover damages "for lost income, lost opportunity, fringe benefits, attorney fees, costs and any other non-emotional distress compensatory damages"). Moreover, the Court refuses to conclude at this point that the only type of quantifiable loss of educational opportunities or benefits is lost tuition or scholarship payments.[14]

In *Doe v. Bd. of Regents of the Univ. of Nebraska,* D.Neb. No. 4:20CV3036, 2022 U.S. Dist. LEXIS 148284, at *11 (Aug. 18, 2022), for example, following *Cummings,* a court permitted a Title IX plaintiff to present evidence about "actual financial damages she suffered as a result of leaving" the school. And in *Rullo v. Univ. of Pittsburgh*, W.D.Pa. Civil Action No. 17-1380, 2021 U.S. Dist. LEXIS 29882, at *10

[14] Defendants do not argue that the damages claimed by Plaintiffs is too speculative. Nonetheless, this Court in *Snyder-Hill* noted that losses still "must be established with reasonable certainty." 2026 U.S. Dist. LEXIS 143803, at *11. Even in the absence of an economics expert, Plaintiffs have set forth sufficient evidence to create a genuine issue of material fact with respect to the question of lost earnings. The record provides an adequate factual basis from which a jury could, with reasonable certainty, make a finding of such damages. Reasonable certainty does not mean absolute certainty, and if absolute certainty were required, lost earnings could seldom, if ever, be proven. *Cf. Ohio Environmental Dev. Ltd. Partnership v. Envirotest Sys. Corp.*, 478 F.Supp.2d 963, 975 (N.D.Ohio 2007) (observing that "Reasonable certainty does not mean absolute certainty…").

(Feb. 18, 2021), a court found that the loss of professional opportunities where alleged Title IX violations led Plaintiff to transfer to a lower ranked law school, and therefore lose access to certain caliber of jobs, was recoverable. *See also Montgomery v. D.C*, No. 18-1928, 2022 U.S. Dist. LEXIS 92281 (D.D.C. May 23, 2022) (while the plaintiff could not recover either emotional distress damages in light of *Cummings*, he may be able to recover damages to compensate him for the opportunity as a result of the agency's failures to comply with the statute); *Chaitram v. Penn Medicine-Princeton Med. Ctr.*, D.N.J. Civil Action No. 21-17583, 2022 U.S. Dist. LEXIS 203676 (Nov. 8, 2022) (after *Cummins* a plaintiff asserting a claim under a Spending Clause statute could "state a claim for recovery for compensatory damages under a loss of opportunity theory").

**CONCLUSION**

The Motion should be Denied.

Respectfully submitted,

/s/ Joshua A. Engel

Joshua Adam Engel (OH 0075769)
Scott O'Reilly (OH 0075717)
ENGEL AND MARTIN, LLC
4660 Duke Dr., Suite 101
Mason, OH 45040
(513) 445-9600
engel@engelandmartin.com

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been electronically served via the Court's ECF system this September 14, 2026 upon all counsel of record.

/s/ Joshua Engel
Joshua Engel